# EXHIBIT B

# ASSET PURCHASE AGREEMENT

**Execution Version**

ASSET PURCHASE AGREEMENT


by and among


SCOVILL, INC.,

SCOVILL FASTENERS INC.,

PCI GROUP, INC.,

SCOMEX, INC.,

RAU FASTENER COMPANY, L.L.C.,

and

GLOBAL SFI HOLDINGS, LLC

Exhibits

| | |
|---|---|
| Exhibit A | Form of Bidding Procedures Order |
| Exhibit B | Form of Approval Order |
| Exhibit C | Form of Purchaser Affiliate Guaranty |
| Exhibit D | Base Working Capital Statement |
| Exhibit E | Form of Bill of Sale |
| Exhibit F | Form of Deed |
| Exhibit G | Form of Assignment and Assumption Agreement |

Schedules

| | |
|---|---|
| 1(a)(i) | Real Property |
| 1(a)(ii) | Real Property Leases |
| 1(a)(iii) | Other Leases (Operating) |
| 1(a)(iv) | All Other Contracts, including Contracts Assigned and Contracts Rejected |
| 1(a)(v) | Tangible Personal Property |
| 1(a)(viii) | Intellectual Property |
| 1(a)(xi) | Permits |
| 1(a)(xii) | Warranties Acquired |
| 1(a)(xiv) | Acquired Avoidance Claims |
| 1(b)(xii) | Excluded Real Property Leases |
| 1(b)(xiv) | Certain Excluded Assets |
| 1(c)(viii) | Management Bonuses |
| 2(b) | Cure Costs |
| 5(a)(ii) | Capitalization |
| 5(e) | Consents |
| 5(f) | Brokers |
| 5(g) | Permitted Liens; Condition of Assets and Sufficiency |
| 5(h) | Real Property Leases (Acquired Foreign Subs) |
| 5(i) | Material Intellectual Property |
| 5(j) | Benefit Plans |
| 5(j)(i) | Persons Receiving Retirement Benefits |
| 5(j)(ii) | Employees |
| 5(j)(iii) | Pre-Petition Employee Terminations and Health and Safety |
| 5(j)(iv) | Restrictive Agreements |
| 5(k) | Litigation |
| 5(l) | Compliance with Laws |
| 5(m) | Environmental |
| 5(n) | Financial Statements |

| 5(o)(i) | Material Contracts |
| 5(o)(ii) | Exceptions to Material Contracts Representation |
| 5(p) | Product Liability; Insurance |
| 5(q) | Permits |
| 5(r) | Absence of Changes |
| 5(s)(i) | Suppliers |
| 5(s)(ii) | Customers |
| 8(a) | Operation of Business Prior to Closing |
| 9(h) | No Material Disruption |
| 14(e) | Employment Matters |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April 15, 2011 (the "Agreement Date"), is by and among Scovill, Inc., a Delaware corporation ("Parent"), Scovill Fasteners Inc., a Delaware corporation ("Scovill"), PCI Group, Inc., a Delaware corporation ("PCI"), Scomex, Inc., a Delaware corporation ("Scomex"), and Rau Fastener Company, L.L.C., a Delaware limited liability company ("Rau"), on the one hand, and Global SFI Holdings, LLC, a Delaware limited liability company ("Purchaser"), on the other hand. Parent, Scovill, PCI, Scomex and Rau are sometimes referred to individually as "Seller" and collectively as "Sellers" with respect this Agreement.

## BACKGROUND

Sellers are engaged in the design, manufacture and distribution of closure fasteners and related products for consumer, industrial and military applications (the "Business"). Scovill is a wholly-owned subsidiary of Parent, and each of PCI, Scomex and Rau are wholly-owned subsidiaries of Scovill (collectively, the "U.S. Subs").

Scovill Fasteners (HK) Ltd. ("Scovill HK"), Scovill Fasteners (UK) Ltd. ("Scovill UK") and Scovill Fasteners India Pvt. Ltd. ("Scovill India") are also wholly-owned subsidiaries of Scovill (Scovill HK, Scovill UK and Scovill India are collectively the "Acquired Foreign Subs").

Scovill Europe S.A. ("Scovill Europe") is a wholly-owned subsidiary of Scovill; Scovill Europe has a branch office in the United Kingdom ("UK Branch"); Scovill Fasteners France, S.A. ("Scovill France") is a wholly-owned subsidiary of Scovill Europe; Scovill Fasteners, S.A. de C.V. ("Scovill Mexico") is a wholly-owned subsidiary of Scomex; Scovill Canada Inc. is a wholly-owned subsidiary of Rau ("Scovill Canada"); and Scovill Schenzhen ("Scovill China") is a wholly-owned subsidiary of Scovill Hong Kong (Scovill France, Scovill Belgium, UK Branch, Scovill Mexico, Scovill Canada and Scovill China are collectively the "Non-Acquired Foreign Subsidiaries" and, together with the Acquired Foreign Subs, the "Foreign Subs").

Sellers desire to sell to Purchaser, and Purchaser desires to purchase from Sellers, substantially all the assets used by Sellers in the Business, including all of the equity interests of the Acquired Foreign Subs, pursuant to the terms and conditions hereinafter set forth, free and clear of liens, interests and claims, charges, security interests, options, mortgages, and monetary encumbrances (collectively, "Liens"), pursuant to Sections 363 and 365 of the United States Bankruptcy Code (the "Bankruptcy Code"). Accordingly, Sellers, promptly following the execution of this Agreement, will file bankruptcy petitions (collectively, the "Petition") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") and seek joint administration of their bankruptcy cases (the "Bankruptcy Case").

Notwithstanding the foregoing, Purchaser shall elect either to purchase the assets and liabilities of Scovill HK (excluding Scovill HK's equity interests in Scovill China), or purchase the equity interests of Scovill HK (after Sellers have caused Scovill HK to transfer the equity interests of Scovill China to Scovill).

Sellers shall file a motion with the Bankruptcy Court as soon as reasonably practicable after the date on which the Petition is filed (such date, the "Petition Date"), and no later than two (2) Business Days (as hereinafter defined) thereafter, requesting (i) the entry of an order by the Bankruptcy Court approving procedures pursuant to which interested and qualified parties can bid on the assets prior to and at such auction (which procedures shall establish a bid submission deadline (the "Bid Submission Deadline") that is no later than May 27, 2011, and an auction date that is no later than five (5) days after the Bid Submission Deadline), such procedures and order to be substantially in the form set forth as Exhibit A to this Agreement (such order, the "Bidding Procedures Order") and (ii) an order by the Bankruptcy Court approving this Agreement and setting a hearing date at which, if there is no higher and better offer made prior to or at the auction described in the Bidding Procedures Order, an order authorizing the sale of substantially all of the assets of the Business to Purchaser and containing a finding that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code may be entered, such order to be substantially in the form set forth as Exhibit B (such order, the "Approval Order" and such motion, the "Bidding Procedures and Sale Motion"). For purposes hereof, "Business Day" means any day on which national banks in New York, New York are open for business.

To ensure Purchaser performs its obligations set forth in this Agreement, Purchaser's affiliate, Global Equity Capital, LLC, a Delaware limited liability company ("Global"), Purchaser has caused Global to deliver to Sellers, as of the Agreement Date, a guaranty in the form attached hereto as Exhibit C (the "Purchaser Affiliate Guaranty") duly executed by Global.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, the mutual agreements, covenants, representations and warranties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereinafter set forth, the parties agree as follows:

1.    Sale and Purchase of Certain Assets.

    a.    Acquired Assets.  Subject to the terms and conditions contained in this Agreement, at the Closing (as defined in Section 3(a)), Sellers shall sell to Purchaser, and Purchaser shall purchase from Sellers, for the consideration set forth in Section 2, all of Sellers' right, title and interest, as of the Closing Date (as defined in Section 3(a)), in and to all of the assets, properties and rights of Sellers used in or related to the conduct of the Business, wherever located, as the same shall exist on the Closing Date (the "Acquired Assets"), free and clear of Liens, except for Permitted Liens (as defined in Section 5(g)), but excluding those certain assets that constitute Excluded Assets (as defined in Section 1(b)), and including the following:

        (i)    the real property owned by Sellers, including the real property described on Schedule 1(a)(i), and all buildings, structures, fixtures and improvements owned by Sellers and located on such real property, and all privileges, rights, easements and appurtenances belonging to or for the benefit of such real property, but in all events only to the extent, if any, of Sellers' interest in the same (the "Real Property");

- 2 -

(ii)    the real estate leases pursuant to which one or more Sellers is lessee, including the lease set forth on Schedule 1(a)(ii) (the "Real Property Leases") (the premises which are leased or subleased pursuant to the Real Property Leases are herein collectively referred to as the "Leased Real Property");

(iii)    the other leases identified pursuant to which one or more Sellers is lessee, including those other leases set forth on Schedule 1(a)(iii) (the "Other Leases");

(iv)    the Contracts (other than the Real Property Leases and the Other Leases) identified on Schedule 1(a)(iv) or identified by Purchaser to Seller in writing after the Agreement Date in accordance with Sections 2(b) and 8(h)(i), and any other Contracts (other than the Real Property Leases and the Other Leases) entered into by Sellers after the date hereof, subject to Purchaser's right hereunder to remove any such Contracts from the Acquired Assets (all such Contracts other than the Real Property Leases and the Other Leases, the "Other Contracts"), with the term "Contracts" meaning, for purposes of this Agreement, any agreements, contracts, commitments, purchase and sale orders, and distribution and licensing agreements, whether oral or written, to which any Seller is a party;

(v)    the personal property, furniture, machinery, equipment, tools, computers, terminals, computer equipment, office equipment, hardware, business machines, telephones and telephone systems, parts, accessories owned by Seller, and all assignable warranties of third parties with respect thereto, and all motor vehicles, trucks, forklifts and other rolling stock owned by Seller, and all assignable warranties of third parties with respect thereto, including all of such set forth on Schedule 1(a)(v) (collectively, the "Tangible Personal Property");

(vi)    the inventory, wherever located, which is owned by Sellers as of the Closing Date, including all finished goods, work in process, raw materials, parts, and all other materials and supplies to be used or consumed by Seller in the production of finished goods, together with all rights of Sellers against suppliers of inventory, including the right of any Seller to receive refunds or rebates in connection with its purchase of such Inventory (the "Inventory");

(vii)    the accounts receivable of Sellers, including trade and miscellaneous accounts receivable from the Foreign Subs to Sellers, recorded on the Books and Records (as defined in Section 1(a)(x)) of Sellers as an asset at the Effective Time (as defined in Section 3(a)) (collectively, the "Accounts Receivable");

(viii)    all (A) trade secrets, know-how, inventions, formulae and processes, whether trade secrets or not, (B) trade names, trademarks, service names, service marks, logos, assumed names, internet domain names, URL addresses, brand names and all registrations and applications therefor, together with the goodwill of the Business symbolized thereby, (C) copyrights, registered and unregistered, and any registrations and applications therefor, (D) subject to receipt of third party consent, if applicable, technology rights and licenses not otherwise embodied in an Other Contract, and (E) subject to third party consent, if applicable, computer software and any similar type of proprietary intellectual property rights, in each case, which is owned or licensed (subject to third party consent, if applicable) by Sellers

- 3 -

and used or held for use in the Business, including all of such set forth on <u>Schedule 1(a)(viii)</u> (the "<u>Intellectual Property</u>");

(ix)    subject to Purchaser's election in accordance with Section 8(h)(v), all of the shares or other equity interests of Scovill in the Acquired Foreign Subs;

(x)    the existing data, data bases, books, records, correspondence, business plans and projections, records of sales and purchases, customer and vendor lists, files, papers, website content, email archives, and, to the extent permitted under applicable law or regulation, historical personnel payroll and medical records of each employee of any Seller in the possession of such Seller and related to the Business, including employment applications, corrective action reports, disciplinary reports, notices of transfer, notices of rate changes, other similar documents, and any summaries of such documents regularly prepared by any Seller and related to the Business; all reported medical claims made for each of the employees of the Business; and all manuals and printed instructions of any Seller relating to the Acquired Assets (the "<u>Books and Records</u>"), provided, that Sellers may retain copies of Books and Records required for administration of the Bankruptcy Case, its rights and obligations hereunder and for any other reasonable purpose, including the preparation of tax returns;

(xi)    to the extent transferable under applicable law, including the Approval Order (as defined in Section 8(f)) and the Bankruptcy Code, the permits, licenses, franchises, certificates, consents, and other governmental or quasi-governmental authorizations of Sellers, or necessary or material to own, use or operate the Acquired Assets (other than qualifications of Sellers to do business as a foreign corporation), and all pending applications therefor and renewals thereof, including those identified on <u>Schedule 1(a)(xi)</u> (the "<u>Permits</u>");

(xii)    claims and causes of action arising under warranties for the Tangible Personal Property and the Real Property, for enforcement of rights under Intellectual Property, the Real Property Leases, Other Leases and the Other Contracts, including those set forth on <u>Schedule 1(a)(xii)</u>;

(xiii)    all those expenses prepaid in cash and recorded as current assets on the Books and Records of the Company and that are not Excluded Assets;

(xiv)    all avoidance claims permitted under the Bankruptcy Code, if any, against the Persons (as hereinafter defined) listed on <u>Schedule 1(a)(xiv)</u>; for purposes hereof, "<u>Person</u>" means a natural person or any legal, commercial or governmental entity, including a corporation, general partnership, joint venture, limited partnership, limited liability company, limited liability partnership, trust, business association, group acting in concert, or any person acting in a representative capacity; and

(xv)    the restricted cash held by SunTrust by SunTrust Bank, Northeast Georgia N.A. (or its successor,), as Trustee as set forth in the Trust Agreement for Post-Closure Care dated September 19, 1996 between Scovill and the Trustee (the "<u>Restricted Cash</u>").

The parties shall work together in good faith to transfer to Purchaser any other assets (that are not Excluded Assets) used in the operation of the Business but were inadvertently omitted from the foregoing descriptions of Acquired Assets and the related Schedules.

        b.     <u>Excluded Assets</u>. No Seller shall sell hereunder, Purchaser shall not purchase or acquire any right, title or interest of any Seller in or to, and the Acquired Assets shall not include, any asset, right, interest or privilege specifically identified in this Section 1(b) (the "<u>Excluded Assets</u>"), consisting of:

        (i)     any and all cash on hand of Sellers and the Acquired Foreign Subs (excluding the Restricted Cash) as of the Effective Time, including Accounts Receivable collected prior to the Effective Time;

        (ii)     any and all bank accounts and lock boxes;

        (iii)     the corporate franchise and stock record books, corporate seals, corporate record books of Sellers and Non-Acquired Foreign Subs, containing minutes of meetings of directors, stockholders, managers or members, as applicable, tax returns and records, such other records having to do with each Seller's and each Non-Acquired Foreign Sub's organization or stock capitalization, including all of the issued and outstanding capital stock and membership interests, as applicable, of Sellers and the Non-Acquired Foreign Subs (collectively, the ("<u>Corporate Records and Shares</u>");

        (iv)     other than the avoidance actions described in Section 1(a)(xiv), any and all claims and causes of action of any Seller arising under Chapter 5 of the Bankruptcy Code, including Sections 541, 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or under comparable state law provisions;

        (v)     any and all policies of insurance related to the Business, and any and all rights of Sellers under such policies, including premium rebates, premium prepayments, refunds, proceeds, claims and causes of action with respect to or arising out of such policies;

        (vi)     any and all tax deposits or rights to any claims of Sellers for any federal, state, local or foreign tax refund;

        (vii)     other than the claims and causes of action described in Section 1(a)(xii) and Section 1(a)(xiv), whether or not filed, any and all causes of action, including any causes of action arising as a result of the commencement of the Bankruptcy Case, whether pursuant to the Bankruptcy Code or otherwise, and including all proceeds arising therefrom, to the extent related to activities or time periods prior to the Closing Date;

        (viii)     subject to any Purchaser obligation in connection with Section 4980B of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), any and all rights and assets related to any of Sellers' Benefit Plans (as defined in Section 14(e)(iv));

        (ix)     any and all intercompany receivables, other than those payable by the Acquired Foreign Subs to Sellers;

(x)    any and all assets and properties used in the Business which have been disposed of or terminated since the date of this Agreement, provided such disposition or termination, as applicable, has been made in accordance with the terms hereof and the applicable governing documents and in the ordinary course of business;

(xi)    any and all projections, descriptive brochures or other sales-related documentation prepared in connection with the offering of the Acquired Assets contemplated by the Bidding Procedures, except that Purchaser shall acquire the right to enforce any confidentiality provisions thereof that benefit Sellers;

(xii)    any and all subleases pursuant to which one or more Sellers is sublessor, including those subleases set forth on Schedule 1(b)(xii) (the "Real Property Leases") (the premises which are leased or subleased pursuant to the Real Property Leases are herein collectively referred to as the "Leased Real Property");

(xiii)    all shares and any other equity interests in and to Scovill China;

(xiv)    the assets, properties and rights specifically listed and described on Schedule 1(b)(xiv); and

(xv)    any and all of Sellers' rights which accrue or will accrue under this Agreement, including all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms hereof.

c.    Assumed Liabilities.  Subject to Section 1(d), as of the Effective Time, Purchaser shall assume and pay, perform, discharge and have responsibility for the performance and satisfaction of only the following liabilities of Sellers (collectively, the "Assumed Liabilities"):

(i)    any and all of the executory obligations and liabilities of Sellers arising after the Petition Date pursuant to the terms of the Real Property Leases, the Other Leases and the Other Contracts assumed and assigned by Sellers to Purchaser as provided for in Sections 1(a)(ii), 1(a)(iii) and 1(a)(iv) (the "Executory Obligations");

(ii)    any and all post-Petition accounts payable of Sellers, including trade accounts payable incurred after the Petition Date but unpaid as of the Closing Date, so long as such payables are no more than sixty (60) days outstanding from the invoice date (the "Accounts Payable");

(iii)    any and all post-Petition expenses of Sellers, incurred after the Petition Date in the ordinary course of business but not paid prior to the Closing Date, for goods and services acquired or performed in the ordinary course of business and all related taxes (excluding income taxes and any expenses incurred with respect to fees to professionals, the retention of which have been approved by the Bankruptcy Court, the United States Trustee fees incurred in the Bankruptcy Case which would qualify as administrative priority expenses under Section 503(b) of the Bankruptcy Code, and expenses arising from the Agreements Concerning

- 6 -

Incentive Arrangements dated March 17, 2011 (the "Incentive Arrangements"), or investment banking fees and related expenses) (the "Accrued Expenses");

(iv)   any and all post-Petition rebates Sellers owe to third parties, incurred in the ordinary course of business after the Petition Date but not paid prior to Closing, arising out of the ordinary course of the Business, to the extent disclosed and accrued for in the calculation of Working Capital;

(v)   any and all post-Petition charge-backs for damaged goods, incurred in the ordinary course of business after the Petition Date but not paid prior to Closing, arising out of the ordinary course of the Business to the extent disclosed and accrued for in calculation of Working Capital;

(vi)   the accrued deferred obligation to Ti Tong Products Ltd. ("Ti Tong") arising out of the prepaid royalty in connection with the Trademark License and Supply Agreement dated as of September 29, 2009 between Fasteners and Ti Tong, which equals One Million Three Hundred Seventy Five Thousand Dollars ($1,375,000) as of the Agreement Date;

(vii)   any and all pre-Petition and post-Petition unused vacation of the Hired Employees (as defined in Section 14(e)) incurred in the ordinary course of business but not paid used by the Hired Employees prior to Closing (the "Unused Vacation");

(viii)   any and all pre-Petition bonus obligations to certain management employees as set forth on Schedule 1(c)(viii) (the "Management Bonuses"); and

(ix)   any and all post-Petition payroll obligations to the Hired Employees and related payroll taxes incurred in the ordinary course of business after the Petition Date but not paid prior to Closing (the "Payroll Obligations").

For the avoidance of doubt, the Assumed Liabilities shall not include any indebtedness owed to the Lenders (as hereinafter defined) whether or not recorded as a liability on the Books and Records of Sellers.  For purposes hereof "Lenders" means, collectively, those Lenders as set forth in the Credit Agreement dated February 2, 2004 by and between Scovill, as borrower, Parent, Rau, Scomex, PCI, as credit parties, General Electric Capital Corporation, as Agent and Lender, and UPS Capital Corporation, as Lender, as amended, and any of such Lenders' successors, assigns and transferees (the "Senior Lenders"); the Term Loan Agreement dated December 23, 2005 by and between Scovill, Rau, PCI and Scomex and GSCP Recovery, Inc., GSC Recovery II, L.P. and GSC Recovery IIA, L.P., as amended, and any of such Lenders' successors, assigns and transferees; and the Third Amended and Restated Loan and Security Agreement dated February 2, 2004 by and between Scovill, Rau and Scomex and GSCP Recovery, Inc., GSC Recovery II, L.P. and GSC Recovery IIA, L.P, as amended, and any of such Lenders' successors, assigns and transferees.

d.   Excluded Liabilities.  Purchaser shall not assume or become liable for any obligations, commitments or liabilities of Sellers or any affiliate of Sellers, whether known or unknown, absolute, contingent or otherwise, and whether or not related to the Acquired Assets,

except for the Assumed Liabilities (the obligations and liabilities of Sellers and their affiliates not assumed by Purchaser are hereinafter referred to as the "Excluded Liabilities"), including, and whether pre-Petition or post-Petition, any liabilities for income taxes, breach of contract, accrued but unpaid employee compensation not included in the Assumed Liabilities, liabilities for employee benefits (subject to any Purchaser obligation in connection with Section 4980B of the Code), indebtedness of Sellers, liabilities and obligations arising under Environmental Laws (as defined in Section 5(m)) or regulations prior to the Effective Time, any amount due from a Seller to an Acquired Foreign Sub, whether incurred pre-Petition or post-Petition; and post-Petition trade payables more than sixty (60) days outstanding from the invoice date.  For the avoidance of doubt, Purchaser shall not assume or become liable for any obligations, commitments or liabilities of Sellers or any affiliate of Sellers set forth in the Incentive Arrangements

      2.    Purchase Price.

      a.    Purchase Price for Acquired Assets.  The total consideration to be paid by Purchaser for the Acquired Assets (the "Purchase Price") shall be an amount equal to (i) Seventeen Million Dollars ($17,000,000) (the "Business Value"), plus (ii) the Purchaser's Total Cure Costs (as defined in Section 2(b)), if any, and, plus or minus, as the case may be, (iii) the difference between the Base Working Capital (as defined in Section 2(c)) and the Working Capital as of the Effective Time (the "Change in Working Capital"); provided however, if the Change in Working Capital, either positive or negative, is greater than $2,000,000 (the "Maximum Amount"), then the Change in Working Capital shall be deemed equal to the Maximum Amount; and, in addition, Purchaser shall assume the Assumed Liabilities.

      b.    Cure Costs.  "Cure Costs" means all cure amounts which the Bankruptcy Court orders to be paid as a condition to Sellers' assumption of and assignment to Purchaser of the Assumed Contracts (as defined in Section 8(h)(i)).  Purchaser shall be responsible for the Cure Costs set forth on Schedule 2(b) as of the Agreement Date (the "Purchaser's Agreement Date Cure Costs").  If the Cure Costs for the Assumed Contracts set forth on Schedule 2(b) as of the Agreement Date are higher than as set forth on Schedule 2(b) as of the Agreement Date, then Sellers shall be responsible for the difference between the Cure Costs and Purchaser's Agreement Date Cure Costs.  In the event Purchaser, after the Agreement Date, notifies Sellers that it would like to add Contracts to Schedule 2(b) pursuant to Section 8(h)(i), Purchaser shall be responsible for all Cure Costs for such additional Contracts (together with the Purchaser's Agreement Date Cure Costs, the "Purchaser's Total Cure Costs").

      c.    Definitions.

For purposes of this Agreement:

      (i)    "Working Capital" means, as of a certain date, the difference between (X) the WC Assets (as hereinafter defined), and (Y) the WC Liabilities (as hereinafter defined), which may be a positive or negative number.

(ii)    "WC Assets" means the sum of (A) consolidated accounts receivable, plus (B) product inventory, plus (C) transferred prepaid/deposits; utilities/other, all as set forth on Exhibit D.

(iii)    "WC Liabilities" means the sum of (A) consolidated accounts payable, plus (B) the total Ti Tong unearned royalty, and (C) the Payroll Obligations, all as set forth on Exhibit D.

(iv)    "Adjusted GAAP" shall mean generally accepted accounting principles as applied in the United States ("GAAP") applied consistently with the Sellers' past practice except for the valuation of Inventory. Inventory shall be valued using the Average Actual Costing Method in accordance with GAAP.

(v)    "Base Working Capital" means Nine Million Six Hundred Seventy Five Thousand Dollars ($9,675,000).

d.    Calculations. All calculations of Working Capital shall be calculated consistently with the Base Working Capital Statement attached as Exhibit D; provided, however, the parties acknowledge and agree that the calculation of Base Working Capital as set forth on Exhibit D does not take into account the Payroll Obligations, but the calculation of Working Capital as of the Effective Time shall take into account the change in Payroll Obligations from the Petition Date until the Effective Time. The determination of any amounts that constitute any portion of Working Capital shall be determined in accordance with Adjusted GAAP, and other than set forth in the definition of Adjusted GAAP applied consistently with past practices of Sellers, and as set forth in Exhibit D.

e.    The Deposit.

(i)    Upon the execution of this Agreement, Purchaser shall deposit with Alston & Bird LLP, counsel for Sellers ("Sellers' Counsel") cash in immediately available funds by wire transfer to an account designated by Sellers' Counsel, in an amount equal to One Million Dollars ($1,000,000) (the "Deposit"), to be held in escrow in an interest bearing account by Sellers' Counsel until the earlier of (A) the Closing, and (B) the termination of this Agreement as set forth in Section 12, such interest being accrued at the actual rate of interest on the escrow account Sellers' Counsel maintains for the Deposit (the "Rate").

(ii)    At the Closing, the Deposit (and interest accrued thereon, if any) shall be credited and applied toward the Purchase Price.

(iii)    Except as set forth in Section 2(e)(iv), if this Agreement shall be terminated pursuant to Section 12, then Sellers' Counsel shall return the Deposit (and interest accrued thereon, if any) to Purchaser, within three (3) Business Days of Sellers' Counsel's receipt of Purchaser's written request therefor.

(iv)    If this Agreement has been terminated by Sellers pursuant to (A) Section 12(a)(iv) as a result of the failure of any condition set forth in Section 10 to be satisfied on or prior to the Closing Date exclusively by reason of any breach by Purchaser of an

- 9 -

obligation hereunder, or (B) Section 12(a)(vi)(B), then Sellers' Counsel shall, as soon as reasonably practicable after such termination, disburse the Deposit (and interest accrued thereon, if any) to Sellers, to be retained by Sellers for their own account.

      f.    Payment of the Purchase Price.

      (i)    At least two (2) Business Days prior to the Closing Date, Sellers shall deliver to Purchaser a certificate setting forth Sellers' good faith computation of the difference between (A) the Base Working Capital, and (B) the Working Capital as of the Effective Time (the "Estimated Change in Working Capital").

      (ii)    On the Closing Date:

      (A)    Sellers' Counsel shall transfer the Deposit, and all interest accrued thereon at the Rate through the day immediately preceding the Closing Date (the "Deposit Balance"), to Sellers;

      (B)    Purchaser shall pay Sellers (I) the Business Value, less an amount equal to the Deposit Balance, plus or minus, as the case may be, (II) the Estimated Change in Working Capital (the sum of (I) and (II), the "Closing Date Cash Consideration");

      (C)    Purchaser shall transfer to Sellers the Purchaser's Cure Costs, if any, to be held by Sellers in trust, and promptly after receipt thereof, Sellers shall pay the applicable amounts, on behalf of Purchaser, to the applicable parties by corporate check or wire transfer of immediately available funds; and

      (D)    Sellers shall pay the Sellers' Cure Cost Payments, if any, to the applicable parties by corporate check or wire transfer of immediately available funds.

      (ii)    No later than sixty (60) days after the Closing Date, Purchaser shall cause to be prepared and delivered, at its sole cost and expense, to Sellers a certificate, duly executed by an authorized officer of Purchaser, setting forth in reasonable detail Purchaser's good faith computation of the difference between (A) the Base Working Capital and (B) the Working Capital as of the Effective Time ("Purchaser's Calculation of Change in Working Capital") (provided however, if Purchaser's Calculation of Change in Working Capital is greater than the Maximum Amount, then Purchaser's Calculation of Change in Working Capital shall be deemed equal to the Maximum Amount). Purchaser's certificate shall include reasonable supporting documentation, all reasonably acceptable to Sellers. Within fifteen (15) days of Sellers' receipt of Purchaser's certificate, Sellers shall provide written notice to Purchaser of Sellers' agreement or disagreement with Purchaser's certificate. If Sellers agree with Purchaser's certificate and Purchaser's Calculation of Change in Working Capital is a positive number, Purchaser shall pay Sellers such amount within five (5) days of Purchaser's receipt of such notice. If Sellers agree with Purchaser's certificate and Purchaser's Calculation of Change in Working Capital is negative, Sellers shall pay Purchaser the difference within five (5) days of Purchaser's receipt of such notice. In either case, the payment shall be deemed the "Final Adjustment".

(iii)    If Sellers dispute Purchaser's certificate, Sellers and Purchaser shall work together in good faith to resolve the dispute.  If the parties are unable to resolve the dispute within fifteen (15) days of the date of Sellers' notice, then the dispute shall be referred to an independent national accounting firm (the "Independent Accountant") jointly selected by the parties or, if the parties cannot agree, selected by the Bankruptcy Court.  Each party shall sign any reasonable engagement letter requested by the Independent Accountant and shall require the Independent Accountant to make a written determination within thirty (30) days of submission by each party of the remaining issues in dispute, including a determination as to the Independent Accountant's calculation of the Final Adjustment.  Once the parties have received the Independent Accountants' determination, such determination shall be final and binding on the parties, and the Final Adjustment shall be paid as if the parties had reached agreement initially per Section 2(f)(ii).  The fees and expenses of the Independent Accountant shall be borne between Sellers, on the one hand, and Purchaser, on the other hand, in accordance with the Independent Accountant's assessment of the relative merits of each party's arguments submitted to the Independent Accountant, and such assessment shall be set forth in the Independent Accountant's determination.  For example, if it is Purchaser's position that the payment owed is $100, Sellers' position that the payment owed is $300 and the Independent Accountants' finding that the payment owed is $250, then Purchaser shall pay seventy-five percent (75%) (i.e., (250-100/300-100) of the Accountants' fees and expenses and Sellers shall pay twenty-five percent (25%) (i.e., (300-250/300-100)) of the Accountants' fees and expenses.

3.    Closing.

a.    Closing; Location; Closing Date; Effective Time.  The closing of the purchase and sale of the Acquired Assets, and the consummation of the other transactions contemplated by this Agreement (the "Closing"), shall take place within three (3) Business Days after the Bankruptcy Court's entry of the Approval Order, but only after the satisfaction or waiver of the conditions set forth in Sections 9 and 10, at the offices of Alston & Bird LLP located at 1201 West Peachtree Street, Atlanta, Georgia, 30309, or at such other location as the parties may mutually agree in writing; provided, however, that such date may be extended upon the mutual written agreement of Sellers and Purchaser.  The date on which the Closing actually occurs, or is deemed to have occurred, is herein referred to as the "Closing Date".  At the Closing, all of the transactions contemplated by this Agreement shall be deemed to occur simultaneously and shall become effective as of 12:01 a.m. Eastern Standard Time on the Closing Date (the "Effective Time").

b.    Transfer Taxes and Expenses.  In the event that any (i) real estate transfer taxes or similar taxes or charges are required to be paid in order to record the deed to be delivered to Purchaser hereunder in accordance herewith, or in the event any such taxes are assessed at any time thereafter, or (ii) sales, use, transfer or other similar taxes or charges are assessed at the Closing or at any time thereafter on the transfer of any of the Acquired Assets, then in each instance such taxes or charges incurred shall be borne by Purchaser.  The parties shall cooperate to the extent reasonably necessary to make such filings or returns as may be required.

c.    Allocation of Purchase Price.  Purchaser and Sellers agree that the Purchase Price (as adjusted) shall be allocated in accordance with Section 1060 of the Code.

- 11 -

Purchaser and Sellers shall each file U.S. Internal Revenue Service Form 8594 (Acquisition Statement under Code Section 1060) and all other federal, state, local and foreign tax returns in accordance with applicable law, including Section 1060 of the Code.  Sellers shall provide Purchaser at least ten (10) days notice prior to the filing of any such returns and the opportunity to review any such returns prior to the filing date.

> 4.    "AS IS, WHERE IS".

PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER AND ITS REPRESENTATIVES HAVE THE EXPERIENCE AND KNOWLEDGE TO EVALUATE THE BUSINESS AND THE ACQUIRED ASSETS, THAT PURCHASER AND ITS REPRESENTATIVES, BEFORE THE AGREEMENT DATE, HAVE HAD ACCESS TO SUCH INFORMATION AND DOCUMENTS RELATING TO THE BUSINESS AND TO SUCH OF THE ACQUIRED ASSETS AS PURCHASER AND ITS REPRESENTATIVES HAVE REQUESTED TO SEE AND/OR REVIEW, AND THAT, IN DETERMINING TO ACQUIRE THE ACQUIRED ASSETS, PURCHASER HAS MADE ITS OWN INVESTIGATION INTO THE BUSINESS AND THE REQUIRED ASSETS, AND, BASED THEREON, PURCHASER HAS MADE ITS OWN INDEPENDENT JUDGMENT CONCERNING THE PURCHASE OF THE BUSINESS AND THE ACQUIRED ASSETS.  IT IS THEREFORE EXPRESSLY UNDERSTOOD AND AGREED THAT PURCHASER ACCEPTS THE CONDITION OF THE BUSINESS AND THE ACQUIRED ASSETS "AS IS," "WHERE IS" AND "WITH ALL FAULTS" WITHOUT ANY IMPLIED REPRESENTATION, WARRANTY OR GUARANTEE AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, PROSPECTS FOR THE BUSINESS OR OTHERWISE, OR AS TO THE CONDITION OF THE BUSINESS OR THE ACQUIRED ASSETS, OR AS TO THE CONDITION, SIZE, EXTENT, QUANTITY, TYPE OR VALUE OF SUCH PROPERTY, AND SELLERS HEREBY EXPRESSLY DISCLAIM ANY AND ALL SUCH IMPLIED REPRESENTATIONS, WARRANTIES OR GUARANTEES, INCLUDING ANY REPRESENTATIONS THAT THE ACQUIRED ASSETS ARE ALL THE ASSETS NECESSARY FOR PURCHASER TO ENGAGE IN THE BUSINESS.  **FOR THE AVOIDANCE OF DOUBT, NO REPRESENTATION OR WARRANTY OF SELLERS SET FORTH HEREIN OR IN ANY IF THE OTHER DOCUMENTS SHALL SURVIVE THE CLOSING.**

> 5.    Sellers' Representations.    Each Seller for itself hereby represents and warrants to Purchaser, as of the Agreement Date, the following:

>> a.    Incorporation; Capitalization.

>>> (i)    As applicable, Parent, Scovill, PCI, Scomex and Rau are each either a corporation or a limited liability company under the laws of the State of Delaware. Scovill is validly existing and in good standing in the State of Delaware.  Scovill is duly qualified to do business as a foreign corporation in the State of Georgia.  Scovill HK is a private company having a share capital incorporated under the laws of Hong Kong.  Scovill UK is a limited company incorporated under English law and has been in continuous existence since incorporation, and Scovill UK is not dormant within the meaning of Section 1169 of the

Companies Act 2006. According to the website of the Ministry of Corporate Affairs, Scovill India is an "active" private limited company organized in India.

(ii)    Schedule 5(a)(ii) lists and describes the equity ownership of record of each Acquired Foreign Sub. Except as set forth on Schedule 5(a)(ii), all the outstanding shares of capital stock of, or other ownership interests in, each of the Acquired Foreign Subs are validly issued, fully paid and non-assessable and are owned beneficially and of record by a Seller, directly or indirectly, free and clear of all Liens. Except as set forth on Schedule 5(a)(ii), none of the Acquired Foreign Subs, directly or indirectly, own any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity or similar interest in, any corporation, partnership, joint venture or other business association or entity. There is no outstanding subscription, option, warrant, call, right, or other agreement or commitment obligating any Acquired Foreign Sub to issue, sell, deliver, or transfer (including any right of conversion or exchange under any outstanding security or other instrument) any security or other evidence of any ownership interest such Acquired Foreign Sub. There does not exist any agreement with respect to payment of or restricting payment of dividends or other distributions by, or with respect to the voting of capital stock or other equity interests in, any Acquired Foreign Sub, other than as may be set forth in organizational documents made available to Buyer or under applicable law.

b.    Authorization.    Subject to and conditioned upon the entry and effectiveness of the Approval Order, Seller has the power and authority necessary to enter into and perform its obligations under this Agreement and the other documents and instruments referred to in this Agreement (the "Other Documents") to which it is a party, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Other Documents to which it is a party have been approved by all necessary action of the board of directors or members of Seller, as applicable. This Agreement has been, and the Other Documents to which Seller is a party will be, executed and delivered by duly authorized officers of Seller.

c.    Binding Obligation.    Subject to obtaining the Approval Order, this Agreement and the Other Documents to which Seller is a party, when executed and delivered by such Seller, will constitute legal, valid and binding obligations of such Seller in accordance with their respective terms, except to the extent that the enforcement thereof may be limited by bankruptcy, reorganization, insolvency or similar laws of general applicability governing the enforcement of the rights of creditors or by general principles of equity (regardless of whether considered in a proceeding at law or in equity).

d.    Validity of Contemplated Transactions; Restrictions.    The execution, delivery and performance of this Agreement by Seller and the Other Documents to which Seller is a party, and the consummation of the transactions contemplated hereby and thereby, will not (i) violate any provision of the Certificate of Incorporation, Bylaws or Operating Agreement, as applicable, of such Seller, or (ii) subject to obtaining the Approval Order, result in a violation by such Seller of any law or Order (as hereinafter defined) of any Governmental Authority (as hereinafter defined) to which such Seller is subject or by which its assets are bound. For purposes hereof, "Order" means any decree, injunction, judgment, order, ruling, writ, quasi-judicial decision or award or decision or award of any federal, state, local, foreign or other court,

- 13 -

arbitrator, mediator, tribunal, administrative agency or Governmental Authority to which any Person is a party or that is or may be binding on any Person or its securities, assets or business. For purposes hereof, "Governmental Authority" means any federal, state, county, local, foreign or other governmental, public or regulatory agencies, authorities (including self-regulatory authorities), instrumentalities, commissions, boards or bodies having jurisdiction over the applicable party.

   e. Consents and Approvals. Except for all applicable approvals of the Bankruptcy Court and except as set forth on Schedule 5(e), no consent, approval, authorization, declaration, filing or registration with any Governmental Authority, or any other Person, is required to be made or obtained by Seller in connection with the execution, delivery and performance by Seller of this Agreement and the Other Documents to which it is a party or the consummation of the transactions contemplated hereby and thereby.  Except as set forth on Schedule 5(e), none of the execution and delivery by Seller of this Agreement, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any breach, violation of or default under (with or without notice or lapse of time, or both), result in the creation of any Lien, or give rise to a right of acceleration, termination or cancellation under any provision of, subject to entry of the Approval Order, any Contract to which such Seller is a party or by which any of the properties or assets of such Seller is bound.

   f. Brokers and Finders. Except as set forth on Schedule 5(f), Sellers have not incurred any liability to any party for any brokerage fees, agent's commissions or finder's fees in connection with the sale of the Acquired Assets.  No such fees shall be Assumed Liabilities.

   g. Purchased Assets. Subject to the entry of the Approval Order, on the Closing Date, Purchaser will acquire all of Sellers' right, title and interest in the Acquired Assets, free and clear of all Liens, other than Liens described on Schedule 5(g) ("Permitted Liens"), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  Except as set forth on Schedule 5(g), the Real Property and Tangible Personal Property are in all material respects in good operating condition (normal wear and tear excepted) and are fit in all material respects for use in the ordinary course of business.  Except as described on Schedule 5(g), the Acquired Assets comprise all of the material assets, properties and rights of every type and description, real, personal, tangible and intangible (other than the Excluded Assets) held or used by Sellers and the Acquired Foreign Subs in conducting the Business as conducted as of the Agreement Date.

   h. Real Property.

   (i) Scovill (a) has good and marketable fee simple title to each item of owned Real Property, subject to (i) all restrictions, easements, encumbrances, Liens and other information set forth or described in the Title Commitment dated January 18, 2011 issued by Fidelity National Title Insurance Company (such Title Commitment, the "Title Commitment", and such foregoing items set forth or identified therein, the "Title Commitment Restrictions") and (ii) all applicable zoning laws (collectively, with the Title Commitment Restrictions, the "Real Property Restrictions"), and (b) as of the Closing Date will convey good and marketable

- 14 -

fee simple title to each item of owned Real Property, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code, free and clear of all Liens except Permitted Liens. Sellers have provided to Purchaser a true and correct copy of the Title Commitment. Subject to the Real Property Restrictions, to the Knowledge of Sellers (as defined in Section 15(l)), the use of the Real Property for the purposes to which it is presently being used is permitted as of right under all applicable material zoning laws and is not subject to material "permitted nonconforming" use or structure classifications. To the Knowledge of Sellers, and subject to the Real Property Restrictions, no Seller has received any notice that any improvements situated in whole or in part at the Real Property are not in material compliance with applicable laws, and, all such improvements are in all material respects in good repair and condition, ordinary wear and tear excepted, and are adequate in all material respects for the purposes for which they are being used.

(ii)    With respect to the Real Property Leases:

(A)    Sellers have made available to Purchaser accurate and complete copies of the Real Property Leases, together with any amendments, modifications and assignments of such Real Property Leases, pursuant to which Real Property Leases the applicable Seller holds a leasehold interest in the Leased Real Property described therein;

(B)    The applicable Seller has the rights provided in the Real Property Leases to be assumed by Purchaser hereunder and the leasehold interests created thereby;

(C)    The current use, occupancy and operation of the Leased Real Property under the Real Property Leases by the applicable Sellers are not in material violation of any material applicable Permit or zoning, use, subdivision or similar applicable law.

(D)    Seller has not received written notice that any of the improvements located on the Leased Real Property are not presently used and operated in material compliance with (I) all Permits or (II) material covenants, easements and restrictions affecting such Leased Real Property.

(E)    Except as set forth on Schedule 5(h), the Real Property and Leased Real Property comprises all of the real property used or occupied in the operation of the Business, other than any Real Property and Leased Real Property of the Non-Acquired Foreign Subs.

i.    Intellectual Property.

(i)    Except as set forth on Schedule 5(i), to the Knowledge of Sellers, the applicable Seller or Acquired Foreign Sub is the sole owner of and possess all right, title and interest in and to the Intellectual Property included in the Acquired Assets or owned by an Acquired Foreign Sub, free and clear of any Liens, other than Permitted Liens, and, except as set forth on Schedule 5(i), to the Knowledge of Sellers, the applicable Seller or Acquired Foreign Sub has not granted to any Person any license, option, consent, right of first or last offer or negotiation or other rights in or to any such item.

- 15 -

(ii)     Set forth on <u>Schedule 5(i)</u> are, to the Knowledge of Sellers, all material items of third party licensed Intellectual Property used in connection with the Business. Except as set forth on <u>Schedule 5(i)</u>, to the Knowledge of Sellers, no Seller or Acquired Foreign Sub has granted any sublicense or similar right with respect to the licensed Intellectual Property.

(iii)     Except as set forth on <u>Schedule 5(i)</u>, to the Knowledge of Sellers, no Person is infringing or misappropriating, as the case may be, any material Intellectual Property of the Business. The operation of the Business as currently conducted does not, to the Knowledge of Sellers, infringe upon or misappropriate the intellectual property rights of any other Person.

(iv)     None of the Non-Acquired Foreign Subs have any rights in any material Intellectual Property used in the Business, and no contract or agreement entered into or binding upon a Non-Acquired Foreign Sub grants any license or other rights in material Business intellectual property to a third party.

     j.     <u>Employees and Benefits</u>.

(i)     Set forth on <u>Schedule 5(j)</u> is a complete and correct list of all "employee benefit plans" as defined by Section 3(3) of ERISA (whether or not subject thereto) and all employment, consulting, retention, deferred compensation, bonus or other incentive compensation, severance or termination pay, stock purchase, stock option and other equity compensation, and all other employee benefit plans, programs or arrangements of any kind that are currently sponsored or maintained, or contributed to or required to be contributed to, by a Seller, and which provides benefits to any current or former employee or independent contractor of a Seller (collectively the "<u>Employee Plans</u>"); provided, however, the term "<u>Employee Plans</u>" does not include any arrangement required under applicable local law.  Sellers have made available to Purchaser copies of the documents comprising each Employee Plan.  <u>Schedule 5(j)(i)</u> sets forth a list of (A) each person formerly employed by a Seller receiving a "retirement benefit" (as hereinafter defined); (B) each person receiving a retirement benefit through a Seller's payroll; and (C) each person currently employed by a Seller who is eligible for a retirement benefit.  No employee of an Acquired Foreign Sub is eligible for, or has been granted rights under, any Employee Plan.  Other than benefits required under applicable local law or as set forth on <u>Schedule 5(j)(i)</u>, no Acquired Foreign Sub has adopted an employee benefit plan or employee welfare benefit plan.  Solely for purposes of this Section 5(j)(i), the term "retirement plan" means an "employee pension benefit plan" as defined in ERISA Section 3(2), but such terms shall not include benefits payable under a retirement plan intended to comply with Code Section 401(k) and any plan whose benefits are payable from the Pension Benefit Guaranty Corporation or its designee.

(ii)     <u>Schedule 5(j)(ii)</u> contains a complete and accurate list of the following information for each employee, director, independent contractor, consultant and agent of each Seller, including each employee on leave of absence or layoff status:  employer, name, job title, date of commencement of employment or engagement, current compensation paid or payable, and service credited for purposes of vesting and eligibility to participate under any Employee Plan, or any other employee or director benefit plan.

(iii)    Sellers have not violated in any material respect the Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act") or any similar local, state or foreign law since December 1, 2010. Schedule 5(j)(iii) lists the names of persons who became entitled to severance or termination pay from a Seller between December 1, 2010 and the Effective Date, and the date of separation from the applicable Seller. To the Knowledge of Sellers, except as set forth on Schedule 5(j)(iii), there is no pending investigation, inquiry or proceeding by any Governmental Authority related to employee health or safety or working conditions, and neither Sellers nor the Business is subject to any Order or judgment regarding employee health or safety or working conditions. To the Knowledge of Sellers, Sellers' insurers are not seeking to retroactively assess or adjust premiums for policies related to employee health or safety, workers' compensation, or working conditions.

(iv)    To the Knowledge of Sellers, except as set forth on Schedule 5(j)(iv), no officer, director, agent, employee, consultant or contractor of any Seller is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant or contractor (A) to engage in or continue or perform any conduct, activity, duties or practice relating to the Business, or (B) to assign to any Seller or to any other Person any rights to any invention, improvement or discovery related to the Business. To the Knowledge of Sellers, no former or current employee of any Seller is a party to, or is otherwise bound by, any agreement that in any way materially and adversely affects the Business.

k.    Litigation.    Except for the Bankruptcy Case or as set forth on Schedule 5(k), there are no material legal proceedings (including arbitrations or investigations) pending or, to the Knowledge of Sellers threatened, against or affecting the Business, any Acquired Assets or any employee of Sellers. The Business does not have any pending or threatened claims against third parties.

l.    Compliance with Laws.    Except as set forth on Schedule 5(l), (i) each Seller is in compliance in all material respects with all laws applicable to the Business and the Acquired Assets, and (ii) no Seller has received any written notice within the past twelve (12) months relating to violations, defaults (with or without notice or lapse of time or both) or alleged written violations or alleged written defaults under any Order or any Permit from any Governmental Body, in each case with respect to the Business.

m.    Environmental Matters.    Except as set forth on Schedule 5(m), the Business, the products and facilities thereof and the operations conducted by each Seller and Acquired Foreign Sub currently comply in all material respects with applicable Environmental Laws (as hereinafter defined), and, except as set forth on Schedule 5(m), to the Knowledge of Sellers there are not any features of the products or conditions at the facilities that reasonably could be expected to result in a material liability under Environmental Laws. Sellers have obtained and maintain all material Permits required under applicable Environmental Laws to operate the Business as it is currently being operated, and all such Permits are in full force and effect. Except as set forth on Schedule 5(m), to the Knowledge of Sellers, no Seller is subject to any pending or ongoing legal proceedings under Environmental Laws. Sellers have made available to Purchaser all material environmental audits, environmental assessments and environmental investigation reports, relating to the Real Property or the Leased Real Property,

- 17 -

that are in the possession of Sellers as of the Agreement Date. Sellers do not manufacture, license, distribute or sell products containing asbestos or lead paint. For purposes hereof:

(A) "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any laws promulgated thereunder;

(B) "Environmental Laws" means whenever in effect, all federal, state, and local statutes, Laws, ordinances, directives and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws, and all laws of foreign countries and localities thereof where the Business maintains facilities);

(C) "Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes and any other substance with respect to which liability or standards of conduct may be imposed under any Environmental Laws, including petroleum and petroleum related substances, products, by products and wastes, asbestos, urea, formaldehyde and lead based paint;

(D) "Law" means any law, statute, regulation, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority; and

(E) "Release" has the meaning set forth in CERCLA.

n. Financial Statements. Schedule 5(n) contains (i) audited consolidated financial statements (including a balance sheet and income statement) of the Business for the fiscal years ended December 31, 2008 (the "Audited Financial Statements") and (ii) unaudited consolidated financial statements of the Business for the periods ending December 31, 2009 and December 31, 2010 (the "Unaudited Financial Statements", and together with the Audited Financial Statements, the "Financial Statements"). The Financial Statements were prepared in accordance with generally accepted accounting principals as applied in the United States ("GAAP") applied consistently other than as set forth in Schedule 5(n) and except that the Unaudited Financial Statements do not contain footnotes that would be required under GAAP, and fairly present in all material respects the financial condition and results of operations of the Business on a consolidated basis as of and for the periods referenced thereon. Except as set forth on Schedule 5(n), the accounting principles and practices (including revenue recognition and establishment of accruals and reserves) used in the Audited Financial Statements were the same used in compilation of the Unaudited Financial Statements. To the Knowledge of Sellers, adjustments required under GAAP in an audit of the 2010 financial statements would not be individually or in the aggregate material.

o. Contracts.

- 18 -

(i)    Schedule 5(o)(i) lists, to the Knowledge of Sellers, all Other Contracts that individually provide for annual payments or receipts after the date hereof of greater than Fifty Thousand Dollars ($50,000) or which are otherwise material to the Business or the Acquired Assets (collectively, the "Material Other Contracts"). Seller has delivered or made available to Purchaser true, correct and complete copies of the Material Other Contracts. Except as disclosed on Schedule 5(o)(i) the Business, Sellers and the Acquired Foreign Subs are not subject to, or a party to an agreement, involving (A) any Contract containing covenants limiting the freedom of a Seller or Acquired Foreign Sub to engage in a line of business or compete with any Person, (B) any joint venture contract, partnership agreement, limited liability company or other Contract (however named) involving a sharing of profits, losses, costs or liabilities by Seller with any other Person, (C) any written warranty, guaranty or other similar undertaking with respect to contractual performance extended by a Seller other than in the ordinary course of business, (D) any collective bargaining agreement, arrangement or other Contract with any labor union, staff association or other body of employee representatives, (E) any license agreement or other Contract relating to Intellectual Property that is necessary or otherwise material to the operation of the Business, (F) any Contract with a distributor or reseller of a Seller's or Acquired Sub's products or services, (G) any tax allocation or tax sharing agreement, (H) any employment or severance arrangement with any director, officer, employee or consultant of any of the Sellers or the Business, or any obligation of any Seller or the Business to make payments or provide any benefits to any employee after cessation of employment other than as may be required by applicable law (I) any Contract with "take or pay" provisions or "requirements" provisions committing a Person to provide the quantity of goods or services required by another Person, or (J) any Contract with any Person who is an affiliate of a Seller.

(ii)    Except as set forth on Schedule 5(o)(ii), (A) each Real Property Lease, Other Lease and material Other Contract is a valid and binding agreement of the applicable Seller and is in full force and effect, (B) neither the applicable Seller or Acquired Foreign Sub nor, to the Knowledge of Sellers, any other party thereto is in material default or breach, (C) to the Knowledge of Sellers, no event or condition has occurred which after notice or with the lapse of time or both would constitute a default or breach, in any respect under the terms of any Material Contract, and (D) Sellers have not received any written notice of the intention of any Person to terminate any Real Property Lease, Other Lease and material Other Contract or that any Person considers Seller to be in material breach or material default thereunder or in potential breach or default in a material respect thereunder, in each case, other than as s result of the filing of the Petition or the occurrence of any changes resulting from the commencement or continuation of the Bankruptcy Case.

p.    Product Liability; Insurance.  Except as set forth on Schedule 5(p), there has not within the past two (2) years, nor is there presently pending, nor, to the Knowledge of Sellers threatened, any material civil, criminal or administrative actions, suits, demands, claims, hearings, notices of violation, investigations, proceedings, demand letters or product recalls relating to any alleged hazard or alleged defect in design, manufacture, materials or workmanship relating to any products of the Business. Schedule 5(p) sets forth a list of all Sellers' material insurance policies in effect as of the Agreement Date.

- 19 -

q.    Permits.    Sellers and the Acquired Foreign Subs possess all material Permits in connection with the operation of the Business as currently conducted and the ownership of the Acquired Assets, including those Permits set forth on Schedule 5(q).

r.    Absence of Certain Changes.    Since December 31, 2010, except as set forth on Schedule 5(r), there has not occurred with respect to any Seller, any Acquired Foreign Sub or the Business taken as a whole:

(i)    other than the filing of the Petition or the occurrence of any changes resulting from the commencement or continuation of the Bankruptcy Case, any event, occurrence or development which has had or is reasonably likely to have a Material Adverse Effect (as defined in Section 8(d));

(ii)    declaration, setting aside or payment of any dividend or other distribution with respect to any shares of capital stock of any of the Sellers or any Acquired Foreign Sub, or any repurchase, redemption or other acquisition by any of the Sellers of any outstanding shares of capital stock or other securities of any of the Sellers or any Acquired Foreign Sub, or any resolution or similar pronouncement of a governing body of an entity adopted authorizing a share capital reduction or similar transaction that may be reasonably expected to permit a distribution from a Seller or an Acquired Foreign Sub to its owners at a subsequent date;

(iii)    incurrence, assumption or guarantee by any Seller or Acquired Foreign Sub of any indebtedness, other than in the ordinary course of business consistent with past practices;

(iv)    creation or other incurrence by any Seller of any Lien (other than Permitted Liens) on any material asset of any Seller, Acquired Foreign Sub or the Business other than in the ordinary course of business consistent with past practices;

(v)    making of any loan, advance or capital contributions to or investment by any Seller, Acquired Foreign Sub, or the Business in any Person, other than loans to employees to advance reasonable and customary expenses to be incurred by them in the performance of their duties on behalf of any Seller, an Acquired Foreign Sub or the Business, in each case made in the ordinary course of business consistent with past practices;

(vi)    acquisition, disposition or similar transaction by any Seller, Acquired Foreign Sub or the Business involving any of its assets, properties or liabilities, whether by merger, purchase or sale of stock, purchase or sale of assets or otherwise;

(vii)    material damage, destruction or other casualty loss suffered by any Seller, Acquired Foreign Sub or by the Business;

(viii)    material change in any method of accounting or accounting practice by any Seller or Acquired Foreign Sub, or any tax election or change in tax practices, by an Acquired Foreign Sub, except for any such change after the date hereof required by applicable law;

- 20 -

(ix)    payment, sale, purchase, pledge or other transfer of material assets, properties or liabilities among Sellers or their affiliates;

(x)    incurrence of any material intercompany indebtedness between or among Sellers and the Acquired Foreign Subs or material change in or extinguishment of any intercompany indebtedness;

(xi)    payment, deferral, discharge or satisfaction by any Seller or Acquired Foreign Sub or the Business of any material liabilities, other than the payment, deferral, discharge or satisfaction, in accordance with the respective terms thereof and in the ordinary course of business consistent with past practices, of liabilities and obligations incurred since December 31, 2010 in the ordinary course of business consistent with past practices;

(xii)    collection or attempt to collect any accounts receivable of any Seller, Acquired Foreign Sub or the Business that involves provision of future discounts, concessions, merchandise or credits to a third party;

(xiii)    resignation or any termination or removal of any executive officers of any Seller or Acquired Foreign Sub;

(xiv)    material increase in the compensation of, or Employee Benefits made available to, any of the executive officers of any Seller, Acquired Foreign Sub or the Business, or material increase in the rate of pay or employee benefits of any material employees;

(xv)    labor dispute, other than routine individual grievances, or written notice of any, or, to the Knowledge of Sellers threatened, activity or proceeding by a labor union or representative thereof to organize any employees of any Seller, Acquired Foreign Sub or the Business, which employees were not subject to a collective bargaining agreement on December 31, 2010, or any lockouts, strikes, slowdowns, or work stoppages by or with respect to any employees of any Seller or the Business, nor, to the Knowledge of Seller, has any Person threatened in writing to initiate any such activity;

(xvi)    a material contract, or any relinquishment or waiver by any Seller or Acquired Foreign Sub of any material right under any Real Property Lease, Other Lease and Other Contract, and, other than filing the Petition or the occurrence of any changes resulting from the commencement or continuation of the Bankruptcy Case, no Seller or Acquired Foreign Sub has taken or omitted to take, and, to the Knowledge of Sellers, no third party has taken or omitted to take, any action that constitutes, or would with the passage of time constitute, a material default under any Real Property Lease, Other Lease and material Other Contract; or

(xvii)    any layoffs or employment terminations sufficient in number to trigger application of any law requiring notice to employees or consultation with their authorized representatives.

s.    <u>Relations with Suppliers and Customers</u>.  <u>Schedule 5(s)(i)</u> sets forth a list of the material suppliers for products and supplies of each Seller since January 1, 2010.  Except as set forth on <u>Schedule 5(s)(i)</u>, since January 1, 2010, no Seller has received any written notice

or, to the Knowledge of Sellers oral notice, from any supplier to the effect that any supplier will stop, materially decrease the rate of or materially change the terms (whether related to payment, price or otherwise) with respect to, supplying materials, products or services to any Seller. Schedule 5(s)(ii) sets forth a list of the top ten (10) customers of Sellers by dollar volume of purchases for annual period ended as of December 31, 2010.  No Seller has received written notice from any customer of any Seller responsible for revenues in excess of One Hundred Thousand Dollars ($100,000) in the last twelve (12) months to the effect that such customer will stop, or materially decrease the rate of, buying products or services from any Seller.

6.    Purchaser's Representations.  Purchaser hereby represents and warrants to Sellers, as of the Agreement Date, the following:

a.    Organization.  Purchaser is a limited liability company, validly existing and in good standing under the laws of the State of Delaware.  Purchaser is duly qualified or licensed to transact business as a foreign limited liability company in good standing in the States of the United States and foreign jurisdictions where the character of its assets or the nature or conduct of its business requires it to be so qualified or licensed, except where such failure would not materially affect Purchaser's ability to consummate the transactions contemplated by this Agreement.

b.    Authorization.  Purchaser has the power and authority necessary to enter into and perform its obligations under this Agreement and the Other Documents to which it is a party, and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement, and the Other Documents to which it is a party, by Purchaser have been approved by all necessary action of the Manager of Purchaser.  This Agreement has been, and the Other Documents to which Purchaser is a party will be, executed and delivered by duly authorized officers of Purchaser.

c.    Binding Obligation.   Subject to obtaining the Approval Order, this Agreement and the Other Documents to which it is a party, when executed and delivered by Purchaser, will constitute legal, valid and binding obligations of Purchaser in accordance with their respective terms, except to the extent that the enforcement thereof may be limited by bankruptcy, reorganization, insolvency or similar laws of general applicability governing the enforcement of the rights of creditors or by general principles of equity (regardless of whether considered in a proceeding at law or in equity).

d.    Validity of Contemplated Transactions, Restrictions.   The execution, delivery and performance of this Agreement, and the Other Documents to which it is a party, by Purchaser, and the consummation of the transactions contemplated hereby and thereby, will not (i) violate any provision of the Limited Liability Company Agreement of Purchaser, or (ii) result in a violation by Purchaser of any law or order of any court or governmental unit to which Purchaser is subject, or by which its assets are bound.

e.    Consents and Approvals.  Except for all applicable approvals of the Bankruptcy Court, no consent, approval, authorization, declaration, filing or registration with any governmental authority, or any other Person, is required to be made or obtained by Purchaser in connection with the execution, delivery and performance by Purchaser of this Agreement, the

- 22 -

Other Documents to which it is a party, or the consummation of the transactions contemplated hereby and thereby.

        f.    <u>Brokers and Finders</u>.  Purchaser has not incurred any liability to any party for any brokerage fees, agent's commissions or finder's fees in connection with the purchase of the Business or the Acquired Assets for which Sellers or any claimant against Sellers would be liable.

        g.    <u>Cash Consideration</u>.  Purchaser has, and will have at the Closing Date, cash available as and when required to consummate the transactions contemplated by this Agreement, including the Closing Date Cash Consideration.

    7.    <u>Deliveries at Closing</u>.

        (a)    <u>Sellers' Deliveries to Purchaser</u>.  At the Closing, Sellers shall make or cause the following deliveries to Purchaser:

        (i)    a bill of sale, quit claim deed, assignment and any other instruments of conveyance, as appropriate, all in form reasonably satisfactory to Purchaser and duly executed by each applicable Seller, with respect to the Acquired Assets, the bill of sale substantially in the form attached hereto as <u>Exhibit E</u> (the "<u>Bill of Sale</u>"), duly executed by Sellers, and the quit claim deed substantially in the form attached hereto as <u>Exhibit F</u> (the "<u>Deed</u>"), duly executed by Scovill;

        (ii)    an assignment and assumption agreement substantially in the form attached as <u>Exhibit G</u> (the "<u>Assignment and Assumption Agreement</u>") duly executed by Sellers;

        (iii)    certified copies of resolutions of the boards of directors and the managing member, as applicable, of each Seller, authorizing the execution and delivery by each Seller of this Agreement and the Other Documents to which it is a party, and the consummation of the purchase and sale contemplated hereby and thereby;

        (iv)    the certificates contemplated by Sections 9(a), 9(b), 9(f) and 9(g);

        (v)    a closing statement, the form of which shall be mutually agreed upon by the parties, duly executed by Sellers;

        (vi)    at least one (1) Business Day prior to Closing, deeds of reconveyance or other documentation reasonably required by Purchaser's title insurer from Sellers' secured lenders to record the transfer of the Real Property free and clear of Liens, other than Permitted Liens, together with the customary certificate that Scovill is not subject to withholding for taxes in regard to the sale of Real Property;

        (vii)    resolutions of the applicable Boards of Directors or other governing bodies of the Acquired Foreign Subs, together with stock transfer documentation reasonably acceptable to Purchaser and its counsel; provided, however, if this clause (viii) cannot be satisfied as of the date on which all other conditions herein are to be satisfied or waived, then

- 23 -

the provisions of Section 8(h)(v) shall apply, and the Closing of the acquisition of the Acquired Foreign Sub, if applicable, shall be delayed until such documentation becomes available;

        (viii)   if requested by Purchaser in writing, resignation of officers and/or directors of Acquired Foreign Subs identified by Purchaser in writing; and

        (ix)   any other documents or instruments, duly executed by each Seller, as applicable, as reasonably requested by Purchaser for the consummation of the transactions contemplated hereby.

        (b)   Purchaser's Deliveries to Sellers.  At the Closing, Purchaser shall make or cause the following deliveries to Sellers:

        (i)   the Closing Date Cash Consideration and the Purchaser's Cure Costs;

        (ii)   the Assignment and Assumption Agreement, duly executed by Purchaser;

        (iii)   certified copies of resolutions of the Manager of Purchaser authorizing the execution and delivery by Purchaser of this Agreement and the Other Documents to which it is a party, and the consummation of the purchase and sale contemplated hereby and thereby;

        (iv)   the certificates contemplated by Sections 10(a), 10(b), 10(f) and 10(g);

        (v)   a closing statement, the form of which shall be mutually agreed upon by the parties, duly executed by Purchaser; and

        (vi)   any other documents or instruments, duly executed by Purchaser, as reasonably requested by Sellers for the consummation of the transactions contemplated hereby.

        8.   Pre-Closing Covenants.

        Sellers covenant and agree with Purchaser, and Purchaser covenants and agrees with Sellers, as follows:

        a.   Operation of Business Prior to Closing.  Sellers shall operate the business in all material respects in compliance with the Bankruptcy Code, any orders entered by the Bankruptcy Court and applicable law.  Except as set forth on Schedule 8(a), the Business shall be operated after the Petition Date in the ordinary course consistent with past practice and in accordance with any debtor in possession financing facility provided pursuant to the DIP Order (as hereinafter defined), the Approved Budget (as defined in the DIP Order), or any Order regarding the use of cash collateral to which Purchaser has consented and as subsequently approved by the Bankruptcy Court, and Sellers shall use commercially reasonable efforts to preserve their relations with the material customers and vendors.  Sellers shall perform and

complete in all material respects, but only to the extent practicable to do so in the time prior to Closing, the work required under the findings referred to in Schedule 5(j)(iii). After the Petition Date, other than as permitted by any debtor in possession financing facility that being paid in full at Closing, the Sellers shall not consent to the incurrence of any Lien on the Real Property or other material Acquired Asset without the prior written consent of Purchaser. In furtherance and not in limitation of the foregoing, Sellers will not, without the prior written consent of Purchaser, take or cause the Business to take any actions (other than as required by the Bankruptcy Court) that if taken prior to the date hereof would have been disclosed on Schedule 5(r), but if any such Bankruptcy Court requirement would be reasonably expected to have Material Adverse Effect, the consent of Purchaser shall be required. For purposes hereof, "DIP Order" means the order entered by the Bankruptcy Court approving the "debtor in possession" financing provided by the Senior Lenders.

       b.      Access and Information.

       (i)      Sellers shall provide Purchaser and Purchaser's counsel, accountants, lenders, employees and other representatives, during normal business hours from the Agreement Date until the Closing Date, access to the personnel, facilities, customers, vendors, all of the Acquired Assets and all of the liabilities of Sellers, including the Books and Records, and the Corporate Records and Shares; provided, however, such access shall not materially interfere with the ongoing business operations of Sellers, and such access shall not include privileged communications, confidential information or information about any employee, the disclosure of which might violate such employee's reasonable expectation of privacy.

       (ii)      Purchaser shall be entitled to conduct environmental assessments of the Real Property at its own cost and expense upon reasonable written notice to Sellers. In the event Purchaser conducts such assessments, Purchaser shall provide Sellers all preliminary and final assessments as soon as reasonably practicable after Purchaser's receipt thereof. Purchaser expressly acknowledges and agrees that Sellers may provide copies of such assessments to any Person, including its lenders and any prospective purchaser of the Acquired Assets.

       (iii)      Until the Closing Date, Purchaser shall, and Purchaser shall cause its counsel, accountants, lenders, employees and other representatives to, hold in confidence all data and information obtained from Sellers or Sellers' Counsel, accountants, lenders, employees and other representatives, unless compelled to disclose by judicial or administrative process or by other requirements of applicable law; and, if the transactions provided for herein are not consummated for any reason, Purchaser and Purchaser's counsel, accountants, lenders, employees and other representatives shall return or destroy, upon the written request of Sellers, all documents received from Sellers or Sellers' Counsel, accountants, lenders, employees and other representatives, and shall continue to hold in confidence all such data and information and shall not use any such data or information for any purpose whatsoever; provided, however, that this obligation shall not apply to any data and information that (A) was in Purchaser's possession prior to receipt from Sellers with the violation of any applicable restrictive covenant of a third party, (B) is now or later becomes generally available to the public through no fault of Purchaser or its counsel, accountants, lenders, employees or other representatives, (C) either is, on the date of disclosure by Sellers, or later becomes, lawfully available from another source on a non-confidential basis, and such source is not under an obligation of confidentiality to Sellers, or

(D) was independently developed by employees or agents of Purchaser who had no prior access to such data or information. If Purchaser provides confidential information to Sellers, this covenant also shall bind Sellers, as if the word "Purchaser" and "Sellers" were substituted for each other in this clause. This obligation and covenant shall survive the termination of this Agreement.

(iv)    Notwithstanding the foregoing, Purchaser expressly acknowledges and agrees that nothing contained in this Section 8(b), subject to Seller's compliance with the applicable covenants contained herein, including the receipt or review of any environmental assessments, is intended to give rise to any contingency to Purchaser's obligations to proceed with the transactions contemplated by this Agreement, other than those conditions expressly set forth herein.

c.    Consents and Approvals.    Sellers shall use commercially reasonable efforts to obtain, on or before the Closing, the waiver, consent and approval of all Persons whose waiver, consent or approval is required by the Bankruptcy Code or pursuant to a Real Property Lease, Other Lease and Other Contract in order for Sellers to assume and assign the Assumed Contracts to Purchaser.

d.    Schedules.    Each party shall be obligated, up to and including the Closing Date, to supplement promptly or amend any Schedules hereto with respect to any material matter hereinafter arising or discovered which, if existing or known on the Agreement Date, would have been required to be set forth or listed in the Schedules. Any such amendment or supplement, however, shall not preclude Purchaser from determining, in its reasonable judgment, that such amendment or supplement constitutes a Material Adverse Effect (as hereinafter defined). For purposes hereof, "Material Adverse Effect" means, as a reasonable Person would determine, any fact, circumstance, change in or effect on Sellers, the Acquired Foreign Subs or the Business that is materially adverse to the condition of the Business (financial or otherwise), taken as a whole, the results of operations of the Business, taken as a whole, or the Acquired Assets, taken as a whole; provided, however, general changes in the economy or the industry in which Sellers operate shall not be a Material Adverse Effect.

e.    Public Announcements.    Except as may be reasonably necessary to the parties in connection with their filings with and appearances before the Bankruptcy Court, no party shall make any public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other parties, unless required by law or judicial process, in which case notification shall be given to the other parties prior to such disclosures. Each party shall require its agents, employees, counsel, accountants and any other representatives to comply with this Section 8(e).

f.    Bankruptcy Court Approval.

(i)    Sellers and Purchaser acknowledge that under the Bankruptcy Code, this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Sellers and Purchaser acknowledge and agree that to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and best price possible for the Business, including giving notice of the transactions contemplated by this

Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Business to responsible bidders, entertaining higher and better offers from responsible bidders and conducting an auction.

(ii)    To facilitate the foregoing, promptly following the filing of the Petition (but no later than two (2) Business Days thereafter), Sellers shall file the Bidding Procedures and Sale Motion with the Bankruptcy Court, together with appropriate supporting papers and notices.

(iii)    From the Agreement Date until the earlier of (A) the Closing and (B) the termination of this Agreement, Purchaser and Sellers acknowledge and agree that Sellers may inform any and all interested third parties that they intend to submit this Agreement to the Bankruptcy Court in order to obtain entry of the Bidding Procedures Order and the Approval Order. After the entry of the Bidding Procedures Order, any and all other bids or offers with respect to the Acquired Assets must be presented to Sellers in accordance with the procedures and deadlines set forth in the Bidding Procedures Order.

(iv)    The parties shall determine the Cure Costs required to obtain the Approval Order and attach the list of Cure Costs to this Agreement as an updated Schedule 2(b) by written amendment in accordance with the terms hereof.  In the event Sellers and the counterparty to a Contract are unable to agree on the Cure Cost, and the Contract is not a material Contract, then Sellers may by written notice require Purchaser to not include the applicable Contract as an Assumed Contract.  If the Contract is a material Contract, then Purchaser may assume the Contract and pay Sellers the Cure Cost requested by the counterparty at the Closing (the "Requested Amount") until the Cure Cost is finally determined (the "Final Cure Cost"), and promptly after final determination, (A) if the Requested Amount is greater than the Final Cure Cost, Purchaser may seek reimbursement of the overpayment from the applicable counterparty, and (B) if the Final Cure Cost is greater than the Requested Amount, Purchaser shall pay the applicable counterparty the difference between the Final Cure Cost as ordered by the Bankruptcy Court and the Requested Amount.

g.    Other Filings.  Sellers and Purchaser shall, if required in connection with the transactions contemplated hereby, (i) promptly take all actions necessary to make the filings required of it or its affiliates by any governmental or quasi-governmental entities (domestic and foreign), (ii) comply at the earliest practicable date with any request for additional information received by it or its affiliates from any governmental or quasi-governmental entities (domestic or foreign), (iii) cooperate with the other parties in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by state attorneys general, and (iv) cooperate with the other parties in connection with any other party's filing, (other than as provided for in subsection (iii) above) as may be required by any governmental or quasi-governmental entities (domestic or foreign).  All fees required to be paid in connection with any filings hereunder shall be borne by the party incurring such expense.

h.    Executory Contracts; Acquired Foreign Subs.

(i)    The Real Property Leases, Other Leases and Other Contracts to be assumed and assigned by Sellers and assumed by Purchaser at the Closing pursuant to

Section 365 of the Bankruptcy Code (the "Assumed Contracts") shall consist of the Real Property Leases, Other Leases and Other Contracts not expressly excluded by Purchaser on or before the Closing Date by written notice from time to time to Sellers given on or before such date, and all other Contracts, if expressly designated by Purchaser (and not removed) on or before the Closing Date as Assumed Contracts by written notice from time to time to Sellers given on or before the Closing Date; provided further, along with any such notice to Sellers, Purchaser shall provide Sellers an amended and restated Schedule 2(b) reflecting the Assumed Contracts, and Sellers also shall update the amended and restated Schedule 2(b) with their good faith estimate of the applicable Cure Costs.  All such exclusions and designations shall be made in Purchaser's sole discretion, and shall be subject to change by Purchaser from time to time by giving written notice thereof to Sellers, so long as any such changes are delivered prior to the Closing Date.  All exclusions and designations of Assumed Contracts that Purchaser is entitled to exclude or designate hereunder shall be become final and binding upon Purchaser at 5:00 p.m. Eastern time one (1) Business Day prior to the Closing Date.  Notwithstanding the foregoing, if at any time Sellers become aware of any Contract not disclosed in writing to Purchaser on or before the Agreement Date (an "Undisclosed Contract"), Sellers shall promptly thereafter advise Purchaser of the existence, and provide Purchaser with a copy of such Undisclosed Contract, and Purchaser shall have the right to request, by written notice to Sellers within five (5) days, that Sellers assume, assign and sell such Undisclosed Contract to Purchaser, in which case Sellers shall use commercially reasonable efforts to assume, assign and sell such Contract to Purchaser, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Assumed Contracts, it being understood that such assumption, assignment and sale shall not be required to take place on or before the Closing or constitute a condition precedent to Purchaser's obligation to consummate the Closing; provided further, along with any such notice to Sellers, Purchaser shall provide Sellers an amended and restated Schedule 2(b) reflecting the Assumed Contracts, and Sellers also shall update Schedule 2(b) with their good faith estimate of the applicable Cure Costs.  Any Cure Cost related to an Undisclosed Contract that Purchaser designates as an Assumed Contract shall be borne by Sellers if such Undisclosed Contract should have been disclosed on Schedule 5(o)(i).

(ii)    As part of the Bidding Procedures and Sale Motion, Sellers shall seek approval by the Bankruptcy Court of the assumption and assignment by Sellers to Purchaser of the Assumed Contracts.  Sellers shall serve the Bidding Procedures and Sale Motion on all counterparties to the Assumed Contracts, along with a notice specifically stating that Sellers are or may be seeking the assumption and assignment of the Assumed Contracts, and shall notify such counterparties of the deadline for objecting to the amounts listed in Schedule 2(b), which deadline shall be not less than three (3) Business Days prior to the Sale Hearing.  Sellers shall seek authority to file with the Bankruptcy Court, not later than ten (10) days prior to the Sale Hearing, the list identifying the Assumed Contracts and the amounts necessary to cure defaults under each of such Assumed Contract as determined by Sellers in accordance with Schedule 2(b), so as to enable any such party to object to the proposed Cure Cost and the Bankruptcy Court to determine such Cure Cost as promptly as reasonably possible.  In cases in which Sellers are unable to establish that a default exists, the relevant Cure Cost shall be set at $0.00.  The Bidding Procedures and Sale Motion shall reflect Purchaser's promise to perform from and after the Closing under the Assumed Contracts, and such promise shall be the only adequate assurance

of future performance necessary to satisfy the requirements of Section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of such Assumed Contracts.

(iii)    Anything contained in this Agreement to the contrary notwithstanding, (A) this Agreement shall not constitute an agreement to assume or assign any Contracts if, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assumption and assignment thereof, without obtaining a Consent, would constitute a breach thereof or in any way negatively affect the rights of Sellers or Purchaser, as the assignee of such Contracts; (B) no breach of this Agreement shall have occurred by virtue of such non-assumption and non-assignment; and (C) Purchaser shall not be under any obligation to consummate the transactions provided for in this Agreement unless on or before the Closing Sellers deliver to Purchaser all necessary Consents to the assumption and assignment of each material Contract with respect to which a third party Consent is required hereunder.  If, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, such Consent is required but not obtained, Sellers shall, if requested by Purchaser and at Purchaser's sole cost and expense, cooperate with Purchaser in any reasonable arrangement, including Purchaser's provision of credit support, designed to provide for Purchaser the benefits and obligations of or under any of such Contracts, including enforcement for the benefit of Purchaser of any and all rights of Sellers against a third party thereto arising out of the breach or cancellation thereof by such third party.  Any assignment to Purchaser of any Contracts that shall, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent of any third party for such assignment as aforesaid shall be made subject to such consent being obtained.  Any contract that would be a Contract but is not assigned in accordance with the terms of this Section 8(h) shall not be considered an "Assumed Contract" for purposes hereof unless and until such contract is assigned to Purchaser following the Closing Date upon receipt of the requisite consents to assignment and Bankruptcy Court approval.

(iv)    If at the time all conditions to Closing set forth in Section 9 have been satisfied or waived by Purchaser, other than the condition requiring instruments of transfer of the Acquired Foreign Subs (or the Scovill HK Business (as defined Section 8(h)(v), if applicable) pursuant to Section 7(a)(vii) and this Section 8(h), then the purchase of the Acquired Assets and any Acquired Foreign Subs for which documentation is available shall be closed. Scovill shall retain ownership of each such Acquired Foreign Sub until the transfer documentation for the applicable Acquired Foreign Sub, consistent with Section 7(a)(vii) and this Section 8(h), has been delivered to Purchaser, and Sellers shall operate the Acquired Foreign Sub with the assistance of Purchaser (which shall be provided at the sole cost and expense of Purchaser), and subject in all cases to the covenants in Section 8(a).

(v)    Sellers shall use commercially reasonable efforts to cause Scovill HK to transfer the equity of Scovill China to Scovill prior to the Closing Date.  In the event Scovill HK is unable make such transfer prior to the Closing Date, Purchaser shall then provide written notice to Sellers, prior to the Closing Date, of its election to either (A) subject to Section 1(b)(ix), purchase all of the assets and liabilities of Scovill HK (excluding its equity interests in Scovill China) as of the Closing Date (the "Scovill HK Business"), or (B) wait until Scovill HK has transferred the equity interests of Scovill China to Scovill after the Closing Date, and then promptly thereafter require Scovill to transfer to Purchaser the equity interests of Scovill HK.  If

- 29 -

Purchaser elects to purchase the assets of Scovill HK, then the consideration paid for such assets shall be the sum of (W) ten US Dollars ($10), plus (X) the assumption of all liabilities of Scovill HK shown on the Purchaser's Calculation of Change in Working Capital, as updated through the Final Adjustment, plus (Y) the assumption of all additional liabilities arising in the ordinary course of the Scovill HK Business between the Effective Time and the date of the transfer of such assets, and plus (Z) the assumption of any amounts payable from Scovill HK that are included in the Acquired Assets or due to another Acquired Foreign Sub.

(vi)    For purposes of this Agreement, notwithstanding the delayed closing of the sale of equity interests in Acquired Foreign Subs or the sale of the Scovill HK Business, if applicable, the "Closing Date" as defined in Section 3(a) shall be the day the other Acquired Assets are transferred to Purchaser, and all adjustments of the Purchase Price shall be computed as if the Acquired Foreign Subs or the Scovill HK Business, if applicable, were transferred on the Closing Date, and there shall not be any adjustment to the Purchase Price as a result of the delayed closing of the sale of equity interest in any Acquired Foreign Sub or the sale of the Scovill HK Business.

i.    Conditions Precedent.  Sellers shall use commercially reasonable efforts to satisfy the conditions enumerated in Section 9.  Purchaser shall use commercially reasonable efforts to satisfy the conditions enumerated in Section 10.

j.    2011 Financial Statements.  Sellers shall provide to Purchaser unaudited consolidated financial statements of the Business for the period ending March 31, 2011 (the "2011 Financial Statements").  Such financial statements shall be prepared consistently in all material respects with the unaudited consolidated financial statements of the Business for the period ending December 31, 2011.  Purchaser acknowledges and agrees that the 2011 Financial Statements are for informational purposes only.

9.    Conditions Precedent to Purchaser's Obligations.  The obligation of Purchaser to consummate the transactions provided for in this Agreement is subject to the satisfaction of each of the following conditions on or before the Closing, any of which may be waived by Purchaser in its sole discretion.

a.    Certificate Regarding Schedules and Representations and Warranties.  The representations and warranties made by each Seller in Section 5 shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except that such representations and warranties may be untrue or incorrect as a result of actions or transactions expressly permitted by this Agreement or actions or transactions of Sellers made with the prior written consent of Purchaser).  Purchaser shall have received a certificate dated as of the Closing Date, executed by a duly authorized officer of each Seller, to such effect.

b.    Compliance by Sellers.  Each Seller shall have duly performed in all material respects all of the covenants, agreements and conditions contained in this Agreement to be performed or satisfied by such Seller on or prior to the Closing Date.  Purchaser shall have received a certificate from each Seller dated as of the Closing Date, executed by a duly authorized officer of such Seller, to such effect.

- 30 -

c.      Governmental Approvals.  All requirements imposed with respect to the transactions contemplated by this Agreement by any Governmental Authority shall have been satisfied.

d.      No Adverse Litigation.  No action, suit or proceeding shall be pending or threatened (i) challenging or seeking to restrain, prohibit, alter or materially delay the transactions contemplated by this Agreement, or (ii) seeking to prohibit Purchaser from controlling or operating the Business or the Acquired Assets upon the Closing.

e.      Approval Order.  After notice and a hearing as defined in Section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Approval Order (which shall be substantially in the form attached as Exhibit B), and such Approval Order (i) shall have become a Final Order (as hereinafter defined), and (ii) shall not be subject to a pending request for a stay (pending appeal or otherwise), have been stayed, stayed pending appeal or vacated (but such condition may be waived by Purchaser in its sole discretion).  As used herein, "Final Order" means an order or other action (x) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; and (y) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired.

f.      Incumbency.  Purchaser shall have received a certificate of incumbency of each Seller executed by the Secretary or Assistant Secretary of such Seller, listing the officers of such Seller authorized to execute this Agreement, the Other Documents to which it is a party and all other instruments executed on behalf of such Seller, and certifying the authority of each such officer to execute the agreements, documents and instruments on behalf of such Seller in connection with the consummation of the transactions contemplated by this Agreement.

g.      Certificate of Secretary.  Purchaser shall have received from each Seller a certificate executed by the Secretary or Assistant Secretary of such Seller certifying (i) that such Seller's board of directors or managing member, as applicable, has approved and authorized this Agreement and each of the Other Documents to which such Seller is a party and each of the transactions contemplated hereby and thereby pursuant to the resolutions attached to such certificate, and (ii) that such resolutions have not been rescinded, revoked, modified or otherwise affected and remain in full force and effect.

h.      No Material Business Disruption.  The parties listed on Schedule 9(h) shall not have communicated in writing to Seller or Purchaser that they will not conduct further business with or will materially reduce the amount of business conducted with Seller, or with Purchaser after the Closing.

i.      Document Delivery.  Purchaser's counsel shall have received duly executed copies of the documents to be delivered by Seller pursuant to Section 7, including but not limited to Section 7(a)(vi).

10.    <u>Conditions Precedent to Sellers' Obligations</u>.    The obligation of Sellers to consummate the transactions provided for in this Agreement is subject to the satisfaction of each of the following conditions on or before the Closing, any of which may be waived by Sellers.

a.    <u>Certificate Regarding Representations and Warranties</u>.    The representations and warranties made by Purchaser in Section 6 shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date; and Sellers shall have received a certificate dated the Closing Date, executed by a duly authorized officer of Purchaser to such effect.

b.    <u>Compliance by Purchaser</u>.    Purchaser shall have duly performed in all material respects all of the covenants, agreements and conditions contained in this Agreement to be performed or satisfied by Purchaser on or before the Closing Date.    Sellers shall have received a certificate dated the Closing Date, executed by a duly authorized officer of Purchaser, to such effect.

c.    <u>Governmental Approvals</u>.    All requirements imposed with respect to the transactions contemplated by this Agreement by any Governmental Authority shall have been satisfied.

d.    <u>No Injunction</u>.    No order restraining, prohibiting, altering or materially delaying the transactions contemplated hereby shall have been issued.

e.    <u>Approval Order</u>.    The Approval Order substantially in the form of <u>Exhibit B</u> shall have been entered by the Bankruptcy Court and shall not be stayed pending appeal or reversed as of the Closing Date.

f.    <u>Certificate of Secretary</u>.    Sellers shall have received from Purchaser a certificate executed by the Secretary or Assistant Secretary of Purchaser certifying (i) that Purchaser's Manager has approved and authorized this Agreement and each of the Other Documents to which Purchaser is a party and each of the transactions contemplated hereby and thereby pursuant to the resolutions attached to such certificate, and (ii) that such resolutions have not been rescinded, revoked, modified or otherwise affected and remain in full force and effect.

g.    <u>Incumbency</u>.    Sellers shall have received a certificate of incumbency of Purchaser executed by the Secretary or Assistant Secretary of Purchaser, listing the officers of Purchaser authorized to execute this Agreement, the Other Documents to which it is a party and all other instruments executed on behalf of Purchaser, and certifying the authority of each such officer to execute the agreements, documents and instruments on behalf of Purchaser in connection with the consummation of the transactions contemplated hereby.

h.    <u>Confirmation of Consideration</u>.    Purchaser shall have in its possession or under its direction, custody or control the Closing Date Cash Consideration and the Purchaser's Cure Costs, and Purchaser shall have provided Sellers written proof thereof reasonably acceptable to Sellers.

- 32 -

i.    Delivery of Documents.  Seller's Counsel shall have received duly executed copies of the documents to be delivered by Purchaser pursuant to Section 7(b).

11.    Expenses.  Subject to Section 2(f)(iii), Section 3(b) and this Section 11, each party shall be responsible and pay for its own fees and expenses, including those of its counsel, incurred in the preparation and negotiation of this Agreement and the consummation of the transactions contemplated hereby, whether or not such transactions are consummated. Notwithstanding anything contained herein to the contrary, in the event a party brings a claim or cause of action against any other party or parties, the Bankruptcy Court shall cause the losing party in the dispute to pay the reasonable fees and expenses of the winning party; provided, however, in the event the Bankruptcy Court determines that there is no winning or losing party or parties, the Bankruptcy Court shall apportion the fees and expenses between and among the parties based on the Bankruptcy Court's judgments as to the relative merits of each party's position with respect to the dispute.

12.    Termination.

a.    Methods of Termination.  This Agreement may be terminated at any time prior to the Closing Date:

(i)    by Purchaser, if Sellers shall not have filed the Petition and the Bidding Procedures and Sale Motion in the Bankruptcy Court within two (2) Business Days after this Agreement shall have been executed and delivered;

(ii)    by Purchaser, if either (A) the Bankruptcy Court hearing on Sellers' motion seeking entry of the Bidding Procedures Order is not held within twenty-three (23) days of the Petition Date or (B) the Bankruptcy Court has not entered the Bidding Procedures Order within two (2) Business Days of such hearing;

(iii)    by Purchaser or Sellers, if either (A) the Bankruptcy Court hearing on Sellers' motion seeking entry of the Approval Order is not held within seven (7) days of the auction described in the Bidding Procedures Order, or (B) the Bankruptcy Court has not entered the Approval Order within two (2) Business Days of such hearing;

(iv)    by Purchaser or Sellers, if the Closing shall not have occurred by the close of business on the date that is thirty (30) days after the Auction (as defined in the Bidding Procedures) (the "Transaction Deadline"); provided, that if the Closing shall not have occurred on or before the Transaction Deadline due to a breach of any material representations, warranties, covenants or agreements contained in this Agreement by a party, then such party may not terminate this Agreement pursuant to this Section 12(a)(iv);

(v)    by Sellers and Purchaser by mutual written consent;

(vi)    (A) by Purchaser, in the event of any inaccuracy in any of Sellers' representations or warranties contained in this Agreement or any breach of any of Sellers' covenants or agreements contained in this Agreement which, individually or in the aggregate with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth

- 33 -

in Section 9, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) fifteen (15) calendar days after written notice thereof and (y) the Transaction Deadline; provided, that Purchaser shall not have the right to terminate this Agreement under this Section 12(a)(vi)(A) at a time when Sellers have (or would have after the passage of time) the right to terminate this Agreement under Section 12(a)(vi)(B), and (B) by Sellers, in the event of any inaccuracy in any of Purchaser's representations or warranties contained in this Agreement or any breach of any of Purchaser's covenants or agreements contained in this Agreement which, individually or in the aggregate with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth in Section 10, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) fifteen (15) calendar days after written notice thereof and (y) the Transaction Deadline; provided, that Sellers shall not have the right to terminate this Agreement under this Section 12(a)(vi)(B) at a time when Purchaser has (or would have after the passage of time) the right to terminate this Agreement under Section 12(a)(vi)(A).

(vii)    by Purchaser or Sellers upon the closing of an Alternative Transaction (as defined in Section 13(c)), provided that no such termination shall affect Purchaser's right to payment of the Break-Up Fee (as defined in Section 13(a)) in accordance with the provisions of this Section 12;

(viii)    [Intentionally Omitted];

(ix)    by Purchaser, upon the conversion of the Bankruptcy Case to a Chapter 7 liquidation, the dismissal of the Bankruptcy Case, or the appointment of a trustee or examiner with extended powers; or

(x)    by Purchaser or Sellers, by written notice to the other parties if there shall be in effect an Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, or the Bankruptcy Court or another court of competent jurisdiction shall stay the Approval Order.

b.    Notice of Termination.  Notice of termination of this Agreement shall be given by the party or parties so terminating to the other parties in accordance with Section 15(e). Notwithstanding anything contained in Section 15(e) to the contrary, any notice of termination shall be required to be delivered to Sellers' Counsel and countersigned by a Seller.

c.    Effect of Termination.  Upon termination of this Agreement, the parties may abandon the transactions contemplated hereby and, to the extent practicable, shall withdraw all filings, applications and other submissions made pursuant to the transactions contemplated hereby from the Governmental Authority or Person to which made.  Except as otherwise provided in this Section 12(c), upon termination of this Agreement, this Agreement shall cease to have any force or effect and the parties under this Agreement shall cease to have any further obligations or liabilities under this Agreement.  Notwithstanding the foregoing, (i) following any termination of this Agreement, each party shall continue to be liable to the other parties for fraud occurring on or before the date of such termination, (ii) if this Agreement is terminated by reason of (A) any material breach hereof by the non-terminating party or (B) any non-compliance by the non-terminating party with its obligations under this Agreement, which non-compliance shall

- 34 -

have been the cause of the failure of one or more of the conditions to the terminating party's obligations to effect the transactions contemplated hereby to have been satisfied, the terminating party's right to pursue any available remedies at law, subject to Section 15(p) and Section 15(q), shall survive such termination unimpaired, and (iii) all rights and obligations of any party pursuant to Section 2(e)(iii), Section 2(e)(iv), Section 8(e), Section 11, this Section 12(c), Section 13, Section 15(a), Section 15(b), Section 15(k), Section 15(m), Section 15(o), Section 15(p), and Section 15(q) shall survive such termination unimpaired.

13.    Break-Up Fee.

a.    Sellers agree and acknowledge that Purchaser's negotiation and execution of this Agreement has required a substantial investment of management time and a significant commitment of financial and other resources by Purchaser, and that the negotiation and execution of this Agreement have provided value to Sellers. Therefore, if any Alternative Transaction closes, Sellers shall pay or cause Purchaser to be paid cash in an amount equal to Six Hundred Twenty Thousand Dollars ($620,000) as a break-up fee (the "Break-Up Fee").

b.    Sellers' obligation to pay the Break-Up Fee under this Section 13 shall be subject to the entry of the Bidding Procedures Order. The Break-Up Fee shall become due and payable upon the closing of an Alternative Transaction, and the Break-Up Fee shall be paid within two (2) Business Days of such closing in immediately available funds to an account designated in writing by Purchaser to Sellers within a reasonable time prior to the date set forth herein and without need for Order of the Bankruptcy Court (other than the Bidding Procedures Order). Notwithstanding the foregoing, the Break-Up Fee shall not be due and payable if Purchaser committed a Purchaser Material Breach prior to the termination of this Agreement.

c.    As used in this Agreement, "Alternative Transaction" means any transaction that results in the sale or transfer (in a plan of reorganization, single transaction or a series of transactions) by the Seller of all or substantially all of the Acquired Assets, or the issuance or sale (in a plan of reorganization, single transaction or a series of transactions) by the Seller of all or substantially all of the equity interests of a Seller or the Acquired Foreign Subs, to any Person other than Purchaser or its assignee, provided however, that a transaction shall not constitute an Alternative Transaction unless the Senior Lenders determine, in good faith, taking into consideration such matters that they deem relevant, that such transaction is more favorable to the Senior Lenders than the transactions contemplated hereby.

d.    As used in this Agreement, "Purchaser Material Breach" shall mean any inaccuracy in any of Purchaser's representations or warranties contained in this Agreement or any breach of any of Purchaser's covenants or agreements contained in this Agreement which, individually or in the aggregate with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth in Section 10, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) fifteen (15) calendar days after written notice thereof and (y) the Transaction Deadline.

14.    Closing Date and Post-Closing Covenants.

a. <u>Further Assurances</u>.  At any time and from time to time after the Closing, Sellers and Purchaser shall, at the request of any party hereto, take any and all reasonable actions necessary to fulfill its obligations hereunder and to put Purchaser in actual possession and operating control of the Acquired Assets, and execute and deliver such further instruments of conveyance, sale, transfer and assignment, and take such other actions necessary or desirable to effectuate, record or perfect the transfer of the Acquired Assets to Purchaser, to confirm the title of the Acquired Assets in Purchaser, to assist Purchaser in exercising rights relating thereto, or to otherwise effectuate or consummate any of the transactions contemplated hereby.

b. <u>Retention of Information and Documents; Access</u>.

(i) So long as the Bankruptcy Case is pending and for one (1) year thereafter, but not to exceed a cumulative three (3) years, (A) Purchaser shall permit Sellers' counsel and other professionals employed in the Bankruptcy Case reasonable access to the Books and Records, whether in documentary or data form, for the purpose of the continuing administration of the Bankruptcy Case, including the pursuit of any avoidances, preferences or similar actions, concluding the transactions contemplated herein, preparing or filing tax returns or responding to audits, satisfying any other legal and contractual requirements, and prosecuting or defending third party claims, which access shall include (I) the right of such professional to copy, at Sellers' expense, such documents and records as they may request in furtherance of the purposes described herein, and (II) Purchaser's copying and delivering to Sellers or their professionals such documents or records as they may reasonably request, provided that Sellers or their professional furnish Purchaser with reasonably detailed written descriptions of the documents or records to be so copied and Seller reimburses Purchaser for the reasonable costs and expenses thereof, and (B) Purchaser shall provide Sellers and such professionals, at no cost to Sellers, with reasonable access to various personnel to whom Sellers will need continued access after Closing during the regular business hours of Purchaser and at Purchaser's business locations to assist Sellers in furtherance of purposes set forth herein; provided, that such access does not unreasonably interfere with Purchaser's business operations.  Thereafter, access shall be permitted upon the reasonable written request of Seller, at Seller's sole cost and expense, which shall include any actual and reasonable out-of-pocket expenses of Purchaser.

(ii) Without limiting the generality of Section 14(b)(i) with respect to the purposes set forth therein, (A) the parties acknowledge and agree that after Closing, Sellers and their successors, including the representatives, agents and advisors thereto, may need access to the information and documents in the custody or control of Purchaser for the purposes of concluding the transactions contemplated herein, preparing or filing tax returns or responding to audits, satisfying any other legal and contractual requirements, and prosecuting or defending third party claims, and (B) Purchaser shall not dispose of or destroy any of the Books and Records, prior to the fifth (5th) anniversary of the Closing Date; provided, however, if Purchaser desires to dispose of or destroy any of such, after such anniversary, Purchaser shall first provide sixty (60) days' prior written notice to Sellers or their successors, as applicable, and Sellers or such successors shall have the right, at their option and expense, upon prior written notice to Purchaser within such sixty-day period, to take possession of such Books and Records within ninety (90) days after the date of the notice from Sellers or their successors, as the case may be.

- 36 -

(iii)    Purchaser shall cooperate with, and shall permit and use its best efforts to cause, its former and present directors, officers and employees to cooperate with Sellers or their successors, on and after the Closing, in furnishing information, testimony and other assistance in connection with any action, proceeding, arrangement or dispute of any nature with respect to the Business or the Acquired Assets for periods prior to the Closing Date.

(iv)    Sellers shall be entitled to retain copies of any Books and Records, excluding those consisting of Intellectual Property.

c.    Use of "Scovill" Name.  Within seven (7) days of Closing, (a) Sellers shall change their corporate names to no longer reference "Scovill" or any other trademark or trade name of the Business.  Sellers may refer to themselves as "formerly known as Scovill" solely in connection with Sellers winding up their estate in the Bankruptcy Case, for tax purposes and for corporate governance purposes and (b) seek Bankruptcy Court approval to change the caption on the Bankruptcy Case to a materially different name than "Scovill."  In no event will Sellers refer to a founding date in any communication with third parties after the Closing.

d.    Amounts Held In Trust.  Following the Closing, any amounts paid to Sellers in connection with the Acquired Assets, including the Accounts Receivable, shall be held in trust by Sellers for the benefit of Purchaser and tendered and paid by Seller to Purchaser as soon as reasonably practicable after the receipt thereof, and no less frequently than each Tuesday (or the next Business Day) with respect to receipts for the preceding week.  Following the Closing, any amounts paid to Purchaser in connection with the Excluded Assets, shall be held in trust by Purchaser for the benefit of Sellers and tendered and paid by Purchaser to Sellers as soon as reasonably practicable after the receipt thereof.

e.    Employment Matters.

(i)    Employment of Employees.  Purchaser shall offer employment to all of the salaried and non-salaried employees of Sellers, as of the Closing Date, with compensation (excluding performance bonuses, Employee Plans and other benefits, and equity incentives) substantially comparable, in the aggregate, to that offered by Sellers to such employees as of December 31, 2010.  All employees of Sellers accepting Purchaser's offer of employment are hereinafter referred to as the "Hired Employees."  Sellers shall be responsible for the payment of all unpaid salaries, sick pay, holiday pay, employee retention or stay-put compensation, severance pay and other like obligations and payments to Sellers' employees earned in or relating to all periods ending prior to the Petition Date; provided, however, the parties expressly acknowledge and agree that (A) the Unused Vacation incurred in the ordinary course of business prior to the Petition Date but unpaid or unused prior to the Closing Date and (B) the Management Bonuses, shall be Assumed Liabilities.  Subject to this Section 14(e)(i), Sellers shall be responsible for all other costs, expenses and liabilities attributable to the Hired Employees accruing on and after the Petition Date in the ordinary course of business but unpaid prior to the Closing Date, including any costs, expenses or liabilities incurred in connection with the termination of the employment of a Hired Employee after the Petition Date but prior to the Closing Date.

- 37 -

(ii)     Severance Policies.    Sellers shall notify all employees of the Business prior to the Closing Date that persons offered employment with Purchaser will not be entitled to receive severance pay, whether or not they accept such employment.  Failure to accept employment with Purchaser shall be deemed to be a voluntary resignation by the employee.

(iii)     Purchaser Benefit Plans.  As of the Closing Date, Purchaser shall have benefit plans in effect that offer the Hired Employees benefits consistent with Schedule 14(e)(iii).  Each Hired Employee shall receive credit for prior years of service with such Hired Employee's respective Seller for all purposes of Purchaser's benefit plans (except for purposes of benefits accrued under a defined benefit plan) and to the extent permitted under Purchaser's benefit plans shall be entitled to participate in Purchaser's employee benefit plans without the application of any applicable waiting periods.  To the extent permitted under such benefit plans, Purchaser also shall permit the Hired Employees and their eligible dependents to participate in its applicable group medical plans without the application of any waiting periods.  To the extent permitted by Purchaser's benefit plans, Purchaser shall recognize all medical expenses incurred by the Hired Employees and eligible dependents during the calendar year of the Closing and prior to the Closing Date for purposes of satisfying the existing calendar year deductibles and such calendar year's co-payment limitations, if any.   Without limiting the generality of the foregoing, Purchaser shall give each Hired Employee credit for prior years of service with such Hired Employee's respective Seller for purposes of calculating vacation pay that may be received pursuant to the vacation pay policy of Purchaser as may be in effect from time to time after the Closing, and will waive any eligibility requirements of such policy with respect to the Hired Employees.  Purchaser shall assume Sellers' accrued vacation pay liability and allow the Hired Employees to take any unused vacation for the calendar year in which the Closing Date occurs.

(iv)     Sellers' Benefit Plans.    Except for the Assumed Liabilities, Purchaser shall assume no responsibility with respect to any Sellers' Benefit Plans (as hereinafter defined).    To the extent necessary, Sellers may continue to communicate with the Hired Employees regarding their rights and entitlement to any benefits under the Sellers' Benefit Plans. The parties shall cooperate with each other in the administration of all applicable employee benefit plans and programs whether of Sellers or Purchaser.  For purposes hereof, "Sellers' Benefit Plans" shall mean all of Sellers' agreements and plans which are presently in effect and under which Sellers, with respect to employees of Sellers engaged in the Business, have any outstanding, present or future obligation or liability, or under which any such employee has any present or future right to benefits, including, (A) any employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) any other pension, profit sharing, retirement, stock purchase, stock option, other equity-based incentive, bonus, performance, vacation, termination, retention, severance, disability, hospitalization, medical, life insurance or other employee benefit plan, program, policy or arrangement.

(v)     Payments to Certain Individuals.  Purchaser shall make monthly payments to the individuals set forth on Schedule 14(e)(v), in the amount set forth opposite each individual's name thereon, and in accordance with the terms set forth thereon, provided that such individuals execute releases of claims in form and substance reasonably acceptable to the parties.

(vi)    WARN Act.  Purchaser shall be responsible for and shall pay any and all liabilities or obligations arising under the Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act"), or any similar local, state or foreign law, and severance obligations of Sellers, if any, arising out of or resulting from layoffs of Sellers' or their affiliates' employees or any termination of their employment occurring at or after the Effective Time, unless Seller terminates twenty (20) or more employees between the Agreement Date and the Effective Time at a single business location, in which case the sixty (60) day notice period for such terminations shall be included as an accrued liability set forth in the Books and Records of Sellers.  Purchaser shall indemnify, and hold Sellers and their successors and affiliates harmless from or against, any and all claims, losses, damages, expenses, obligations and liabilities, including costs of collection, attorney's fees and other costs of defense, which Sellers or their affiliates may incur in connection with any suit or claim of violation brought against Sellers or their affiliates, arising under the WARN Act, or any similar state or foreign law, or any severance obligation of Sellers or their affiliates, which relates to transactions effected in connection with the transactions provided herein or any other action taken by Purchaser after the Closing Date.

f.    Prorations.

(i)    To the extent not included in the Assumed Liabilities, Utility Charges, Rental Charges, Equipment Charges, Real Property Taxes and Personal Property Taxes, including accruals or prepayments thereof (all as individually defined herein and collectively referred to as the "Proration Items"), calculated without regard to pre-Petition arrearages, shall be prorated directly between Sellers and Purchaser as provided in this Section 14(f).

(ii)    For purposes of this Section 14(f), the capitalized terms set forth below shall have the following meanings:

(A)    "Utility Charges" means water, sewer, electricity, gas and other utility charges, if any, applicable to the Real Property or the Leased Real Property;

(B)    "Rental Charges" means common area maintenance charges, merchant association dues, insurance reimbursement and rental charges payable or receivable and other payments or receipts (other than Real Property Taxes) applicable to the Leased Real Property;

(C)    "Equipment Charges" means rental charges payable or receivable and other payments or receipts applicable to the Tangible Personal Property;

(D)    "Real Property Taxes" means ad valorem taxes imposed upon the Owned Real Property and any portion of the Leased Real Property, general assessments imposed with respect to the Leased Real Property and special assessments upon the Leased Real Property, whether payable in full or by installments prior to the Closing Date; and

(E)    "Personal Property Taxes" means ad valorem taxes imposed upon the Acquired Assets other than the Real Property or the Leased Real Property.

- 39 -

(iii)    As soon as practicable after the Closing Date, all Utility Charges, Rental Charges, Equipment Charges, Real Property Taxes and Personal Property Taxes (including amounts owed pursuant to transferable state licenses applicable to the Acquired Assets and transferred to Purchaser hereunder) which are not included in the Assumed Liabilities shall be apportioned to the Closing Date.  As soon as reasonably practicable after the Closing Date, representatives of Seller and Purchaser will examine all relevant Books and Records as of the Closing Date in order to make the determination of the apportionments.  Payments in respect thereof shall be made to the appropriate party by check within five (5) days after such determination, except that payments for Real Property Taxes and Personal Property Taxes shall initially be determined based on the previous tax year's taxes and shall later be adjusted to reflect the current tax year's taxes when the applicable tax bills are finally rendered.  The parties shall fully cooperate with each other to avoid, to the extent legally possible, the payment of duplicate Personal Property Taxes, and each party shall furnish, at the request of the other, proof of payment of any Personal Property Taxes or other documentation which is a prerequisite to avoiding payment of a duplicate tax.

(iv)    In the event that either party (the "Payor") pays a Proration Item (other than if and to the extent included in the Assumed Liabilities) for which another party (the "Payee") is obligated in whole or in part under this Section 14(f), the Payor shall present to the Payee evidence of payment and a statement setting forth the Payee's proportionate share of such Proration Item, and the Payee shall promptly pay such share to the Payor.  In the event a party (the "Recipient") receives payment of a Proration Item to which another party (the "Beneficiary") is entitled in whole or in part under this Agreement, the Recipient shall promptly pay the Beneficiary's share to the Beneficiary.  All Proration Items are separate and distinct from any calculation of the Final Adjustment.

15.    Miscellaneous.

(a)    Governing Law, Venue and Jurisdiction.    This Agreement shall be governed by the laws of the State of Georgia, without regard to its conflicts of laws rules.  As more fully set forth in Section 15(o), any action or proceeding involving this Agreement or the rights or obligations of the parties under this Agreement shall be brought exclusively in the Bankruptcy Court.  Each of the parties consents to personal jurisdiction and venue in the Bankruptcy Court with respect to disputes arising under this Agreement and agrees to be bound by the Bankruptcy Court's ruling (or the ruling of an appellate court, if such ruling is appealed) as to any such matters.  If, and only if, the Bankruptcy Court shall decline jurisdiction, then matters arising hereunder may be brought in any other court having jurisdiction.

(b)    Binding.    This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective representatives and successors, including any trustee appointed pursuant to the Bankruptcy Code.  This Agreement shall not be assigned by Sellers or Purchaser, except that (i) Purchaser may designate one or more affiliate entities to take title to the Acquired Assets or a portion thereof, without releasing Purchaser from any obligation hereunder, and (ii) Purchaser and/or such designees may pledge this Agreement as collateral to obtain debt financing.

- 40 -

(c)    Entire Agreement.  This Agreement, the Other Documents to which any party hereto is a party, and the accompanying Schedules and Exhibits, contain the full and complete understanding of the parties with respect to the acquisition of the Acquired Assets and all other transactions contemplated hereby, and supersede all prior agreements or understandings by and among the parties hereto relating to the subject matter hereof.

(d)    Amendment.  This Agreement may be amended, modified or supplemented only by written instruments signed by Purchaser and each Seller, and any immaterial amendments, modifications or supplementations required by the Bidding Procedures approved by the Bankruptcy Court.  The parties expressly acknowledge and agree that, as of the Agreement Date, the letter agreement dated March 11, 2011 by and between Parent and Scovill, on the one hand, and Purchaser, on the other hand, is null, void and of no further force or effect.

(e)    Notices.  All notices, requests, demands and other communications under this Agreement to the parties shall be in writing and shall be personally delivered or sent by commercial overnight courier, facsimile (with the original by mail), email (with the original by mail) certified or registered mail, postage prepaid, to the following addresses:

If to Sellers:          Scovill, Inc.
                        Attn:   Mr. Stewart Q. Little
                        1802 Scovill Drive
                        Clarkesville, GA 30523
                        Telephone:    (706) 754-0502
                        Facsimile:    (706) 754-3158
                        Email:        slittle@scovill.com


                        with copies (which shall not constitute notice) to:

                        Carl Marks Consulting Group LLC
                        Attn: Mr. Warren Feder
                        900 Third Avenue
                        New York, New York 10022
                        Telephone:    (212) 909-8459
                        Facsimile:    (212) 752-9753
                        Email:        wfeder@carlmarks.com

                        and to:

                        Alston & Bird LLP
                        Attn:   W. Hunter Holliday
                                John C. Weitnauer
                        One Atlantic Center
                        1201 West Peachtree Street
                        Atlanta, Georgia 30309-3424
                        Telephone:    (404) 881-7000
                        Facsimile:    (404) 881-7777

- 41 -

|          | Email:     | hunter.holliday@alston.com; |
|----------|------------|------------------------------|
|          |            | kit.weitnauer@alston.com     |

If to Purchaser:    Global SFI Holdings, LLC
c/o Global Equity Capital, LLC
Attn: Chief Financial Officer
6260 Lookout Road
Boulder, CO 80301
Telephone:    (303) 531-1000
Facsimile:    (303) 531-1001

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attn: Robert Saunders
Attn: David Barton
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone:    (310) 277-6910
Facsimile:    (310) 201-0760
Email:        rsaunders@pszjlaw.com
              dbarton@pszjlaw.com

Any party may change its address for purposes of this Section 15(e) by giving all the other parties notice of the new address in the manner set forth herein.  Any notice given as set forth herein shall be deemed to have been received on the earlier of actual receipt or five (5) Business Days after being sent.

(f)    Survival.  Except for the covenants herein that are intended to continue or begin after the Closing Date as set forth herein (the "Continuing Covenants", none of the respective representations, warranties, covenants or agreements of Sellers and Purchaser herein, or in any of the Other Documents, shall survive the Closing.  Each Continuing Covenant shall continue in effect until such time as such Continuing Covenant has been fulfilled in full or has been waived in writing by the applicable party or parties to this Agreement.

(g)    Tax Effect.  No party, nor such party's counsel or accountants, has made or is making in this Agreement or otherwise any representation to the other parties, or to their counsel or accountants, concerning any of the tax effects or consequences on the other parties of the transactions provided for in this Agreement.  Each party represents that it has obtained independent tax advice with respect thereto and upon which it has solely relied.

(h)    Employee Withholding.  The parties acknowledge and agree that, pursuant to the "Alternative Procedure" provided in Section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, with respect to filing and furnishing IRS Forms W-2, W-3 and 941, (i) Sellers shall report on a "predecessor-successor" basis, as set forth therein, (ii) Sellers shall be relieved from furnishing Forms W-2 to any of the Continuing Employees, and (iii) Purchaser shall assume the

- 42 -

obligations of Sellers to furnish such Forms W-2 to such Continuing Employees for the calendar year in which the Closing occurs.

(i)    Time of Essence.  Time is of the essence with respect to this Agreement and the transactions contemplated hereby.

(j)    Severability.  If any one or more of the provisions herein shall be deemed invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement and any application thereof shall not in any way be affected or impaired thereby.

(k)    No Third Party Beneficiaries.  No Person (other than the parties to this Agreement and their respective successors and affiliates) shall have or be construed to have any legal or equitable right, remedy or claim under or in respect of or by virtue of this Agreement or any provision herein.  Without limiting the foregoing, no employee of Sellers nor creditor of Sellers in the Bankruptcy Case shall be deemed a third party beneficiary of this Agreement.

(l)    Section Headings; Construction and Interpretation.  The headings of Sections and Articles in this Agreement are provided for convenience only and shall not affect its construction or interpretation.  All references to "Article," "Articles," "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Whenever the words "include," "includes" or "including" are used in this Agreement or any Exhibit, they shall be deemed followed by the words "without limitation."  No party to this Agreement shall be considered the draftsman of the Agreement or any Exhibits, but this Agreement and any Exhibits have been reviewed, negotiated and accepted by the parties and their respective attorneys.  For purposes hereof, "Knowledge of Sellers" and other similar phrases means the knowledge of Stewart Little, Chris Hitt, Larry Himes, Kim Brookshire and Brian Moore, in each case after due inquiry into the relevant matter.  Whenever the phrases "in accordance with GAAP", "applied consistently with prior periods of Sellers", "consistent with Sellers' practices and methods" or similar words and phrases, the words or phrases shall be interpreted to mean the historical policies, practices, methods and procedures of Sellers from December 31, 2008 through the Agreement Date.

(m)    Waiver.  The waiver of any term, condition or performance under this Agreement must be in writing and executed by the party granting such waiver, and such written waiver must expressly state that it is a waiver under this Agreement.  No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly provided in the written waiver.

(n)    Counterparts.  This Agreement and any Other Documents may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.  Signatures supplied by facsimile or contained in documents attached to email for transmission shall be considered valid and binding for all purposes.

- 43 -

(o)    Jurisdiction.  SELLERS AND PURCHASER ACKNOWLEDGE AND AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER DOCUMENTS, INCLUDING THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES, AND PURCHASER EXPRESSLY CONSENTS TO SUCH EXCLUSIVE JURISDICTION AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

(p)    Liquidated Damages as Sole Remedy of Sellers.

THE PARTIES ACKNOWLEDGE THAT SELLERS' ACTUAL DAMAGES IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREBY ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.  THEREFORE, BY SEPARATELY EXECUTING THIS SECTION 15(p) BELOW, THE PARTIES ACKNOWLEDGE THAT THE AMOUNT OF THE DEPOSIT THAT IS THE SUBJECT OF SECTION 2(e) OF THIS AGREEMENT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF SELLERS' DAMAGES, AND AS THE SELLERS' SOLE AND EXCLUSIVE REMEDY AGAINST PURCHASER (OTHER THAN FOR INTENTIONAL MISREPRESENTATION OR FRAUD), WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO, INCLUDING THE FAILURE OF PURCHASER TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR SCHEDULES HERETO.

BY SEPARATELY EXECUTING THIS SECTION 15(p) BELOW PURCHASER AND SELLERS ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISIONS COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.

SELLERS:    _____
PURCHASER:  _____

- 44 -

(o)    Jurisdiction.  SELLERS AND PURCHASER ACKNOWLEDGE AND AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER DOCUMENTS, INCLUDING THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES, AND PURCHASER EXPRESSLY CONSENTS TO SUCH EXCLUSIVE JURISDICTION AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

(p)    Liquidated Damages as Sole Remedy of Sellers.

THE PARTIES ACKNOWLEDGE THAT SELLERS' ACTUAL DAMAGES IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREBY ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.  THEREFORE, BY SEPARATELY EXECUTING THIS SECTION 15(p) BELOW, THE PARTIES ACKNOWLEDGE THAT THE AMOUNT OF THE DEPOSIT THAT IS THE SUBJECT OF SECTION 2(e) OF THIS AGREEMENT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF SELLERS' DAMAGES, AND AS THE SELLERS' SOLE AND EXCLUSIVE REMEDY AGAINST PURCHASER (OTHER THAN FOR INTENTIONAL MISREPRESENTATION OR FRAUD), WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO, INCLUDING THE FAILURE OF PURCHASER TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR SCHEDULES HERETO.

BY SEPARATELY EXECUTING THIS SECTION 15(p) BELOW PURCHASER AND SELLERS ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISIONS COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.

SELLERS:    _____

PURCHASER:  _____

(q)    Liquidated Damages as Sole Remedy of Purchaser.

THE PARTIES ACKNOWLEDGE THAT PURCHASER'S ACTUAL DAMAGES IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREBY ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. THEREFORE, BY SEPARATELY EXECUTING THIS SECTION 15(q) BELOW, THE PARTIES ACKNOWLEDGE THAT THE AMOUNT OF THE BREAK-UP FEE, THE SUBJECT OF SECTION 13 OF THIS AGREEMENT, HAVE BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF PURCHASER'S DAMAGES, AND AS PURCHASER'S SOLE AND EXCLUSIVE REMEDY (OTHER THAN FOR INTENTIONAL MISREPRESENTATION OR FRAUD) AGAINST SELLERS AND THE FOREIGN SUBSIDIARIES, WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO, INCLUDING THE FAILURE OF SELLERS TO PERFORM ANY OF THEIR OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR SCHEDULES HERETO.

BY SEPARATELY EXECUTING THIS SECTION 15(q) BELOW PURCHASER AND SELLERS ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISIONS COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.

SELLERS:            _____

PURCHASER:        _____

[Agreement Continues on Next Page]

- 45 -

    (q)    <u>Liquidated Damages as Sole Remedy of Purchaser</u>.

THE PARTIES ACKNOWLEDGE THAT PURCHASER'S ACTUAL DAMAGES IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED HEREBY ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. THEREFORE, BY SEPARATELY EXECUTING THIS SECTION 15(q) BELOW, THE PARTIES ACKNOWLEDGE THAT THE AMOUNT OF THE BREAK-UP FEE, THE SUBJECT OF SECTION 13 OF THIS AGREEMENT, HAVE BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF PURCHASER'S DAMAGES, AND AS PURCHASER'S SOLE AND EXCLUSIVE REMEDY (OTHER THAN FOR INTENTIONAL MISREPRESENTATION OR FRAUD) AGAINST SELLERS AND THE FOREIGN SUBSIDIARIES, WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO, INCLUDING THE FAILURE OF SELLERS TO PERFORM ANY OF THEIR OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR SCHEDULES HERETO.

BY SEPARATELY EXECUTING THIS SECTION 15(q) BELOW PURCHASER AND SELLERS ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISIONS COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.

**SELLERS:** _____

**PURCHASER:** _____

[Agreement Continues on Next Page]

IN WITNESS WHEREOF, the parties have caused this Asset Purchase Agreement to be signed by their respective duly authorized officers as of the date first above written.

SELLERS:

SCOVILL, INC.

By: *[signature]*
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

SCOVILL FASTENERS INC.

By: *[signature]*
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

PCI GROUP, INC.

By: *[signature]*
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

SCOMEX, INC.

By: *[signature]*
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

RAU FASTENER COMPANY, L.L.C.

By: Scovill Fasteners Inc.

By: *[signature]*
Name:  Stewart Q. Little
Title: President and Chief Executive Officer

PURCHASER:

GLOBAL SFI HOLDINGS, LLC

By: _____

Name: Thomas A. Waldman

Title: VP and Secretary

## Exhibit A

Form of Bidding Procedures Order

## EXHIBIT A TO ASSET PURCHASE AGREEMENT

### IN THE UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOVILL FASTENERS INC., *et. al.* | ) | Case No. 11-21650 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**Order (A) Approving Bidding Procedures for the Proposed Sale of Substantially All of Debtors' Assets; (B) Scheduling an Auction and a Hearing to Consider Approval of the Sale of Debtors' Assets; (C) Approving Notices of Respective Dates, Times, and Places for Auction and for Hearing on Approval of Sale of Assets; (D) Approving Certain Break-Up Fee Provisions; and (E) Establishing Procedures Relating to the Assumption and Assignment of Contracts and Leases, including Notice of Cure Costs**

Upon the Motion[2] of the debtors and debtors in possession (collectively, the "**Debtors**" or "**Sellers**"), requesting entry of an order (the "**Motion**"): (A) approving bidding procedures (the "**Bidding Procedures**") for the proposed sale (the "**Sale**") of substantially all of the Debtors' assets, (B) scheduling an auction (the "**Auction**") and a hearing (the "**Sale Hearing**") to consider approval of the Sale and other related relief, (C) approving the proposed notices of the respective dates, times, and places for the Auction and for the Sale Hearing, (D) approving the Break-Up Fee

---

[1] The last four digits of the tax identification number for each of the Debtors follow in parenthesis: (i) Scovill Fasteners, Inc. (9561); (ii) Scovill, Inc. (3634); (iii) PCI Group, Inc. (7672) and Rau Fastener Company, L.L.C. (0883). Scomex, Inc. does not have a taxpayer identification number. The mailing address of the Debtors is 1802 Scovill Drive, Clarkesville, GA 30523-6348.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the APA (defined below) or in the Bidding Procedures (defined below).

provisions contained in the asset purchase agreement (the "**APA**") dated April 15, 2011 with Global SFI Holdings, LLC (the "**Buyer**") and (E) establishing procedures relating to the assumption and assignment of certain executory contracts and unexpired leases, including notice ("**Cure Notice**") of proposed cure amounts ("**Cure Costs**") (collectively referred to herein as the "**Initial Relief**"); and the Court having determined at the April ___, 2011 hearing on the Motion (the "**Hearing**") that, to the extent set forth herein, the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors and other parties in interest; due and appropriate notice of the Motion and the relief requested therein was provided by the Debtors; and after due deliberation thereon; and good and sufficient cause appearing therefore, it is hereby

FOUND, CONCLUDED AND DECLARED THAT:[3]

A.      This Court has jurisdiction over these cases, this proceeding and over the property of the estates of the Debtors pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M) and (0).

B.      Notice of the Hearing, the Motion and proposed entry of this Order is sufficient for all purposes under the Bankruptcy Code, Bankruptcy Rules and Local Rules of this Court, including, without limitation, Bankruptcy Code § 102(1), and no further notice of, or hearing on, the matters addressed in this Order is necessary or required.

C.      The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the Bidding Procedures.   The Bidding Procedures were negotiated in good faith by the Debtors and the Buyer and are reasonable and appropriate.

D.      The dates proposed by the Debtors for the Auction and the Sale Hearing are reasonable and appropriate.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

E.      The form of notices, parties to be served, and method of service proposed by the Debtors (described in more detail below) are reasonable and appropriate, and are in compliance with the applicable Bankruptcy Rules.

F.      The Buyer has expended, and likely will continue to expend, considerable time, money and energy pursuing its proposed purchase of the Acquired Assets and has engaged in extended arm's length and good faith negotiations. The APA is the culmination of these efforts. The Debtors, after extensive efforts, has been unable to find a purchaser for the Assets who is willing to enter into a definitive agreement to purchase the Assets on terms as favorable to the Debtors and their estates as the APA.

G.      The Debtors have demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee to Buyer.

H.      The Break-Up Fee is fair and reasonable, provides a material benefit to the Debtors' estates and creditors, and was negotiated by the Debtors in good faith and at arm's-length.

I.      The Debtors' payment to the Buyer (under the conditions of and as set forth in the APA) of the Break-Up Fee are: (i) actual and necessary costs and expenses of preserving the Debtors' estates; (ii) of substantial benefit to the Debtors' estates; (iii) reasonable and appropriate, in light of, among other things, (a) the size and nature of the proposed sale under the APA; (b) the substantial efforts that have been and will be expended by the Buyer; and (c) the benefits that the Buyer has provided to the Debtors' estates and creditors and all parties in interest herein, notwithstanding that the proposed sale is subject to higher or better offers; and (iv) necessary to ensure that the Buyer will continue to pursue its proposed acquisition of the Acquired Assets. In particular, the APA was the culmination of a process undertaken by the Debtors and their professionals to negotiate a transaction with a bidder who was prepared to pay the highest or

3

otherwise best purchase price to date for the Acquired Assets in order to maximize the value of the Debtors' estates.

J.      The Break-Up Fee is an expense that is necessary to maximize the value of the Debtors' estates and the entry of this Order is in the best interests of the Debtors, their estates, creditors, and all other parties in interest.

K.      No other party to date has entered into an asset purchase agreement for the acquisition of the Acquired Assets on terms acceptable to the Debtors: (i) the execution of the APA is a necessary prerequisite to determining whether any party other than the Buyer is willing to enter into a definitive agreement for the acquisition of the Acquired Assets on terms acceptable to the Debtors and their creditor constituency; (ii) the protections afforded to the Buyer by payment of the Break-Up Fee in accordance with the provisions of the APA were material inducements for, and express conditions of, the Buyer's willingness to enter into the APA, and (iii) the Buyer is unwilling to commit to hold open its offer to acquire the Acquired Assets under the terms of the APA unless the provisions set forth in the APA with respect to the allowance and payment of the Break-Up Fee are approved.

L.      The assurance of the payment in cash of the Break-Up Fee: (i) will promote more competitive bidding by inducing the Buyer's bid, which otherwise would not have been made, without which competitive bidding would be limited, and which may be the highest and best available offer for the Acquired Assets; (ii) has induced the Buyer to research the value of the Acquired Assets, conduct extensive due diligence and propose the transactions contemplated by the APA, including, among other things, submission of a bid that will serve as a minimum or floor bid on which all other bidders can rely; and (iii) will provide a benefit to the Debtors' estates by increasing the likelihood that the price at which the Acquired Assets are sold will reflect their true worth.

M.      The procedures proposed by the Debtors relating to the assumption and assignment of certain executory contracts and unexpired leases, including the form of the Cure Notice are reasonable and appropriate, and are in compliance with applicable Bankruptcy Rules.

N.      The entry of this Order is in the best interests of the Debtors, their estates, creditors and other parties-in-interest; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.      The Initial Relief requested in the Motion is granted to the extent set forth herein. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

2.      The **Bidding Procedures** attached hereto as **Exhibit 1**, are hereby approved and fully incorporated into this Order, and shall apply with respect to the Debtors' proposed sale of the Assets. The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures and this Order. As set forth in the Bidding Procedures, the **Bid Deadline** is **May 27, 2011 at 4:00 p.m. (Eastern Time)**. If a Bid (other than the Buyer's) is received by the Bid Deadline (or thereafter if the Bankruptcy Court grants an extension) and is determined to be a Qualified Bid, the Debtors shall conduct an **Auction** which shall commence at **10:00 a.m. (Eastern Time), on June 1, 2011** (the "**Auction Date**") in the offices of Alston & Bird LLP, Atlantic Center Plaza, 15th Floor, 1180 West Peachtree Street, Atlanta, GA 30309.

3.      Not later than three (3) business days from the entry of this Order Debtor shall send, by first-class mail postage prepaid, the **Notice of Auction and Hearing,** substantially in the form annexed hereto as **Exhibit 2,** to all parties listed on the creditor matrix.

4.      To the extent not previously provided, not later than three (3) days after entry of this Order, the Debtors shall send, by first-class mail postage prepaid, the **Notice of Proposed Sale, Bidding Procedures, Auction Date and Sale Hearing,** substantially in the form

5

annexed hereto as **Exhibit 3**, to (i) the Master Service List, (ii) the Buyer and all other entities known by the Debtors to have expressed a *bona fide* interest in acquiring all or portions of the Assets, (iii) all taxing authorities in the jurisdictions where the Debtors operate that have a reasonably known interest in the relief requested and which may have claims against the Debtors, (iv) all federal, state and local regulatory authorities known by the Debtors to assert jurisdiction over the Debtors and/or their property and to have an interest in the proposed Sale (including, without limitation, all relevant governmental authorities with authority over labor, employment, pensions and retiree medical benefits, including, without limitation, the Pension Benefit Guaranty Corporation, the United States Department of Labor and the Equal Employment Opportunity Commission), (v) any and all unions representing former employees or retirees of the Debtors or their predecessors, (vii) any retirees or former employees of any of the Debtors that are entitled to any retiree medical or life insurance benefits or other payments from any of the Debtors; (viii) the United States Environmental Protection Agency, (ix) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property, (x) the office of the United States Attorney for the Northern District of Georgia, (xi) all non-debtor parties to a contract or lease that the Debtors reasonably expect a purchaser to have assumed and assigned in connection with any Sale, and (ix) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets.

5.      The Break-Up Fee is hereby approved in all respects.

6.      Subject to the conditions and limitations set forth in the APA, the Debtors shall pay the Break-Up Fee to the Buyer pursuant to the terms and conditions set forth in the APA and without further order of this Court.

7.      Not later than five (5) days from entry of this Order, the Debtors shall serve the **Cure Notice**, substantially similar to the form attached hereto as **Exhibit 4** hereto, upon

counterparties to any contract or lease that the Debtors reasonably expect a purchaser to have assumed and assigned in connection with any Sale.

        8.      The Debtors will attach to the Cure Notice its calculation of the undisputed Cure Costs that the Debtors believe must be paid to cure all defaults under all such contracts or leases. If no amount is listed on the Cure Notice or is shown as "0", the Debtors believe that there are no Cure Costs. Unless the non-debtor party to a Designated Contract files an objection (the **"Cure Amount Objection"**) to its scheduled Cure Costs no later than three (3) business days prior to the Sale Hearing and serves the objection upon: (a) counsel to the Debtors, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, Attention: W. Hunter Holliday, Esq. and John C. Weitnauer, Esq.; (b) counsel to the lender, King & Spalding, 1180 Peachtree Street, NE, Atlanta, GA 30309, Attention: Sarah Borders, Esq. and Sarah Taub, Esq.; (c) counsel to any appointed committee; and (d) counsel for the Buyer, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd, Suite 1100, Los Angeles, CA 90067, Attention: Robert M. Saunders, Esq. and David Barton, Esq. and Burr & Forman LLP, 171 17th Street, NW, Atlanta, GA 30363, Attention: Erich N. Durlacher, Esq., then such non-debtor party shall (i) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts owing with respect to any defaults existing under such Designated Contract and the Debtors shall be entitled to rely solely upon the Cure Costs; and (ii) be forever barred and estopped from asserting or claiming against the Debtors, the Buyer, or such other Successful Bidder or any other assignee of the relevant Designated Contract that any additional amounts are due or defaults exist under such Designated Contract.

        9.      In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (i) the basis for the objection with specificity, (ii) the amount the party asserts as the Cure Costs, and (iii) attach appropriate documentation in support of the asserted Cure Costs. In the event that the Debtors and the non-debtor party to the Designated Contract cannot

consensually resolve the Cure Amount Objection, the Debtors will segregate any disputed cure amounts pending the resolution of any such disputes by this Court or mutual agreement of the parties.

10.    Hearings on any Cure Amount Objections may be held (a) at the Sale Hearing, or (b) on such other date as this Court may designate upon motion by the Debtors, provided that if the subject Designated Contract is assumed and assigned prior to such hearing, the cure amount asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be deposited and held in a segregated account pending further order of this Court or mutual agreement of the parties.

11.    The Debtors' decision to assume and assign any contracts or leases is subject to Court approval and consummation of the proposed sale of the Acquired Assets. Absent consummation of the proposed sale of the Assets, no contracts or leases shall be deemed assumed or assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

12.    Except to the extent otherwise provided in the APA or the agreement with the Successful Bidder, subject to payment of the cure amount determined by the Court (the "**Cure Payment**"), the assignee of any assumed contract or lease shall not be subject to any liability or other obligation to the  counterparty that accrued or first arose before the effective date of the proposed sale of the Assets, and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to Section 365(k) of the Bankruptcy Code.

13.    Objections, if any, to the remaining relief requested in the Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the Northern District of Georgia, on or before 4:00 p.m. (prevailing Eastern time) on _____, 2011 and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon: (i) counsel to the Debtors, Alston &

Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, Attention: W. Hunter Holliday, Esq. and John C. Weitnauer, Esq.; (ii) counsel to the lender, King & Spalding, 1180 Peachtree Street, NE, Atlanta, GA 30309, Attention: Sarah Borders, Esq. and Sarah Taub, Esq.; (iii) counsel to any appointed committee; and (iv) counsel for the Buyer, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd, Suite 1100, Los Angeles, CA 90067, Attention: Robert M. Saunders, Esq. and David Barton, Esq. and Burr & Forman LLP, 171 17th Street, NW, Atlanta, GA 30363, Attention: Erich N. Durlacher, Esq.

14.     The Sale Hearing shall be held before this Court on _____, 2011 at __:__ _.m. (prevailing Eastern time).  The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

15.     The notices to be issued in connection with the proposed sale of the Acquired Assets, substantially in the form of the notices annexed hereto as Exhibits 2, 3 and 4 are approved in all respects.

16.     Upon the consummation or closing of an Alternative Transaction, the Debtors shall pay to the Buyer in immediately available funds an amount equal to $620,000 (the **"Break-up Fee"**); provided, however, the Break-up Fee shall not be due and payable if the Buyer has committed a Purchaser Material Breach prior to any termination of the APA.  The Break-up Fee shall be treated in the Debtors' bankruptcy cases as an administrative expense claim under Section 503(b)(1) and Section 507(a)(1) of the Bankruptcy Code and shall be paid to Buyer (or such person or persons as the Buyer may designate) as of the consummation of an Alternative Transaction.

17.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

18.    This Order shall not be stayed for fourteen (14) days after the entry thereof as provided by Bankruptcy Rules 6004(h) and 6006(d), and shall be effective and enforceable immediately upon its entry on this Court's docket.

19.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

20.    This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order and the Bidding Procedures.

*** **END OF ORDER** ***

**Prepared and presented by:**

ALSTON & BIRD LLP

/s/   John C. Weitnauer
John C. Weitnauer (Bar No. 746550)
Heather Byrd Asher (Bar No. 139022)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Proposed Attorneys for Debtors*

<u>**EXHIBIT 1 TO BIDDING PROCEDURES ORDER**</u>

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOVILL FASTENERS INC., *et. al.* | ) | Case No. 11-_____ |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| _____ | ) | |

<u>**BIDDING PROCEDURES**</u>

      The above-captioned debtors (collectively the "**Debtors**") have filed chapter 11 cases pending in the Bankruptcy Court,[2] which cases are jointly administered under Case No. 11-_____ (____). By motion dated April __, 2011 (the "**Motion**"), the Debtors sought, among other things, approval of the process and procedures set forth below (the "**Bidding Procedures**") through which they will determine the highest, best or otherwise financially superior offer for substantially all of the Debtors' assets (the "**Assets**"). On April __, 2011, the Bankruptcy Court entered its order (the "**Bidding Procedures Order**") which, among other things, approved these Bidding Procedures.

      On June 2, 2011, the Bankruptcy Court shall conduct the Sale Hearing at which the Debtors shall seek entry of the Sale Order authorizing and approving the sale of the Assets (the "**Proposed Sale of the Assets**") to the Buyer (defined below) or to a Qualified Bidder (defined below) that the Debtors, in their reasonable discretion, determine to have made the highest and best offer for the Assets (the "**Successful Bid**").

*Agreement*

      On April __, 2011, the Debtors entered into an asset purchase agreement (the "**APA**") with Global SFI Holdings, LLC (the "**Buyer**"), pursuant to which the Buyer proposes to acquire the Assets. Pursuant to the APA, the Buyer will pay the Debtors (i) $17,000,000, plus (ii) the Purchaser's Total Cure Costs, if any, and, plus or minus, as the case may be, (iii) the difference between $10,000,000 and the Working Capital as of the Effective Time (the "**Change in Working Capital**"); provided however, if the Change in Working Capital, either positive or negative, is

---

[1]  The last four digits of the tax identification number for each of the Debtors follow in parenthesis: (i) Scovill Fasteners, Inc. (9561); (ii) Scovill, Inc. (3634); (iii) PCI Group, Inc. (7672) and Rau Fastener Company, L.L.C. (0883). Scomex, Inc. does not have a taxpayer identification number. The mailing address of the Debtors is 1802 Scovill Drive, Clarkesville, GA 30523-6348.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA (defined below).

greater than $2,000,000 (the "**Maximum Amount**"), then the Change in Working Capital shall be deemed equal to the Maximum Amount; and, in addition, Purchaser shall assume the Assumed Liabilities, in consideration for the sale of substantially all of the assets of the Debtors' estates as set forth in the APA.  The transaction contemplated by the APA is subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to Bankruptcy Code §§ 363 and 365.

*Assets for Sale*

The Debtors are offering for sale all or substantially all of the assets of the Debtors.  The assets for sale do not include the Excluded Assets, as more fully set forth in the APA.

*Designation as a Potential Bidder*

A person interested in making a bid to purchase the Assets must first deliver to the Debtors and their counsel written evidence that demonstrates that such person has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction *provided however*, that this requirement does not apply to a person who provided such information to the Debtors prior to the Petition Date.

If the Debtors conclude, following consultation with General Electric Capital Corporation, Agent for the Debtors' prepetition secured lenders and postpetition lenders (the "**Lender**") and any Official Committee of the Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"), that a person has the necessary financial ability to close the contemplated transaction, the Debtors will notify such person that it has been designated as a "**Potential Bidder**." Notwithstanding the designation of a person as a Potential Bidder, each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Potential Bidder and its contemplated transaction.

*Only Potential Bidders Given Access to Due Diligence Materials*

Only Potential Bidders that provide an executed confidentiality agreement in substantially the form attached hereto as Exhibit A are eligible to be given access to Scovill management, due diligence materials or additional non-public information, *provided however*, that this requirement does not apply to a person who executed a confidentiality agreement with the Debtors prior to the Petition Date that is still in effect. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders. The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

If the Debtors furnish any written materials related to the Debtors to a Potential Bidder that was not previously made available to the Buyer, then the Debtors shall place such materials in the Debtors' electronic data room and such information shall be made available to the Buyer and all other Potential Bidders (which shall be provided electronic or written notice thereof).

*Designation as Qualified Bidder*

A "Qualified Bidder" is a Potential Bidder that submits a Qualified Bid by the Bid Deadline or is granted an extension of the Bid Deadline by the Bankruptcy Court. The Buyer is a Qualified Bidder.

*Submission of Written Bids and Designation of Qualified Bids*

Each Potential Bidder that desires to make an offer, solicitation or proposal to purchase the Assets (a "**Bid**") shall deliver written copies of such Bid to (a) counsel to the Debtors, Alston & Bird, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, Attention: W. Hunter Holliday, Esq. and John C. Weitnauer, Esq.; (b) counsel to the Lender, King & Spalding 1180 Peachtree Street, Atlanta, GA 30309, Attention: Sarah R. Borders and Sarah L. Taub; and (c) counsel to any Committee no later than **May 27, 2011, at 4:00 p.m. (Eastern time)** (the "**Bid Deadline**"). The Bid Deadline may be extended by an order of the Bankruptcy Court, at the request of a Potential Bidder, after notice and hearing.

Only if a Bid satisfies each of the following conditions can it be designated a Qualified Bid:

(a)  Good Faith Deposit: The Bid must be accompanied by a deposit (the "**Good Faith Deposit**") in the form of a certified check or cash payable to the order of the Debtors in an amount equal to $1,000,000.

(b)  Minimum Overbid: The cash consideration proposed by the Bid must include cash or other consideration acceptable to the Debtors and Lender, in the amount of the APA, the Break-Up Fee and $250,000 ("**Initial Minimum Overbid Increment**"). In addition, the Bid must provide for assumption of the Assumed Liabilities.

(c)  Irrevocable: A bid must be irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court (the "**Termination Date**") and must provide that if such bid is not the successful bid at the Auction, that such bid shall remain open for acceptance as a "back up" bid and remain open for acceptance by the Debtors through the Transaction Deadline at the last price and on the terms offered by the Bidder at the Auction, *provided however*, if a Qualified Bidder states in its Bid that it is not willing for any Bid made by it to be selected as a Back-Up Bid (as that term is defined below), such Qualified Bidder's bid must be irrevocable until the Auction. A Potential Bidder's refusal to serve as a Back-Up Bidder (as that term is defined below) will not disqualify such bidder from becoming a Qualified Bidder nor will such refusal have an impact on the determination of whether such bidder's Bid is the highest and best offer.

(d)  The Same or Better Terms: The Bid must be on terms that, in the Debtors' business judgment, upon consultation with the Lender and any Committee, are substantially the same or better than the terms of the APA. A Bid must include an asset purchase agreement pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "**Contemplated Transaction Documents**"). A Bid shall include a copy of the APA marked to show all changes requested by the Bidder (including those related to Purchase Price). The Contemplated Transaction Documents must include a commitment to close by the Transaction Deadline. A Bid must propose a contemplated transaction involving all or substantially all of the Assets.

(e)  Contingencies: A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and

3

warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall determined by the Debtors in their reasonable discretion, upon consultation with the Lender and any Committee, be more burdensome than those set forth in the APA.

(f)    <u>No Fees payable to Qualified Bidder</u>: A Bid may not request or entitle the Qualified Bidder to any Break-Up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bidding Procedures.

(g)    Ability to Consummate: The Debtors believe, in their reasonable discretion, upon consultation with the Lender and any Committee, that such Bid would be consummated if selected as the Successful Bid.

Notwithstanding any of the foregoing requirements, the shall constitute a Qualified Bid.

After consideration of any Bids received, the Debtors, upon consultation with any Committee and Lender, shall determine as soon as is practicable whether any Bid is a Qualified Bid, and if so, shall notify the Potential Bidder that the Bid is a Qualified Bid and that Potential Bidder is a Qualified Bidder. In the event that any Bid is determined not to be a Qualified Bid, the Potential Bidder shall be refunded its deposit and all accumulated interest thereon within three (3) business days after that determination.

If no Bids are received by the Bid Deadline, or none of the Bids submitted before the Bid Deadline is determined to be a Qualified Bid, then the Buyer will be deemed the Successful Bidder, the APA will be the Successful Bid and the Debtors will seek approval to and authority to consummate the Proposed Sale of the Assets contemplated under the APA. If, however, a Bid (other than the Buyer's) is received by the Bid Deadline and is determined to be a Qualified Bid, the Debtors shall conduct an auction (the "**Auction**") for the Assets as provided below. The Debtors shall provide the Buyer and all Qualified Bidders with copies of all Qualified Bids no later than noon (Eastern time) on the second business day prior to the Auction.

### Auction

*Date, Time and Location of Auction*

**The Auction shall commence at 10:00AM, prevailing Eastern Time, on June 1, 2011 (the "Auction Date") in the offices of Alston & Bird LLP, 15th Floor, 1180 West Peachtree Street, Atlanta, GA 30309.**

*Persons Permitted to Attend or Participate; Consent to Jurisdiction of the Bankruptcy Court*

Only Qualified Bidders will be eligible to participate at the Auction. Only the authorized representatives of Qualified Bidders, any Committee, the Lender and the Debtors shall be permitted to attend. All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.

4

*The Debtors Shall Conduct the Auction*

The Debtors and their professionals shall direct and preside over the Auction.

*Announcement of the Baseline Bid*

At the start of the Auction the Debtors shall describe the terms of the highest and best Qualified Bid, as determined in the Debtors' reasonable discretion (upon consultation with the Lender and any Committee) (the "**Baseline Bid**"). The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors, after consultation with the Lender and any Committee, reasonably deem relevant to the value of the Qualified Bid to the estates, which may include: (A) the amount and nature of the consideration; (B) the proposed assumption of any liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed Closing Date and the likelihood, extent and impact of any potential delays in Closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of any changes from the APA, if any, contemplated by the Contemplated Transaction Documents, (H) the economic effect on the Debtors' estates of any claim waivers included as part of the consideration; and (I) the net after-tax consideration to be received by the Debtors' estates.

*Open Outcry Auction*

After the Baseline Bid has been announced, the auction will proceed by open outcry, as follows: All Bids made thereafter must be Overbids (as defined below), and shall be made and received on an open basis, all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid.

Notwithstanding the foregoing, the Debtors reserve the right, in their reasonable business judgment after consultation with the Lender and any Committee, to temporarily suspend the making of Overbids in order to allow individual Qualified Bidders to consider how they wish to proceed; to allow discussions between the Debtors and individual Qualified Bidders; or to give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, after consultation with the Lender and any Committee, in their reasonable business judgment may require, that the Qualified Bidder (other than the Buyer) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount. Notwithstanding the foregoing, the length and number of such suspensions shall be reasonably limited so that the Auction can, absent extraordinary circumstances, be completed on the Auction Date; and in any event, if the Auction is continued to the day after the Auction Date, no suspensions shall be granted that would prevent the Auction from concluding by 5:00PM Atlanta time on the day after the Auction Date.

*Terms of Overbids*

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid a Qualified Bidder must comply with the following conditions:

5

(i)    Minimum Overbid Increment

Any Overbid after the Baseline Bid shall be made in increments of at least $100,000 of cash or other equivalent value acceptable to the Debtors in its reasonable discretion.  If the Buyer elects to submit an Overbid, the Buyer shall be entitled to a credit in connection with any such Overbid in an amount equal to $620,000, the amount of the Break-Up Fee.

(ii)    Remaining Terms are the Same or Better as Qualified Bid

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply.  Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher Qualified Bid as an Overbid and (ii) the Overbid of another Qualified Bidder is selected as the Back-Up Bid (as defined below).

*Announcing Overbids*

The Debtors shall announce during the Auction the material terms of each Overbid.  After each Overbid, the Debtors shall indicate which Bid is, in the Debtors' reasonable business judgment, after consultation with the Lender and any Committee, the highest and best Bid, the basis for calculating the consideration offered in each such Overbid, and shall thereafter provide the Buyer and each Qualified Bidder an opportunity to make subsequent Overbids.

*No Inconsistent Rules*

The Debtors may not adopt rules for the Auction at or prior to the Auction that are inconsistent with any of the provision of the Bidding Procedures Order or these Bid Procedures, absent the written consent of the Buyer and Lender, or upon Bankruptcy Court order.

*Closing the Auction*

Upon conclusion of the bidding, the Auction shall be closed.  The Debtors will announce which Overbid  has been determined, after consultation with the Lender and any Committee, to be the Successful Bid.  The entity submitting the Successful Bid shall be designated the "Successful Bidder." If the Buyer's final bid is deemed to be highest and best at the conclusion of the Auction, the Buyer will be the Successful Bidder, and such bid, the Successful Bid. In their reasonable discretion, the Debtors may designate the next highest and best offer after the Successful Bid as the "Back-Up Bid" and the bidder making such bid, the "Back-Up Bidder".

**Sale Hearing**

The Sale Hearing shall be conducted by the Bankruptcy Court on a day that is __ (__) business day[s] following the Auction Date or on such date as may be established by the Bankruptcy Court.  The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing upon the entry of the Approval Order.  Following the entry of the Approval Order, if the Successful Bidder fails to consummate the sale within the time required by the Contemplated Transaction Documents, the Debtors shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be

authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Back-Up Bid without further order of the Bankruptcy Court.

### Return of Good Faith Deposit

The Good Faith Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. The Good Faith Deposit of the Back-Up Bidder, if any, shall be held in an interest-bearing escrow account until the Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the Back-Up Bidder, or, in the event the transactions contemplated by the Successful Bid are not consummated, shall be applied to the purchase price of the Back-Up Bid upon the closing of that transaction. Good Faith Deposits of Qualified Bidders other than the deposit of the Back-Up Bidder shall be returned to the respective bidders promptly following the entry of the Approval Order. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

### Modifications

The Bidding Procedures may not be modified except with the express written consent of the Debtors and the Buyer after consultation with any Committee and Lender or upon Bankruptcy Court order.

### Right to Reject Bids

The Debtors, upon consultation with the Lenders and any Committee, may (a) determine, which Qualified Bid, if any, is the highest, best or otherwise financially superior offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors.

**Exhibit A**

**NONDISCLOSURE AGREEMENT**

## Exhibit A to Bidding Procedures - NONDISCLOSURE AGREEMENT

**THIS NONDISCLOSURE AGREEMENT** (the "**Agreement**") is entered into as of the date set forth above the signatures below as the effective date (the "**Effective Date**"), between **Scovill Fasteners, Inc.** (the "**Company**"), on the one hand, and the party designated on the signature page hereof as the Discussion Party (the "**Discussion Party**"), on the other hand.

### Background Statement

The Discussion Party is interested in receiving certain Confidential Information (as defined below) from the Company for the sole purpose of evaluating, negotiating and/or carrying out the performance of one or more possible business transactions with the Company (any such business transaction is referred to as a "**Transaction**"). The parties believe it is in their mutual interest to ensure that all such Confidential Information will be safeguarded and carefully protected by the Discussion Party. In consideration of the foregoing, and other valuable consideration, the parties, intending to be legally bound, agree as follows:

1.    **Confidential Information.**  For purposes of this Agreement, "**Confidential Information**" shall mean the following:

(i)    All records, files, analyses, documents, technical or financial information, business plans, marketing plans, product information, employee and customer information, any financial statements and analyses, budgets, tax returns, benefits and compensation plans, customer list(s) and contact names, designs, drawings, analysis, research, "know how" and the like, including, without limitation, any confidential information memorandum or similar document(s) provided to Discussion Party by or on behalf of the Company; and

(ii)    Other valuable information of Company designated as confidential expressly or by the circumstances in which such information is provided, including the terms of this Agreement and the fact that the Company, one or more third parties and/or the Discussion Party are discussing or have discussed a possible business Transaction.

"Confidential Information" does not include any of the following:  (a) information already known (other than as a result of disclosure by any person on behalf of the Company) or independently developed by the Discussion Party without any reference to any information provided by the Company; (b) information in the public domain through no wrongful act of the Discussion Party; or (c) information received by the Discussion Party from a third party who was under no legal obligation not to disclose it.

2.    **Covenant Not To Disclose Or Use.**

(i)    The Discussion Party hereby acknowledges that it will be exposed to Confidential Information of Company, including, without limitation, specific information regarding the Company's financial condition, products, services, personnel, plans and/or other business matters.

(ii)    The Discussion Party hereby agrees that it shall not (a) use, commercialize or disclose any Confidential Information, (b) make any inquiry about the Company's business to any customer, employee, supplier, creditor or competitor of the Company, or (c) disclose the content or existence of any of the discussions between the parties hereto, to any person or entity, except in connection with the Discussion Party's evaluation of a Transaction to employees or agents of the Discussion Party having a need to know (and who are themselves bound by similar nondisclosure restrictions), to potential sources of financing who agree in writing to be bound by this Agreement, and to such other persons as the Company may approve in writing, provided that all such persons shall have

first executed a confidentiality agreement in a form acceptable to Company. In addition to its other obligations concerning confidentiality contained in this Agreement, Discussion Party agrees at all times to use commercially reasonable efforts in the handling of any Confidential Information of Company and, in any event, to use at least the same degree of care with any Confidential Information of Company that Discussion Party uses with its own Confidential Information.

(iii)     The obligations of confidentiality set forth in this Section 2  shall be effective as of Effective Date and shall continue in full force and effect until such time as either party provides written notice to the other of termination of the applicable Transaction (if one is entered into) or of the discussions concerning a Transaction (if a Transaction is not entered into) and for a period of thirty-six (36) months after any such termination notice; provided, however, that as to any item of Confidential Information that constitutes a trade secret under applicable law, the obligations of confidentiality contained herein shall continue for so long as allowed under applicable law.

(iv)     Each of the foregoing covenants (and that in Section 5 below) is a separate and independent covenant, and is expressly agreed to be severable from the other covenants in this Section 2. The invalidity of any of the independent covenants in this Section 2 (or Section 5) shall in no way render invalid or unenforceable any other part or provision of this Section 2 (or Section 5).

3.     **Limits on Representations, Warranties and Reliance.**

(i)     The Discussion Party understands and acknowledges that neither the Company nor any of its representatives (including without limitation, Carl Marks Advisory Group ("**CMAG**")), make any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information. The Discussion Party agrees that neither the Company nor any of its representatives (including, without limitation, CMAG) shall have any liability relating to or resulting from the use of the Confidential Information. Only those representations or warranties which are made in a final definitive agreement regarding a Transaction, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

(ii)     The Discussion Party agrees that unless and until a final definitive agreement regarding a Transaction between the Company and the Discussion Party has been executed and delivered, that the Company will not be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this Agreement, except for those matters specifically agreed to in this Agreement. The Discussion Party further acknowledges and agrees that the Company reserves the right to reject any and all proposals made by the Discussion Party with regard to a possible Transaction and to terminate discussions and negotiations with the Discussion Party at any time.

4.     **Return of Confidential Information.** Upon the earlier to occur of a request therefor by Company or the completion of the Discussion Party's evaluation of an Transaction between them, the Discussion Party will return all Confidential Information and copies thereof to an officer of Company, or destroy the Confidential Information and certify the destruction to the Company.

5.     **Non-Solicitation of Employees.** For a period of twelve (12) months from the termination of discussions with the Company concerning a Transaction, the Discussion Party will not solicit for employment any of the Company's employees, other than through general advertising not targeted at the employees of the Company..

2

6.    **Remedies for Breach.**    The Discussion Party acknowledges that the violations of the restrictions and other obligations imposed under this Agreement may cause irreparable harm to the Company and that remedies at law would be inadequate to redress any actual or threatened violation of this Agreement.  Accordingly, the Discussion Party agrees that, in addition to other relief, the foregoing restrictions may be enforced by temporary and permanent injunctive relief, without the necessity of the posting of any bond.  Any award of relief to the Company shall include its costs and expenses of enforcement (including reasonable attorneys' fees).  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threatened breach, including recovery of any applicable damages from the Discussion Party.

7.    **Choice of Law; Forum.**    This Agreement is governed by and shall be construed in accordance with the substantive laws of the State of New York, U.S.A. without regard to principles of conflicts of law, and any action arising out of or pertaining to this Agreement may (but need not) be initiated and maintained in a court of competent jurisdiction in such state.

8.    **General Provisions.**    This Agreement, together with any separate written agreements concerning such subject matter, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other communications, whether written or oral, on this subject matter.  This Agreement is may be modified or amended only by a writing signed by an authorized representative of the party against whom enforcement is sought.  This Agreement shall be binding upon each of the parties hereto and their respective successors and assigns (as well as those entities that are affiliated with the parties hereto by common control).  Neither this Agreement nor any rights or obligations hereunder may be transferred or assigned without the other party's prior written consent and any attempt to the contrary shall be void.  Any provision hereof found by a court of competent jurisdiction to be illegal or unenforceable shall be automatically conformed to the minimum requirements of law and all other provisions shall remain in full force and effect.  Waiver of any provision hereof in one instance shall not preclude enforcement thereof on future occasions.  Unless otherwise agreed in writing, this Agreement shall govern Confidential Information disclosed by Company to the Discussion Party prior to, as well as after, the effective date hereof.  This Agreement may be executed in counterpart originals and by facsimile or other electronic signatures (including by exchange of PDF signature pages).

**[Signatures Appear in Following Page]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

Effective Date: _____, 2011

Company: Scovill Fasteners, Inc.

By:_____

Name: ___Stewart Q Little_____

Title: ___CEO & President_____

Address for Notices:

1802 Scovill Drive_____

Clarkesville, Georgia 30523____

_____

Discussion Party:

Entity Name:
[If other than an individual]

Signature:_____

Name (Printed):_____

Title: _____

Address for Notices:

_____

_____

_____

4

**EXHIBIT 2 TO BIDDING PROCEDURES ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOVILL FASTENERS INC., *et. al.* | ) | Case No. 11-21650 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**NOTICE OF AUCTION AND HEARING**

PLEASE TAKE NOTICE that, on April 20, 2011, the debtors and debtors in possession in these bankruptcy cases (the "**Debtors**") filed a motion (the "**Motion**")[2] for Orders: (A) Approving Bidding Procedures for the Proposed Sale of Substantially all of the Debtors' Assets; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale of Debtors' Assets; (C) Approving Notices of Respective Dates, Times, and Places for Auction and for Hearing on Approval of Sale of Assets; (D) Approving Certain Break-Up Fee Provisions; (E) Establishing Procedures Relating to the Assumption and Assignment of Contracts and Leases, including Notice of Cure Amounts; (F) Authorizing and Approving the Asset Purchase Agreement with the Stalking Horse Bidder or Such Other Purchaser Providing a Higher or

---

[1]    The last four digits of the tax identification number for each of the Debtors follow in parenthesis: (i) Scovill Fasteners, Inc. (9561); (ii) Scovill, Inc. (3634); (iii) PCI Group, Inc. (7672) and Rau Fastener Company, L.L.C. (0883). Scomex, Inc. does not have a taxpayer identification number. The mailing address of the Debtors is 1802 Scovill Drive, Clarkesville, GA 30523-6348.

[2]    Terms not defined herein shall have the meaning given to them in the Motion.

Otherwise Better Offer; (G) Authorizing and Approving the Assumption and Assignment of Contract and Leases and Related Cure Amounts; (H) Authorizing the Sale of Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; and (I) Authorizing Debtors to Consummate All Such Transactions.  The relief requested in items (A) through (E) is collectively referred to herein as the "**Initial Relief**".

PLEASE TAKE FURTHER NOTICE that, on _____ __, 2011, the United States Bankruptcy Court for the Northern District of Georgia (the "**Court**") entered an Order (the "**Bidding Procedures Order**") granting the Initial Relief, including approving the bidding procedures attached thereto as **Exhibit 1** (the "**Bidding Procedures**") in connection with the proposed sale by the Debtors of substantially all their assets (the "**Assets**") to Global SFI Holdings, LLC (the "**Buyer**") or another party submitting a higher or otherwise better offer therefor.

PLEASE TAKE FURTHER NOTICE that if you wish to obtain a copy of the Motion and/or Bidding Procedures Order you may obtain a copy by making an electronic or telephonic request upon the Debtors' counsel, Kit Weitnauer (kit.weitnauer@alston.com) or Heather Byrd Asher (heather.asher@alston.com) at 404-881-7000 or by accessing the Debtors' website at www.bmcgroup.com/scovillfasteners.

PLEASE TAKE FURTHER NOTICE that, as outlined in greater detail in and pursuant to the Bidding Procedures, competing bids for the acquisition of the Assets must be in writing, comply with the terms and conditions set forth in the Bidding Procedures, and must be delivered to (a) counsel to the Debtors, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, Attention: W. Hunter Holliday, Esq. and John C. Weitnauer,

2

Esq.; (b) counsel to the Lenders, King & Spalding 1180 Peachtree Street, Atlanta, GA 30309, Attention: Sarah R. Borders and Sarah L. Taub; and (c) counsel to any appointed committee no later than **May 27, 2011, at 4:00 p.m. (Eastern Time)** (the "**Bid Deadline**"). The Bid Deadline may be extended by an order of the Bankruptcy Court at the request of a Potential Bidder and after notice and hearing.

PLEASE TAKE FURTHER NOTICE that, as outlined in greater detail in and pursuant to the Bidding Procedures, if one or more Qualified Bids are received by the Bid Deadline, the Auction shall commence at **10:00 a.m. (Eastern Time) on June 1, 2011 (the "Auction Date") in the offices of Alston & Bird LLP, Atlantic Center Plaza, 5th Floor, 1180 West Peachtree Street, Atlanta, GA 30309.** If, however, the only Bid received by the Bidding Deadline is the agreement with the Buyer, then the Auction will not be held, the Buyer will be deemed the successful bidder for the Assets, and the Debtors will seek approval thereof at the Sale Hearing.

PLEASE TAKE FURTHER NOTICE that a hearing to consider the remaining relief requested in the Motion and the results of the Auction (the "**Sale Hearing**") will be held before the Honorable _____, United States Bankruptcy Court Judge, at the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Courtroom _____, _____, _____, Georgia _____, on _____, 2011 at 9:30 a.m. (the "Sale Hearing Date").

**PLEASE TAKE FURTHER NOTICE that, as outlined in greater detail in and pursuant to the Bidding Procedures Order, any objections to any remaining relief requested in the Motion, must be in writing, stating with particularity the grounds for such objection or other statements of positions, and filed and served so as to be actually received**

3

by   (a) counsel to the Debtors, Alston & Bird LLP, One Atlantic Center, 1201 West

Peachtree Street, Atlanta, GA 30309-3424, Attention: W. Hunter Holliday, Esq. and John

C. Weitnauer, Esq.; (b) counsel to the Lender, King & Spalding, 1180 Peachtree Street,

Atlanta, GA 30309, Attention: Sarah R. Borders and Sarah L. Taub; (c) counsel for the

Buyer, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd, Suite 1100, Los

Angeles, CA 90067, Attention: Robert M. Saunders, Esq. and David Barton, Esq. and Burr

& Forman LLP, 171 17th Street, NW, Atlanta, GA 30363, Attention: Erich N. Durlacher,

Esq., and (d) counsel to any Committee no later than _____ __, 2011, at 4:00 p.m.

(Eastern time).

   PLEASE TAKE FURTHER NOTICE that all requests for information concerning the

Assets and, in particular, any requests for a confidentiality agreement, should be in writing and

directed to John Rakowski, Carl Marks Advisory Group ("CMAG"), 900 Third Avenue, 33rd

Floor, New York, NY 10022.

   PLEASE TAKE FURTHER NOTICE that all parties who timely execute and return a

confidentiality agreement to CMAG and who demonstrate sufficient financial wherewithal, will

be provided certain due diligence materials.

4

Dated: April _____, 2011

ALSTON & BIRD LLP

/s/ John C. Weitnauer
John C. Weitnauer (GA. Bar No. 746550)
kit.weitnauer@alston.com
Heather Byrd Asher (GA. Bar No. 139022)
heather.asher@alston.com
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Proposed Attorneys for Debtor*

## <u>EXHIBIT 3 TO BIDDING PROCEDURES ORDER</u>

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOVILL FASTENERS INC., *et. al.* | ) | Case No. 11-21650 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| ————————————————— | ) | |

**NOTICE OF PROPOSED SALE, BIDDING PROCEDURES,
<u>AUCTION DATE AND SALE HEARING</u>**

PLEASE TAKE NOTICE that, on April __, 2010, the debtors and debtors in possession in these bankruptcy cases (the "**Debtors**") filed a motion (the "**Motion**") for Orders: (A) Approving Bidding Procedures for the Proposed Sale of Substantially all of the Debtors' Assets; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale of Debtors' Assets; (C) Approving Notices of Respective Dates, Times, and Places for Auction and for Hearing on Approval of Sale of Assets; (D) Approving Certain Break-Up Fee Provisions; (E) Establishing Procedures Relating to the Assumption and Assignment of Contracts and Leases, including Notice of Cure Amounts; (F) Authorizing and Approving the Asset Purchase Agreement with the Stalking Horse Bidder or Such Other Purchaser Providing a Higher or Otherwise Better Offer; (G) Authorizing and Approving the Assumption and Assignment of

---

[1] The last four digits of the tax identification number for each of the Debtors follow in parenthesis: (i) Scovill Fasteners, Inc. (9561); (ii) Scovill, Inc. (3634); (iii) PCI Group, Inc. (7672) and Rau Fastener Company, L.L.C. (0883). Scomex, Inc. does not have a taxpayer identification number. The mailing address of the Debtors is 1802 Scovill Drive, Clarkesville, GA 30523-6348.

Contract and Leases and Related Cure Amounts; (H) Authorizing the Sale of Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; and (I) Authorizing Debtors to Consummate All Such Transactions. The relief requested in items (A) through (E) is collectively referred to herein as the "**Initial Relief**".

PLEASE TAKE FURTHER NOTICE that through the Motion, the Debtors seek, among other things, an order authorizing the Debtors to sell substantially all of their assets (the "**Assets**") to Global SFI Holdings, LLC (the "**Buyer**"), pursuant to that certain Asset Purchase Agreement (the "**APA**") free and clear of all claims, liens, interests and other Encumbrances (as such term is defined in the APA), including but not limited to the Debtors' obligations to former employees and retirees for pensions, medical benefits and all other benefits and obligations (other than Assumed Liabilities, as such term is defined in the APA), all as described in more detail in the APA and the attachments thereto.

PLEASE TAKE FURTHER NOTICE that, on _____ __, 2011, the United States Bankruptcy Court for the Northern District of Georgia (the "**Court**") entered an Order (the "**Bidding Procedures Order**") approving the Initial Relief, including the bidding procedures attached thereto as **Exhibit 1** (the "**Bidding Procedures**"). A copy of the Bidding Procedures Order is attached hereto.

PLEASE TAKE FURTHER NOTICE that a hearing on the results of the Auction and approval of the sale of the Assets to the Buyer or other successful bidder will be held before the Honorable Robert E. Brizendine, United States Bankruptcy Court Judge, at the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Courtroom _____, _____, _____, Georgia _____, on _____ __, **2011** at ___ **a.m.**

**PLEASE TAKE FURTHER NOTICE** that any objections to any remaining relief requested in the Motion, must be in writing, stating with particularity the grounds for such objection or other statements of positions, and filed and served so as to be actually received by: (a) counsel to the Debtors, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, Attention: W. Hunter Holliday, Esq. and John C. Weitnauer, Esq.; (b) counsel to the lender, King & Spalding, 1180 Peachtree Street, Atlanta, GA 30309, Attention: Sarah R. Borders and Sarah L. Taub; (c) counsel for the buyer, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd, Suite 1100, Los Angeles, CA 90067, Attention: Robert M. Saunders, Esq. and David Barton, Esq. and Burr & Forman LLP, 171 17th Street, NW, Atlanta, GA 30363, Attention: Erich N. Durlacher, Esq.; and (d) counsel to any appointed committee no later than _____ __, 2011, at 4:00 p.m. (Eastern time).

PLEASE TAKE FURTHER NOTICE that a copy of the Motion, with the attached APA and other exhibits, may be obtained by making an electronic or telephonic request upon the Debtors' counsel, Kit Weitnauer (kit.weitnauer@alston.com) or Heather Byrd Asher (heather.asher@alston.com) at 404-881-7000 or by accessing the Debtors' website at www.bmcgroup.com/scovillfasteners.

Dated: April 19, 2011

ALSTON & BIRD LLP

/s/ John C. Weitnauer
John C. Weitnauer (GA. Bar No. 746550)
kit.weitnauer@alston.com
Heather Byrd Asher (GA. Bar No. 139022)
heather.asher@alston.com
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Proposed Attorneys for Debtors*

<u>**EXHIBIT 4 TO BIDDING PROCEDURES ORDER**</u>

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOVILL FASTENERS INC., *et. al.* | ) | Case No. 11-21650 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**NOTICE OF CURE AMOUNT FOR COUNTERPARTIES TO
EXECUTORY CONTRACTS AND UNEXPIRED LEASES
<u>THAT MAY BE ASSUMED AND ASSIGNED</u>**

PLEASE TAKE NOTICE that, on April 20, 2010, the debtors and debtors in possession in these bankruptcy cases (the "**Debtors**") filed a motion (the "**Motion**")[2] for Orders: (A) Approving Bidding Procedures for the Proposed Sale of Substantially all of the Debtors' Assets; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale of Debtors' Assets; (C) Approving Notices of Respective Dates, Times, and Places for Auction and for Hearing on Approval of Sale of Assets; (D) Approving Certain Break-Up Fee Provisions; (E) Establishing Procedures Relating to the Assumption and Assignment of Contracts and Leases, including Notice of Cure Amounts; (F) Authorizing and Approving the Asset Purchase Agreement with the Stalking Horse Bidder or Such Other Purchaser Providing a Higher or

---

[1]  The last four digits of the tax identification number for each of the Debtors follow in parenthesis: (i) Scovill Fasteners, Inc. (9561); (ii) Scovill, Inc. (3634); (iii) PCI Group, Inc. (7672) and Rau Fastener Company, L.L.C. (0883). Scomex, Inc. does not have a taxpayer identification number. The mailing address of the Debtors is 1802 Scovill Drive, Clarkesville, GA 30523-6348.

[2]  Capitalized terms not defined herein shall have the meaning given to them in the Motion.

Otherwise Better Offer; (G) Authorizing and Approving the Assumption and Assignment of Contract and Leases and Related Cure Amounts; (H) Authorizing the Sale of Debtors' Assets, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; and (I) Authorizing Debtors to Consummate All Such Transactions.  The relief requested in items (A) through (E) is collectively referred to herein as the "**Initial Relief**".

PLEASE TAKE FURTHER NOTICE that in the Motion the Debtors seek, among other things, an order of the Bankruptcy Court authorizing Debtors to sell substantially all of their assets either to Global SFI Holdings, LLC (the "**Buyer**"), pursuant to that certain Asset Purchase Agreement (the "**APA**") or to the successful bidder for the Debtors' assets at an auction (if any) (the "**Auction**"), **including the assumption and assignment of various executory contracts and unexpired leases** (the "**Designated Contracts**").

PLEASE TAKE FURTHER NOTICE that on April ___, 2011 the Court entered an order (the "**Bidding Procedures Order**") approving the Initial Relief, including the Debtors' proposed procedures for the assumption and assignment of Designated Contracts and notice of cure amounts.

PLEASE TAKE FURTHER NOTICE that a hearing to consider the remaining relief requested in the Motion and the results of the Auction (the "**Sale Hearing**") will be held before the Honorable _____, United States Bankruptcy Court Judge, at the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Courtroom _____, _____, _____, Georgia _____, on _____ __, **2011** at ____ **a.m.** (the "**Sale Hearing Date**").

PLEASE TAKE FURTHER NOTICE that the amount shown on <u>Exhibit A</u> attached to this Notice as the "Cure Amount" for the Designated Contract listed on <u>Exhibit A</u> is the amount,

based upon the Debtors' books and records, which the Debtors assert is owed to cure any defaults existing under the Designated Contract as of _____ __, 2011.

**PLEASE TAKE FURTHER NOTICE that if you disagree with the Cure Amount shown for the Designated Contract on <u>Exhibit A</u>, you must file a written objection in this case with the United States Bankruptcy Court for the Northern District of Georgia, on or before 4:00 p.m. (Eastern Time) on _____ __, 2011, <u>provided</u>, <u>however</u>, that if the Buyer is not the successful bidder at the Auction, you may raise an objection at the Sale Hearing to the assumption and assignment of the Designated Contract solely with respect to the successful bidder's ability to provide adequate assurances of future performance under your Designated Contract.  In addition, you must set forth (i) the basis for the objection with specificity, (ii) the amount you assert as the Cure Amount, and (iii) attach appropriate documentation in support of the asserted Cure Amount.**

PLEASE TAKE FURTHER NOTICE that if you have any other objection to the Debtors' assumption and assignment of the Designated Contract to which you are a party or to any of the other relief requested, you also must file that objection in the manner and by the date and time stated above.

PLEASE TAKE FURTHER NOTICE that any objection filed in connection with the Cure Notice must be served so as to be received by that same date and time as set forth above upon the parties below: (a) counsel to the Debtors, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, Attention: W. Hunter Holliday, Esq. and John C. Weitnauer, Esq.; (b) counsel to the lender, King & Spalding, 1180 Peachtree Street, Atlanta, GA 30309, Attention: Sarah R. Borders and Sarah L. Taub; (c) counsel for the Buyer, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd, Suite 1100, Los Angeles, CA

90067, Attention: Robert M. Saunders, Esq. and David Barton, Esq. and Burr & Forman LLP, 171 17th Street, NW, Atlanta, GA 30363, Attention: Erich N. Durlacher, Esq., and (d) counsel to any appointed committee.

**PLEASE TAKE FURTHER NOTICE THAT ANY NON-DEBTOR PARTY TO ANY DESIGNATED CONTRACT WHO DOES NOT FILE A TIMELY OBJECTION TO THE CURE AMOUNT FOR SUCH DESIGNATED CONTRACT IS DEEMED TO HAVE CONSENTED TO SUCH CURE AMOUNT.**

PLEASE TAKE FURTHER NOTICE that a copy of the Motion, with the attached APA and other exhibits, and/or the Sale and Bidding Procedures Order may be obtained by making an electronic or telephonic request upon the Debtors' counsel, Kit Weitnauer (kit.weitnauer@alston.com) or Heather Byrd Asher (heather.asher@alston.com) at 404-881-7000 or by accessing the Debtors' website at www.bmcgroup.com/scovillfasteners.

Dated: April ___, 2011

ALSTON & BIRD LLP

/s/ John C. Weitnauer
John C. Weitnauer (GA. Bar No. 746550)
    kit.weitnauer@alston.com
Heather Byrd Asher (GA. Bar No. 139022)
    heather.asher@alston.com
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
*Proposed Attorneys for Debtors*

4

<u>Exhibit B</u>

Form of Approval Order

**EXHIBIT B TO ASSET PURCHASE AGREEMENT**

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOVILL FASTENERS INC., *et. al.* | ) | Case No. 11-_____ |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| _____ | ) | |

**Order (I) Approving Sale Of Substantially All Of The Debtors' Assets Free And
Clear Of All Liens, Claims And Interests; (II) Approving Debtors' Assumption And
Assignment And Rejection Of Unexpired Leases And Executory Contracts And
Determining Cure Costs; And (III) Waiving 14-Day Stay Periods
Set Forth In Bankruptcy Rules 6004(H) And 6006(D)**

The Court conducted a hearing on _____, 2011 (the "**Sale Hearing**")[2] upon

the motion (the "**Motion**") filed by the debtors and debtors in possession (collectively, the

---

[1]  The last four digits of the tax identification number for each of the Debtors follow in parenthesis: (i) Scovill Fasteners, Inc. (9561); (ii) Scovill, Inc. (3634); (iii) PCI Group, Inc. (7672) and Rau Fastener Company, L.L.C. (0883).  Scomex, Inc. does not have a taxpayer identification number.  The mailing address of the Debtors is 1802 Scovill Drive, Clarkesville, GA 30523-6348.

[2]  Capitalized terms not defined herein shall have the meanings ascribed to such terms in the APA (defined below) approved by this Order and the Bidding Procedures approved by this court in a prior Order.

"**Debtors**") in these jointly administered chapter 11 bankruptcy cases (collectively, the "**Cases**"), seeking this Court's authorization for the Debtors to sell certain assets (the "**Acquired Assets**") and to assume and assign certain unexpired leases and executory contracts ("**Assumed Contracts and Leases**")[3] to Global SFI Holdings, LLC ("**Purchaser**") out of the ordinary course of business and free and clear of all liens, interests, claims, charges, security interests, options, mortgages, and encumbrances, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to, on or subsequent to the Petition Date, whether imposed by agreement, understanding, course of dealing, industry custom and practices, law, equity, or otherwise ("**Encumbrances**") pursuant to sections 105, 363(b) and (f), and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and applicable local rules of this Court. Due and sufficient notice of the Sale Motion and the Sale Hearing having been given, and the Court having found good and sufficient cause appearing to grant the relief as set forth in this Order:

IT IS HEREBY FOUND that:

A.    On April __, 2011 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107 (a) and 1108 of the Bankruptcy Code.

B.    This Court has jurisdiction over these cases, this proceeding and over all of the property of the estates of the Debtors, including the Acquired Assets to be sold, transferred and/or conveyed pursuant to the Asset Purchase Agreement, a copy of which is attached hereto as **Exhibit A** (as may be amended pursuant to this Order, the "**APA**") pursuant to 28 U.S.C. §§

---

[3]     Consisting of, collectively, Real Property Leases, Other Leases, Contracts and Other Contracts.

1334 and 157. This is a core proceeding. Venue of these Cases and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. Section 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Rule 7054 of the Bankruptcy Rules, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

D.     Debtor Scovill Fasteners Inc. (**"Scovill"**) is an industry leader in the production of high quality snap fasteners and tack buttons. Scovill manufactures the majority of its products at its 300,000 square foot factory located in Clarkesville, Georgia. Clarkesville is also its headquarters location. Scovill employs approximately 200 employees in Clarkesville, approximately 17 in other U.S. locations and 5 independent contractors in South America.

E.     Scovill is party to that certain Credit Agreement (the **"Prepetition Credit Agreement"**), dated as of February 2, 2004, as amended, by and between Scovill, as Borrower, and General Electric Capital Corporation (**"GECC"**), for itself as Lender, and as Agent for the Lenders (the **"Lenders"**), as those terms are used in the Prepetition Credit Agreement. Pursuant to the Prepetition Credit Agreement, the Lenders agreed to make Revolving Credit Advances and make Term Loan A, Term Loan B and Term Loan C (as such terms are used in the Prepetition Credit Agreement).

F.     As of the Petition Date, Scovill was indebted to the Lenders in respect of (i) the Revolving Credit Advances in the approximate principal amount of $13,399,893.17 and approximately $258,341.06 in accrued interest and fees; (ii) the Term Loan B in the principal amount of $10,000,000 and approximately $575,342.47 in accrued interest and fees and (iii) the Term Loan C in the principal amount of $2,075,000 and approximately $39,040.69 in accrued

interest and fees; (iv) interest accruing thereon and (v) other costs, fees, expenses, and charges now or hereafter payable thereunder.

G.      The Prepetition Credit Agreement is secured by all, or substantially all, of the assets of the Debtors.

H.      Scovill is a party to that certain Third Amended and Restated Loan and Security Agreement (the "**Tranche B Credit Facility**"), dated as of February 2, 2004, as amended, by and among Scovill, Rau, Scomex, PCI, as borrowers, and GSCP Recovery Inc. ("**Recovery Inc.**"), GSC Recovery II, L.P. ("**Recovery II**"), and GCS Recovery IIA, L.P. ("**Recovery IIA**") (Recovery Inc., Recovery II and Recovery IIA are sometimes collectively referred to as "**Recovery**"), as the lenders, and Recovery, Inc., as administrative agent.   Recovery Inc., Recovery II and Recovery IIA are the sole owners of Parent.  Pursuant to the Tranche B Credit Facility, Recovery agreed to continue to extend certain financing to Scovill in the form of Bridge Loans.  Recovery is no longer obligated to provide additional Bridge Loans to Scovill.

I.      As of the Petition Date, Scovill was indebted to Recovery in the approximate amount of $158,855,000 pursuant to the Tranche B Credit Facility.

J.      The Tranche B Credit Facility is secured by all, or substantially all, of the assets of Scovill, Rau, Scomex and PCI.

K.      All of the indebtedness and obligations of Scovill, Rau, Scomex and PCI arising under the Tranche B Credit Facility are subordinated to all obligations under the Prepetition Credit Agreement pursuant to that certain Subordination Agreement, dated as of February 2, 2004, as amended, by and among Recovery and Agent for the Lenders.

L.      Scovill is a party to that certain Term Loan Agreement (the "**Recovery Term Loan**") dated December 23, 2005 by and among Scovill Fasteners Inc., Rau Fastener Company, L.L.C., PCI Group, Inc. and Scomex, Inc. and Recovery, as amended.

4

M.     As of the Petition Date, Scovill was indebted to Recovery under the Recovery Term Loan in the approximate amount of $48,929,000.

N.     All of the indebtedness and obligations under the Recovery Term Loan are subordinated to all obligations under the Prepetition Credit Agreement pursuant to that certain Subordination Agreement dated December 23, 2005 by and between Scovill, Rau, PCI and Scomex and Recovery, as amended.

O.     In September 2010, Scovill retained Carl Marks Advisory Group, LLC ("**Carl Marks**") to provide financial advisory services to assist Scovill with its exploration of a prospective sale or merger of the business. Following an extensive marketing effort, the Debtors entered into an APA which contemplates the sale of substantially all their assets pursuant to section 363 of the Bankruptcy Code. Accordingly, the Debtors filed their bankruptcy petitions.

P.     On _____, 2011, this Court entered an order (the "**Bidding Procedures Order**") approving bidding procedures (the "**Bidding Procedures**") for the Acquired Assets, which, among other things, scheduled an auction (the "**Auction**") for the sale of the Acquired Assets.

Q.     After having engaged in due diligence and negotiations with a number of prospective buyers, Carl Marks conducted the Auction on _____, 2011 in accordance with the Bidding Procedures. A total of _____ prospective buyers, including the Purchaser, were deemed to be Qualified Bidders (as such terms are defined in the Bidding Procedures) and appeared at the Auction.

**Debtors' Assets**

R.     The Acquired Assets proposed to be sold by the Debtors to the Purchaser are defined in section 1(a) of the APA. The Debtors estimate, and the Court finds, that a liquidation of the Acquired Assets would have material less value than the Purchase Price being paid by the Purchaser as set forth in section 2 of the APA.

5

**Terms of APA**

S.      The APA provides that the Debtors shall sell to the Purchaser the Acquired Assets and the Debtors shall assume and assign to the Purchaser the Assumed Contracts and Leases. Section 1(b) of the APA sets forth those assets which are not being purchased by the Purchaser and are Excluded Assets.

T.      The total consideration to be paid by Purchaser for the Acquired Assets (the "Purchase Price") will be an amount equal to (i) Seventeen Million Dollars ($17,000,000), plus (ii) the Purchaser's Total Cure Costs, if any, and, plus or minus, as the case may be, (iii) the difference between Base Working Capital and the Working Capital as of the Effective Time (the "**Change in Working Capital**"); provided however, if the Change in Working Capital, either positive or negative, is greater than $2,000,000 (the "**Maximum Amount**"), then the Change in Working Capital shall be deemed equal to the Maximum Amount; and, in addition, Purchaser shall assume the Assumed Liabilities. "**Working Capital**" means the difference between (X) the WC Assets, and (Y) the WC Liabilities, which may be a positive or negative number.

U.      In the APA, "**Cure Costs**" means all cure amounts which this Court orders to be paid as a condition to Sellers' assumption of and assignment to Purchaser of the Assumed Contracts. Purchaser is responsible for the Cure Costs set forth on Schedule 2(b) (the "**Purchaser's Agreement Date Cure Costs**"). If the Cure Costs for the Assumed Contracts set forth on Schedule 2(b) are higher than as set forth on Schedule 2(b) as of the agreement date, then Sellers shall be responsible for the difference between the Cure Costs and Purchaser's Agreement Date Cure Costs. If Purchaser, after the Agreement Date, notifies Sellers in writing that it would like to add Contracts to Schedule 2(b) pursuant to Section 8(h)(i), Purchaser shall be responsible for all Cure Costs for such additional Assumed Contracts (the "Purchaser's Additional Cure Costs" and, together with the Purchaser's Agreement Date Cure Costs, the

6

"Purchaser's Total Cure Costs"). The Purchase Price shall be paid by the Purchaser to the Debtors at the time of the closing of the sale (the **"Closing"**).

V.    At the Closing, the Debtors also seek to assume and assign the Assumed Contracts and Leases to the Purchaser, and, effective as of the Closing, the Debtors seek to reject all of their executory contracts and unexpired leases which are not assumed and assigned to the Purchaser.

**Approval of Sale**

W.    The Debtors have demonstrated a sufficient basis and the existence of exigent circumstances for them to enter into the APA, sell the Acquired Assets and assume and assign the Assumed Contracts and Leases under sections 363 and 365 of the Bankruptcy Code and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors.  The exigent circumstances and other facts which support the exercise of the Debtor's business judgment include the following:

X.    The Debtors undertook an intensive sale effort using an independent investment banker to conduct the sale process.

Y.    An open Auction took place for a sale of the Acquired Assets at which any Qualified Bidder was invited to participate in the Auction and the Purchaser submitted the highest and best bid at the Auction.

Z.    The Debtors' concluded that absent an expedited sale of their assets the Debtors would have to close their business and liquidate their assets, which the Debtors believe would substantially impair the value of their assets.

AA.    Any further delay by the Debtors to seek alternative or higher prices for their assets would pose an unacceptable risk to the Debtors' business and likely result in a further

7

reduction in the value of the Debtors' overall assets and impair the value of the Debtors' business.

THE COURT FURTHER FINDS AND CONCLUDES AS FOLLOWS:

BB.   The findings and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the foregoing findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

CC.   The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations contained in this Order are (i) sections 105(a), 363 and 365 of the Bankruptcy Code and (ii) Bankruptcy Rules 2002, 6004, 6006, and 9014.

DD.   As evidenced by the affidavits of service filed with the Court, proper, adequate, and sufficient notice of the Sale Motion, the Auction and the Sale Hearing have been provided in accordance with sections 363(b) and 365 of the Bankruptcy Code and in compliance with Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014, the local rules of this Court, the procedural due process requirements of the United States Constitution and in compliance with the Bidding Procedures.  The Debtors also provided due and proper notice of the assumption and assignment of each of the Assumed Contracts and Leases to each non-Debtor party under each such Assumed Contracts and Leases.  Such notice was good and sufficient and appropriate under the particular circumstances.  No other or further notice of the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts and Leases (including with respect to the payment of any cure amounts due thereunder), or of the entry of this Order is necessary or shall be required.

EE.   A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested parties, as follows: (i) all entities that claim any interest in or lien

8

upon the Acquired Assets; (ii) all parties to Assumed Contracts and Leases assumed and assigned pursuant to this Order; (iii) all governmental taxing authorities that have, or as a result of the sale of the Assets may have, claims, contingent or otherwise, against any of the Debtors; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (v) all known creditors (whether liquidated, contingent or unmatured) of the Debtors; (vi) all taxing authorities in the jurisdiction in which the Debtors operate; (vii) all interested governmental, pension and environmental entities known by the Debtors to assert jurisdiction over the Debtors and to have in interest in the proposed sale of the Acquired Assets; (viii) the Office of the United States Trustee; (ix) counsel to any official committee appointed in these Cases; (x) counsel to the Debtors' pre- and postpetition secured lenders; (xi) all of the Debtors' employees, retirees under any Debtor's pension or retiree benefits plan, plan administrators for all pension and other retiree benefit plans, and all governmental authorities with jurisdiction over labor, pension and retiree benefit benefits relevant to each of the Debtors; and (xii) entities known by the Debtors with an interest in purchasing the Acquired Assets.  Other parties interested in bidding on the Acquired Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Acquired Assets.

FF.    The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates pursuant to section 541 of the Bankruptcy Code.

GG.    The Debtors have demonstrated a sufficient basis and the existence of exigent circumstances requiring them to enter into the APA, to sell the Acquired Assets, and to assume and assign the Assumed Contracts and Leases under sections 105(a), 363, and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors.  There can be no assurance that the value of the Acquired Assets would be maintained if any delay in the

9

consummation of the transactions contemplated in the Sale Motion and APA were to occur. Likewise, there can be no assurance that the Purchaser would be willing to complete such transactions if delay in the consummation of the transactions were to occur. The Bidding Procedures were non-collusive, substantively and procedurally fair to all parties and were reasonable and appropriate in the context of these Cases.

HH.    As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a sale process conducted by Carl Marks in accordance with the Bidding Procedures, the Debtors and their professionals have complied, in good faith, in all material respects with the Bidding Procedures Order and have (a) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as Qualified Bidders and submit their highest and/or otherwise best offer to purchase the Acquired Assets at the Auction, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets at the Auction, and (c) conducted the Auction on _____, 2011.

II.    At the conclusion of the Auction, the Debtors (after consultation with the Lenders and the Creditors' Committee) announced that they had determined, and the Court so finds, that the offer submitted by the Purchaser at the Auction was the highest and best offer for the Acquired Assets, and accordingly, was designated as the Successful Bid.

JJ.    The Successful Bid submitted by the Purchaser at the Auction, on the terms and conditions set forth in the APA, including the form and total consideration to be realized by the Debtors pursuant to the APA:  (i) is the highest and best offer received by the Debtors for the Acquired Assets; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' estates and the creditors thereof; (iv) constitutes full and adequate consideration and reasonably equivalent

10

value for the Acquired Assets; and (v) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

KK.    The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and as interpreted by the Courts regarding the meaning of section 363(m) of the Bankruptcy Code. The APA was negotiated and entered into in good faith, based on arm's-length bargaining, and without collusion or fraud of any kind. The Auction was conducted in accordance with the Bidding Procedures and in good faith within the meaning of section 363(m) of the Bankruptcy Code. Based on the record before this Court, neither the Debtors nor the Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of (or implicate) section 363(n) of the Bankruptcy Code to the APA or to the consummation of the sale transaction and transfer of the Acquired Assets and Assumed Contracts and Leases to the Purchaser. The Purchaser is therefore entitled to all of the protections of section 363(m) of the Bankruptcy Code, including with respect to all of the Acquired Assets.

LL.    The Debtors have full power and authority to execute the APA and all other documents contemplated thereby, and the sale of the Acquired Assets to the Purchaser as contemplated by the APA has been authorized and approved by the Debtors in accordance with the requirements of state law and each of their respective internal governance requirements. Other than as may be expressly provided for in the APA, no further consents or approvals are required by the Debtors to consummate such transactions.

MM.    The Debtors have advanced sound business reasons for seeking to enter into the APA and to sell the Acquired Assets and to assume and assign the Assumed Contracts and Leases, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtors' business judgment to sell the Acquired Assets and to consummate the transactions contemplated by the APA. Notwithstanding any requirement for

11

approval or consent by any person, the transfer of the Acquired Assets to the Purchaser and the assumption and assignment of the Assumed Contracts and Leases is a legal, valid, and effective transfer of the Debtors' right, title and interest in the Acquired Assets and any Assumed Contracts and Leases to the Purchaser.

NN.    The terms and conditions of the APA, including the consideration to be realized by the Debtors pursuant to the APA, are fair and reasonable, and the transactions contemplated by the APA are in the best interests of the Debtors' estates.

OO.    The Purchaser would not enter into the APA to purchase the Acquired Assets or accept an assignment of the Assumed Contracts and Leases in the absence of the entry of this Order providing for such sale, assumption and assignment free and clear of all such Encumbrances.

PP.    The transfer of the Acquired Assets to the Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, and, except as may otherwise be provided in the APA, shall vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of any and all Encumbrances.  Except for the Assumed Liabilities as specifically provided in the APA or this Order, the Purchaser shall not assume or become liable for any Encumbrances relating to the Acquired Assets being sold by the Debtors.

QQ.    Section 363(f) of the Bankruptcy Code provides for the sale of property of the Debtors' estates free and clear of any interest in such property upon the grounds stated in that subsection.  All Encumbrances shall attach to the net proceeds of the sale of the Acquired Assets received by the Debtors in the order of their priority, with the same validity, force, and effect that they now have, if any, as against the Acquired Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto.  All persons having Encumbrances of any kind or nature whatsoever against or in the Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Encumbrances

against the Purchaser, any of its assets (including, without limitation, the Acquired Assets), property, successors or assigns. The net proceeds of the sale of the Acquired Assets shall be paid to GECC, as Agent for the Lender under the Prepetition Credit Agreement and the DIP Credit Facility.

RR.    The Debtors may sell the Acquired Assets to the Purchaser free and clear of the Encumbrances because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. Those (i) holders of Encumbrances and (ii) non-Debtor parties, who did not object, or who withdrew their objections, to the sale of the Acquired Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All objections to the Sale Motion have been resolved or withdrawn or overruled. Those holders of Encumbrances who did object fall within one or more of the other subsections of 363(f) of the Bankruptcy Code and are adequately protected by having their Encumbrances, if any, attach to the proceeds of the sale of the Acquired Assets ultimately attributable to the property against or in which they claim or may claim any Encumbrances.

SS.    Not selling the Acquired Assets free and clear of all Encumbrances would adversely impact the Debtors' estates, and the sale of the Acquired Assets other than free and clear of all Encumbrances would be of substantially less value to the Debtors' estates.

TT.    The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B) and 365(f) of the Bankruptcy Code, in connection with the assumption and assignment of the Assumed Contracts and Leases. The Purchaser has demonstrated adequate assurance of future performance with respect to the Assumed Contracts and Leases pursuant to section 365(b)(1)(C) of the Bankruptcy Code. The Debtors' assumption and assignment of the Assumed Contracts and Leases to the Purchaser is in the best interests of the Debtors' estates and represents the exercise of sound and prudent business judgment by the Debtors.

UU.    The Assumed Contracts and Leases are assignable notwithstanding any provisions contained in the Assumed Contracts and the Leases to the contrary.  The Debtors have provided for the cure and/or other payments or actions required to assume and assign the Assumed Contracts and Leases to the Purchaser.

VV.    The Purchaser will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in consummating the transactions contemplated by the APA at any time on or after the entry of this Order.

WW.    The transactions contemplated under the APA do not amount to a merger or de facto merger of the Purchaser and the Debtors and the Purchaser is not a mere continuation of the Debtors, accordingly, under applicable law, the Purchaser is not a successor to any of the obligations or liabilities of Debtors, except those expressly assumed in the APA.    Except as provided in the Asset Purchase Agreement, the Purchaser is not a successor to any of the obligations or liabilities of the Debtors under the Internal Revenue Code of 1986, as amended (the **"Internal Revenue Code"**), the Employee Retirement Income Security Act ("**ERISA**"), the Multiemployer Pension Protection Act ("**MEPPA**"), the Pension Protection Act ("**PPA**"), title VII of the Civil rights Act of 1964, as amended ("**Title VII**"), the Age Discrimination Act in Employment Act ("**ADEA**"), the Americans with Disability Act ("**ADA**"), the Family Medical Leave Act ("**FMLA**"), the Labor Management Relations Act ("**LMRA**"), and the Fair Labor Standards Act ("**FLSA**")."

XX.    Except for the Assumed Liabilities and its obligations under the APA, the transfer of the Acquired Assets pursuant to this Order shall not subject the Purchaser to any liability with respect to any obligations incurred in connection with or in any way related to the Acquired Assets prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in

whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

YY.    The total consideration provided under the APA by the Purchaser for the Acquired Assets is the highest and best offer received by the Debtors, and the Purchase Price constitutes reasonably equivalent value under § 548 of the Bankruptcy Code and the Uniform Fraudulent Transfers Act codified at O.C.G.A. § 18-2-70 *et seq* for the Acquired Assets.

ZZ.    Time is of the essence in consummating the sale.  To maximize the value of the Acquired Assets and the Assumed Contracts and Leases, it is essential that the sale of the Acquired Assets and the assumption and assignment of the Assumed Contracts and Leases occur as soon as possible.  Accordingly, there is cause to lift the 14-day stays imposed by Bankruptcy Rules 6004 and 6006.

AAA. Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Sale Hearing, and good and sufficient cause appearing therefore;

IT IS HEREBY ORDERED AS FOLLOWS:

1.    The Sale Motion is granted, subject to the terms and conditions set forth in this Order.

2.    All objections and responses to the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  If any such objection or response was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied.

3.    Notice of the Sale Hearing was fair and appropriate under the circumstances and complied in all respects with Bankruptcy Rules 2002, 6004 and 6006.

**Approval of Sale**

4.      The sale of the Acquired Assets, the terms and conditions of the APA (including all schedules and exhibits affixed thereto and any supplements thereof), the bid by the Purchaser and the transactions contemplated thereby are approved in all respects.

5.      The sale of the Acquired Assets and the assumption and assignment of the Assumed Contracts and the Leases and the consideration provided by the Purchaser under the APA are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value under § 548 of the Bankruptcy Code and the Uniform Fraudulent Transfers Act.

6.      The Purchaser is hereby granted and is entitled to all of the protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code, including with respect to the assignment of the Assumed Contracts and Leases as part of the sale of the Acquired Assets pursuant to section 365 of the Bankruptcy Code and this Order.

7.      The Debtors are authorized and directed to consummate the APA and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession any or all of the Acquired Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the APA, without any further corporate action or orders of this Court.

8.      The Debtors and each other person or entity having duties or responsibilities under the APA, any agreements related thereto or this Order, and their respective directors, officers, employees, members, managers, agents, representative, attorneys and other professionals,

16

are authorized and empowered, subject to the terms and conditions contained in the APA, to carry out all of the provisions of the APA and any related agreements; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the APA, and any related agreements; to take any and all actions contemplated by the APA, any related agreements or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the APA, any related agreements and this Order and the transactions contemplated thereby and hereby, all without further notice to any person, application to, or order of, the Court or further action by their respective directors, officers, employees, members, managers, agents, representative, attorneys and other professionals.  The officers, directors, managers, or any other authorized representative of the Debtors are authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).  The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the APA, any related agreements and this Order.

9.      Effective as of the Closing, the sale of the Acquired Assets by the Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Debtors' right, title

and interest in the Acquired Assets to the Purchaser notwithstanding any requirement for approval or consent by any person, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets, free and clear of all Encumbrances of any kind, pursuant to sections 363(f) and (b) of the Bankruptcy Code.

10.     The assumption of any Assumed Liabilities by the Purchaser shall constitute a legal, valid and effective delegation of any Assumed Liabilities to the Purchaser and shall divest the Debtors of all liability with respect to any Assumed Liabilities, and the assignment and assumption of the Assumed Contracts and Leases by the Purchaser shall constituted a legal, valid and effective assignment to and assumption of the Assumed Contracts and Leases by the Purchaser, and shall divest the Debtors of all liability with respect to the future performance of the Assumed Contracts and Leases.

11.     The sale of the Acquired Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

**Transfer of Assets**

12.     Except to the extent specifically provided in the APA, upon the Closing pursuant to the APA, the Debtors are authorized, empowered, and directed, pursuant to sections 105(a), 363(b) and 365 of the Bankruptcy Code, to sell the Acquired Assets to the Purchaser. The sale of the Acquired Assets shall vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of any and all Encumbrances with all such Encumbrances to attach to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Acquired Assets, subject to all claims and defenses the Debtors may possess with respect thereto.

13.    Following the date of the Closing, no holder of any Encumbrances in the Acquired Assets shall interfere with the Purchaser's use and enjoyment of the Acquired Assets based on or related to such Encumbrances, or any actions that the Debtors may take in their Cases, and no person shall take any action to prevent, interfere with, or otherwise enjoin consummation of the transactions contemplated in or by the APA or this Order.

14.    The provisions of this Order authorizing the sale of the Acquired Assets free and clear of Encumbrances, other than Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or instruments to effectuate, consummate, and implement the provisions of this Order.  However, the Debtors and the Purchaser, and each of their respective officers, employees, managers, representatives and agents, are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the APA and this Sale Order. Moreover, effective as of the date of the Closing (the "**Closing Date**"), the Purchaser and its successors and assigns shall be designated and appointed each Debtor's true and lawful attorney and attorneys, with full power of substitution, in each Debtor's name and stead, on behalf and for the benefit of the Purchaser, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof.

15.    The Purchaser and its successors and assigns, may from time to time as deemed appropriate institute and prosecute in the Debtors' (or any of them, as the case may be)

19

name, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors and assigns may deem proper for the collection or reduction to possession of any of the Acquired Assets and for all Avoidance Actions (as such term is defined in the APA) transferred to the Purchaser pursuant to the terms of the APA, and to do all acts and things with respect to the Acquired Assets that the Purchaser, its successor and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are irrevocable by the Debtors, or anyone else.

16.    On or before the Closing Date, the Debtors' creditors are authorized to execute such documents and take all other actions as may be necessary to release any Encumbrances of any kind against the Acquired Assets, as such Encumbrances may have been recorded, filed or may otherwise exist. If any person or entity that has filed financing statements, mortgages, deeds of trust or any other documents or agreements evidencing any Encumbrances in or against the Acquired Assets shall not have delivered to the Debtors prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Encumbrances that the person or entity has with respect to the Acquired Assets, the Debtors are hereby authorized and directed to execute and file such statements, and empowered to perform under, all instruments, releases and other documents on behalf of the person or entity with respect to such Acquired Assets prior to the Closing, and the Purchaser is authorized to file such documents after Closing.

17.  To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing Date.

18.  All of the Debtors' rights, title and interests in the Acquired Assets to be acquired by the Purchaser under the APA shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser.  Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Acquired Assets under the APA transferring good and marketable, indefeasible title and interest in the Acquired Assets to the Purchaser.

19.  Except for the Assumed Liabilities as expressly provided in the APA, the Purchaser is not assuming nor shall it or any affiliate of the Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Acquired Assets prior to the consummation of the transactions contemplated by the APA, or any liabilities calculable by reference to the Debtors or their operations or the Acquired Assets prior to consummation of the transactions contemplated by the APA.

20.  The Purchaser shall have no obligation to pay or provide wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans), or any other payment to or on

21

behalf of current or former employees of the Debtors and their eligible dependents and beneficiaries, except as set forth in the APA. Furthermore, except as set forth in the APA, the Purchaser shall have no obligation or liability, as a successor or otherwise, arising from or related to the breach, non-performance, rejection or termination of any such plan or agreement, including, but not limited to, plans under ERISA. The Purchaser shall have no obligation or liability, as a successor or otherwise, for any of the acts or omissions of the Debtors that may later be found to constitute unfair labor practices.

21.     Neither the Purchaser nor its affiliates shall be deemed to have de facto or otherwise, merged with or into any of the Debtors; or be a mere continuation of any of the Debtors or be holding itself out to the public as a continuation of any of the Debtors, and there is not substantial continuity between the Purchaser (or any of its affiliates) and any of the Debtors, there is no common identity between the Purchaser (or any of its affiliates) and any of the Debtors, and there is no continuity of enterprise between the Purchaser (or any of its affiliates) and any of the Debtors. Without limiting the generality of the foregoing, neither the Purchaser nor any of its affiliate shall be deemed, as a result of any action taking in connection with the purchase of the Acquired Assets or as a result of the consummation of the transactions contemplated by the APA or any other event occurring in the Cases, under any theory of law or equity, to be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA) within the meaning of any revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or

22

regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. Except for the Assumed Liabilities, the Purchaser shall have no liability or responsibility for any liability, including but not limited to successor liability, vicarious liability or transferee liability, or any other obligation of the Debtors arising under or related to the Acquired Assets or otherwise. Without limiting the generality of the foregoing, and except for the Assumed Liabilities, the Purchaser shall not be liable for any and all claims, causes of action, obligations, liabilities, demands, losses, costs or expenses of any kind, character or nature whatsoever against any of the Debtors or any of their predecessors or affiliates, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to any of the Debtors or any obligations of any of the Debtors, including, but not limited, to liabilities on account of, or under any theory of, antitrust law, environmental law, withdrawal liability, labor law, contract law, common law, bulk sales law (to the extent permitted by the Bankruptcy Code) and taxes arising, accruing, or payable under, out of, in connection with or in any way relating to the operation of the Debtors' business prior to the Closing. Also, without limiting the generality of the forgoing, the Purchaser shall not be deemed a successor employer under the Internal Revenue Code, ERISA, MEPPA, PPA, Title VII, ADEA, ADA, FMLA, LMRA, FLSA and any similar applicable state laws

22.    Except as otherwise expressly provided in the APA, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Acquired Assets are directed to surrender possession of the Acquired Assets to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request.

**Assumed Contracts and Leases**

23.    The provisions of the APA relating to the assumption and assignment of the Assumed Contracts and Leases are valid and binding, in full force and effect, and enforceable in accordance with their terms.

24.    Subject to the terms of the APA and the occurrence of the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all of the Debtors' right, title and interest of each of the Assumed Contracts and Leases. The Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

25.    Subject to the terms of the APA and the occurrence of the Closing Date, the assumption by the Debtors of the Assumed Contracts and Leases and the assignment of the Assumed Contracts and Leases to the Purchaser, as provided for or contemplated by the APA, is authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

26.    The Assumed Contracts and Leases shall be deemed valid and binding and in full force and effect and assumed by the Debtors and assigned to the Purchaser at the Closing or at such later time as provided in the APA, pursuant to sections 363 and 365 of the Bankruptcy Code. The Purchaser shall be liable for all obligations under such Assumed Contracts and Leases arising on and after the Closing Date.

24

27.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, the Debtors shall promptly pay or cause to be paid to the parties to any Assumed Contracts and Leases the requisite cure amounts, if any, set forth in the notice served by the Debtors on each of the parties to the Assumed Contracts and Leases, except to the extent that the cure amount was amended on the record of the Sale Hearing or otherwise ordered by the Court (the "Cure Costs"). The Cure Costs are fixed and the non-Debtor parties to the Assumed Leases and Contracts are forever bound by such Cure Costs and each non-Debtor party to an Assumed Contract or Assumed Lease is, except with respect to the Cure Costs, forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Debtors' property or the Acquired Assets, any default existing as of the date of the Sale Hearing; and, each non-Debtor party to an Assumed Contract and Lease hereby is forever barred, estopped, and permanently enjoined from asserting against the Purchaser and its affiliates, or the Purchaser's property (including, without limitation, the Acquired Assets), any default existing as of the date of the Sale Hearing, or any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtors. Neither the Purchaser nor the Debtors shall have any liability to any party on account of any rejected executory contract or unexpired leases to any party for the period subsequent to the date of rejection.

28.     All monetary defaults under the Assumed Contracts and Leases arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Costs.

29.  Any provision in any of the Assumed Contracts and Leases that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable.

30.  No sections or provisions of any of the Assumed Contracts and Leases that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-Debtor third party to any of the Assumed Contracts and Leases as a result of the Debtors' assumption and assignment to the Purchaser of such non-Debtor party's assumed contract or Lease shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  No assignment of any of the Assumed Contracts and Leases pursuant to the terms of the APA shall in any respect constitute a default under any of the Assumed Contracts and Leases.  The non-Debtor party to each of the Assumed Contracts and Leases shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code and the Purchaser shall enjoy all of the rights and benefits under each of the Assumed Contracts and Leases as of the applicable date of assumption without the necessity of obtaining such non-Debtor party's written consent to the assumption or assignment thereof.

31.  The Purchaser has satisfied all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under each of the Assumed Contracts and Leases.  The Purchaser shall be responsible for all post-Closing liabilities and obligations under each of the Assumed Contracts and Leases.

26

32.    The Debtors and their estates shall be relieved of any liability for any breach of any of the Assumed Contracts and Leases occurring from and after Closing, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

**Additional Provisions**

33.    Except to the extent expressly included in the Assumed Liabilities, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all persons and entities, including, without limitation, the Debtors, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental units, tax, and regulatory authorities, Lenders, parties to, trustees of, or beneficiaries under any benefit plan, trade and other creditors asserting or holding any Encumbrance with respect to the Acquired Assets arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Acquired Assets to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Encumbrance against the Purchaser or any affiliate of the Purchaser, successor or assign thereof and each of their respective current and former members, managers, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates and representatives (each of the foregoing in its individual capacity), or the Acquired Assets.    To avoid doubt, the foregoing shall not prevent the Debtors, their estates, successors, or permitted assigns from pursing claims, if any, against the Purchaser and/or its successors and assigns in accordance with the terms of the APA, and the foregoing shall not prejudice any other rights the Debtors have under the APA.

27

34.    The Purchaser has not assumed or is otherwise not obligated for any of the Debtors' liabilities other than the Assumed Liabilities as set forth in the APA, and the Purchaser has not purchased any assets not defined as Acquired Assets. Consequently, all persons, Governmental Units (as defined in sections 101(27) of the Bankruptcy Code) and all holders of Encumbrances based on or arising out of liabilities retained by the Debtors are hereby enjoined from taking any action against the Purchaser (or its affiliates) or the Acquired Assets to recover any Encumbrances or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the APA. All persons holding or asserting any Encumbrances in the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrances or cause of action against the Purchaser or the Acquired Assets (or any other assets of the Purchaser and/or its affiliates) for any liability associated with the Excluded Assets.

35.    Subject to the terms of the APA, the APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court; *provided, however*, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates the APA and any related agreements.

36.    The failure to specifically reference any particular provision of the APA or any related agreements in this Order shall not diminish or impair the effectiveness of such provision. It is the intent of the Court, the Debtors and the Purchaser that the APA and any agreement related thereto are authorized and approved in their entirety with such

28

amendments thereto as may be made by the parties in accordance with this Order prior to Closing.

37.     The net proceeds of the sale of the Acquired Assets shall be paid to GECC as Agent for the Lenders under the Prepetition Credit Agreement and under the DIP Credit Facility and such proceeds will be applied first to reduce the obligations owing under the DIP Credit Facility and second to pay down the prepetition obligations with respect to the Prepetition Credit Agreement.

38.     To the extent any provisions of this Order conflict with the terms and conditions of the APA, this Order shall govern and control.

39.     Nothing in this Order shall alter or amend the APA and the obligations of the Debtors and the Purchaser under the terms of the APA.

40.     This Order and the APA shall be binding on and govern the acts of all persons and entities, including without limitation, the Debtors and the Purchaser, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in chapter 7 cases if these cases are converted from chapter 11, all creditors of the Debtors (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments related to the Acquired Assets.

41.     The provisions of this Order are non-severable and mutually dependent.

42.      Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in the Cases, or any order issued in any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

43.      Notwithstanding Bankruptcy Rules 6004, 6006, 7062, and 9021, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to close under the APA at any time, subject to the terms of the APA.  In the absence of any person or entity obtaining a stay pending appeal, if the Debtors and the Purchaser close under the APA, the Purchaser shall be deemed to be acting in "good faith" and shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the APA if this Order, including, but not limited to, the authorizations provided in this order relating to the sale of the Acquired Assets under section 363(b) of the Bankruptcy Code and the sale of the Acquired Assets free and clear of Encumbrances under section 363(f) of the Bankruptcy Code or any authorization contained herein is subsequently reversed or modified on appeal.

44.      The automatic stay under section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by an party of its rights or obligations under the APA.

45.      This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order and the APA in all respects and to decide any disputes concerning this Order, the

APA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the APA and this Order including, without limitation, the interpretation of the terms, conditions, and provisions hereof and thereof, the status, nature, and extent of the Acquired Assets and any of the Assumed Contracts and Leases and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Acquired Assets free and clear of all Encumbrances.

46.    The stays provided by Bankruptcy Rules 6004 and 6006 are hereby lifted and waived.

47.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) appointing a chapter 11 trustee in any Cases; (b) converting any or all of the Cases to chapter 7 cases; or (c) dismissing the any or all of the Cases, and the terms and provisions of this Order shall continue in full force and effect notwithstanding the entry of such order or conversion or dismissal.

**\*\*\*  END OF ORDER  \*\*\***

**Prepared and presented by:**

ALSTON & BIRD LLP

/s/ John C. Weitnauer
John C. Weitnauer (Bar No. 746550)
Heather Byrd Asher (Bar No. 139022)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

*Proposed Attorneys for Debtors*

<u>Exhibit C</u>

Form of Purchaser Affiliate Guaranty

*EXHIBIT C TO ASSET PURCHASE AGREEMENT*

**GUARANTY**

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, and to induce among Scovill, Inc., a Delaware corporation ("Parent"), Scovill Fasteners Inc., a Delaware corporation ("Scovill"), PCI Group, Inc., a Delaware corporation ("PCI"), Scomex, Inc., a Delaware corporation ("Scomex"), and Rau Fastener Company, L.L.C., a Delaware limited liability company ("Rau", and together with Parent, Scovill, PCI and Scomex, "Sellers" ), to enter into an Asset Purchase Agreement dated the date hereof (the "Agreement") with Global SFI Holdings, LLC, a Delaware limited liability company ("Purchaser"), the undersigned (the "Guarantor") hereby unconditionally, absolutely and irrevocably guarantees the full and timely payment and performance of any and all liabilities and obligations of the Buyer under the Agreement (collectively, the "Obligations"), subject to all conditions and limitations benefiting Purchaser set forth in the Agreement.  Capitalized terms not otherwise defined in this Guaranty shall have the meanings ascribed to such terms as set forth in the Agreement.

This Guaranty (i) is a continuing and unconditional guaranty of payment and performance, and not of collection, of the Obligations and shall remain in full force and effect without regard to any assignment of the Agreement in accordance with the provisions thereof; (ii) shall be construed in accordance with the laws of the State of Delaware applicable to Contracts executed and to be wholly performed within such State and without regard to its choice of law principles; (iii) may be amended or waived only by a writing signed by Sellers and the Guarantor; and (iv) shall be binding upon the Guarantor and its successors and permitted assigns, and shall inure to the benefit of Sellers and their respective successors and permitted assigns, *provided* that neither the Guarantor, on the one hand, nor Sellers, on the other hand, may assign this Guaranty, in whole or in part, without the prior written consent of the other.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of the date of the Agreement.

**GUARANTOR:**

**GLOBAL EQUITY CAPITAL, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

<u>Exhibit D</u>

Base Working Capital Statement

Scovill Fasteners Inc
Net Working Capital Adjustment Analysis/Calculation
amounts in thousands
EXHIBIT D TO ASSET PURCASE AGREEMENT

| | Opening Balance 4/10/2011 | DIP Period Week 1 4/17/2011 | Week 2 4/24/2011 | Week 3 5/1/2011 | Week 4 5/8/2011 | Week 5 5/15/2011 | Week 6 5/22/2011 | Week 7 5/29/2011 | Closing Balance Week 8 6/5/2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Accounts Receivable** | | | | | | | | | |
| Total AR | | | | | | | | | |
| Sales / TI Tong Accruals | | | | | | | | | |
| Sweps / Receipts / TI Tong | | | | | | | | | |
| Ending AR | 9,637 | | | | | | | | |
| **Product Inventory** | | | | | | | | | |
| Total Inventory | | | | | | | | | |
| Material Purchases | | | | | | | | | |
| Cash Conversion Costs | | | | | | | | | |
| Non-Cash Conv Costs | | | | | | | | | |
| Shipments | | | | | | | | | |
| Ending Inventory | 6,347 | | | | | | | | |
| **Transferred Prepaid/Deposits- Utilities/Other** | 925 | | | | | | | | |
| **Accounts Payable** | | | | | | | | | |
| UK A/P other than intercompany | | | | | | | | | |
| Hong Kong | | | | | | | | | |
| Opening (April 10, 2010) | | | | | | | | | |
| Plus Invoices | | | | | | | | | |
| Less Payments | | | | | | | | | |
| Ending | (2,064) | | | | | | | | |
| **Total TI Tong Unearned Royalty** | (1,375) | | | | | | | | |
| **Net Working Capital before Accrued Payroll** | 13,020 | | | | | | | | |
| **Less: Accrued Payroll Liabilities(1)** | (121) | | | | | | | | |
| **Net Working Capital, Net of Accrued Payroll** | 8,549 | | | | | | | | |

(1) Amount to be calculated as of the filing date and included in the schedule.

Note: Agreed Target $9,675,000

<u>Exhibit E</u>

Form of Bill of Sale

*EXHIBIT E TO ASSET PURCHASE AGREEMENT*

## BILL OF SALE

This Bill of Sale ("**Bill of Sale**") dated as of _____, 2011 by and among Global SFI Holdings, LLC, a Delaware limited liability company ("**Purchaser**"), and Scovill, Inc., a Delaware corporation, Scovill Fasteners Inc., a Delaware corporation, PCI Group, Inc., a Delaware corporation, Scomex, Inc., a Delaware corporation, and Rau Fastener Company, LLC, a Delaware limited liability company (together, "**Sellers**").

## PRELIMINARY STATEMENT

Pursuant to that certain Asset Purchase Agreement dated as of April __, 2011 (the "**Asset Purchase Agreement**") between Purchaser and Sellers, Sellers have agreed to sell, transfer and assign to Purchaser, and Purchaser has agreed to purchase and accept, the Acquired Assets, on the terms of, and subject to the conditions set forth in the Asset Purchase Agreement. Terms used but not defined herein shall have the meanings set forth in the Asset Purchase Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which Sellers acknowledge:

1.     <u>Transfer of Assets</u>.  Sellers hereby sell, transfer, assign, convey and deliver to Purchaser and Purchaser hereby purchases, acquires and accepts from Sellers all of Sellers' right, title and interest in and to the Acquired Assets, free and clear of all Liens, except as set forth on Schedule 5(g) to the Asset Purchase Agreement. Notwithstanding the foregoing or any provision of this Bill of Sale to the contrary, Sellers retain and do not transfer, and Purchaser does not purchase or acquire, any of the Excluded Assets.

2.     <u>Representations and Warranties; Conflict with Asset Purchase Agreement</u>. This Bill of Sale is subject to the representations, warranties, covenants and agreements contained in the Asset Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, diminish, enlarge on or modify any provision of, any of the obligations, agreements, covenants or representations and warranties of Sellers or Purchaser contained in the Asset Purchase Agreement (all of which survive the execution and delivery of this Bill of Sale as provided, and subject to the limitations set forth, in the Asset Purchase Agreement). If any conflict or inconsistency exists between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

3.     <u>Assignment</u>. This Bill of Sale shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Bill of Sale shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a party to this Bill of Sale.

4.     <u>Governing Law</u>. This Bill of Sale shall be construed, performed and enforced in accordance with the laws of the State of Georgia without regard to the principles of the conflicts of laws thereof.

5.    Severability.    Whenever possible, each provision of this Bill of Sale shall be interpreted in such manner as to be effective and valid, but if any provision of this Bill of Sale is held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not render invalid or unenforceable any other provision of this Bill of Sale.

6.    Further Assurances.    The parties shall from time to time after the date hereof at the request of the other, and without further consideration, execute and deliver to the other such additional instruments of assignment or assumption and other related documents in addition to this Bill of Sale as the parties shall reasonably request to evidence more fully the assignment to Purchaser of the Acquired Assets.

7.    Counterparts.    This Bill of Sale may be executed in two or more counterparts, all of which shall constitute one and the same instrument.

8.    Facsimile Signatures.    This Bill of Sale and any other document or agreement executed in connection herewith may be executed by delivery of a facsimile copy of an executed signature page with the same force and effect as the delivery of an originally executed signature page.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, Purchaser and Sellers have caused this Bill of Sale to be duly executed as of and on the date first above written.

**PURCHASER:**

GLOBAL SFI HOLDINGS, LLC

By: _____
Name:
Title:

**SELLERS:**

SCOVILL, INC.

By: _____
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

SCOVILL FASTENERS INC.

By: _____
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

PCI GROUP, INC.

By: _____
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

SCOMEX, INC.

By: _____
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

(Signatures continue on the following page)

*Signature Page 1 of 2 to Bill of Sale*

RAU FASTENER COMPANY, LLC

By:  Scovill Fasteners, Inc.

    By: _____
    Name:  Stewart Q. Little
    Title: President and Chief Executive Officer

<u>Exhibit F</u>

Form of Deed

*EXHIBIT F TO ASSET PURCHASE AGREEMENT*

**UPON RECORDING RETURN TO:**

Alston & Bird LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Attn: W. Hunter Holliday

**STATE OF GEORGIA**

**COUNTY OF HABERSHAM**

## QUIT CLAIM DEED

    **THIS INDENTURE,** made as of _____, 2011, between **SCOVILL FASTENERS INC.** (herein called "Grantor"), and **GLOBAL SFI HOLDINGS, LLC** (herein called "Grantee").

    **WITNESSETH,** Grantor for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, cash in hand paid, the receipt of which is hereby acknowledged, has bargained, sold, and does by these presents bargain, sell, remise, release, convey and forever quit-claim to Grantee all the right, title, interest, claim or demand which Grantor has or may have had in and to all that tract of land described on Exhibit A, attached hereto and made a part hereof.

    Together with all the rights, members and appurtenances to the said described premises in anywise appertaining or belonging.

    **TO HAVE AND TO HOLD** the said described premises unto Grantee, so that neither Grantor nor any other person or persons claiming under Grantor shall at any time,

claim or demand any right, title or interest to the aforesaid described premises or its appurtenances.

(The words "Grantor" and "Grantee" include all genders, plural and singular, and their respective heirs, successors and assigns where the context permits.)

[Quit Claim Deed Continues on Next Page]

**IN WITNESS WHEREOF,** Grantor has signed and sealed this quit-claim deed, the day and year above written.

Signed, sealed and delivered in the presence of:

_____          By:_____[SEAL]
Unofficial Witness                                     Name:_____


_____
Notary Public

              (NOTARY SEAL)

My Commission Expires:

_____

<u>Exhibit G</u>

Form of Assignment and Assumption Agreement

*EXHIBIT G TO ASSET PURCHASE AGREEMENT*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "**Agreement**") dated _____, 2011 (the "**Effective Date**"), is entered into by and among Global SFI Holdings, LLC, a Delaware limited liability company ("**Purchaser**"), and Scovill, Inc., a Delaware corporation, Scovill Fasteners Inc., a Delaware corporation, PCI Group, Inc., a Delaware corporation, Scomex, Inc., a Delaware corporation, and Rau Fastener Company, LLC, a Delaware limited liability company (together, "**Sellers**").

WHEREAS, Purchaser and Sellers are parties to that certain Asset Purchase Agreement dated as of April ___, 2011 (the "**Asset Purchase Agreement**"), pursuant to which Purchaser has purchased substantially all of the assets of Sellers that are primarily used in the Business; and

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have agreed to assign certain assets, rights and agreements to Purchaser, and Purchaser has agreed to assume certain obligations of Sellers.

NOW, THEREFORE, for the good and valuable consideration set forth in the Asset Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, Sellers and Purchaser hereby agree as follows:

1.      All capitalized terms used in this Agreement and not defined herein shall have the respective meanings ascribed to them in the Asset Purchase Agreement.

2.      Effective as of the Closing Date, Sellers hereby assign, sell, transfer and set over (collectively, the "**Assignment**") to Purchaser all of their right, title, benefit, privileges and interest in and to, and all of their burdens, obligations and liabilities in connection with, each of the Assumed Liabilities. Purchaser hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities of Sellers to be observed, performed, paid or discharged from and after the Closing Date, in connection with the Assumed Liabilities. Purchaser assumes no Excluded Liabilities, and the parties hereto agree that all such Excluded Liabilities shall remain the sole responsibility of Sellers.

3.      Sellers hereby constitute Purchaser, its successors and assigns, the true and lawful attorneys of Sellers, with full power of substitution in the name, place and stead of Sellers or otherwise, for the benefit of and at the expense of Purchaser, its successors and assigns, to enforce the terms of each Assumed Liability, and from time to time to institute and prosecute, in the name of Sellers or otherwise, any and all proceedings at law, in equity or otherwise, which Purchaser, its successors and assigns, may deem necessary or proper in order to assert or enforce any claim or right arising out of any Assumed Liability, and to defend and compromise any and all actions, suits or proceedings in respect of any Assumed Liability, and to do any and all acts and things in relation to any Assumed Liability that Purchaser, its successors and assigns, shall deem

necessary and proper, Sellers hereby declare that the foregoing powers are coupled with an interest and are and shall be irrevocable and perpetual and shall not be terminated by any act of Sellers, their dissolution, or in any other manner or for any reason whatsoever, provided that Purchaser shall reimburse Sellers for all direct damages arising out of or resulting from the Purchaser's improper exercise of the appointment set forth in this paragraph.

4.      Sellers and Purchaser acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

5.      Each of the parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Agreement.

6.      The provisions of this Agreement shall be binding upon Sellers and Purchaser and their respective successors and assigns.

7.      This Agreement and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement shall be governed by and construed in accordance with the laws of the State of Gerogia applicable to contracts made and performed in such state without giving effect to the choice of law principles of such state that would require or permit the application of the Laws of another jurisdiction, and also in accordance with U.S. federal law to the extent applicable.

8.      This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

9.      This Agreement and any other document or agreement executed in connection herewith may be executed by delivery of a facsimile copy of an executed signature page with the same force and effect as the delivery of an originally executed signature page.

10.     No amendment of any provision of this Assumption Agreement shall be valid unless the same shall be in writing and signed by the parties.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Seller and Purchaser have caused this Assignment and Assumption Agreement to be duly executed as of and on the date first above written.

**PURCHASER:**

GLOBAL SFI HOLDINGS, LLC

By: _____
Name:
Title:

**SELLERS:**

SCOVILL, INC.

By: _____
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

SCOVILL FASTENERS INC.

By: _____
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

PCI GROUP, INC.

By: _____
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

SCOMEX, INC.

By: _____
Name:  Stewart Q. Little
Title:  President and Chief Executive Officer

(Signatures continue on the following page)

*Signature Page 1 of 2 to Assumption Agreement*

RAU FASTENER COMPANY, LLC

By:  Scovill Fasteners, Inc.

    By:  _____
    Name:  Stewart Q. Little
    Title: President and Chief Executive Officer