## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SCOVILL FASTENERS INC., | ) | Case No. 11-21650 |
| SCOVILL, INC., | ) | Case No. 11-21652 |
| PCI GROUP, INC., | ) | Case No. 11-21655 |
| RAU FASTENER COMPANY, L.L.C., | ) | Case No. 11-21654 |
| SCOMEX, INC., | ) | Case No. 11-21653 |
| | ) | |
| Debtors.[1] | ) | Joint Administration Pending |
| | ) | |

## DECLARATION OF STEWART LITTLE IN SUPPORT OF
## FIRST DAY MOTIONS AND APPLICATIONS

I, Stewart Little, declare and state as follows:

### I.    GENERAL BACKGROUND

1.    I am the President and Chief Executive Officer of Scovill Fasteners Inc.

("**Scovill**"), Scovill, Inc. ("**Parent**"), Scomex, Inc. ("**Scomex**"), PCI Group., Inc. ("**PCI**")

and Rau Fastener Company, L.L.C. ("**Rau**") (collectively, the "**Debtors**"), all Delaware

corporations or limited liability companies.  I have been employed by the Debtors since

2006 and I am familiar with the day-to-day operations, businesses, and financial affairs of

the Debtors.

---

[1]    A Motion for Joint Administration has been filed in these cases.  The last four digits of the tax
identification number for each of the Debtors follow in parenthesis: (i) Scovill Fasteners, Inc. (9561);
(ii) Scovill, Inc. (3634); (iii) PCI Group, Inc. (7672) and Rau Fastener Company, L.L.C. (0883).  Scomex,
Inc. does not have a taxpayer identification number.  The mailing address of the Debtors is 1802 Scovill
Drive, Clarkesville, GA 30523-6348.

2.      I submit this Declaration in support of the Debtors' petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), and the Debtors' First Day Pleadings (as defined below).  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Upon commencement of these Chapter 11 cases (the "**Bankruptcy Cases**"), the Debtors will continue to operate as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these Bankruptcy Cases, and in support of the First Day Pleadings.

5.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, review of relevant documents or opinion based upon my experience and knowledge of the Debtors' business operations and financial condition.  If I were called upon to testify, I could and would testify to each of the facts set forth herein.

## II.      OVERVIEW OF THE DEBTORS' BUSINESSES

**<u>Scovill's History and Formation of Core Brands</u>**

6.      Scovill is an industry leader in the production of high quality snap fasteners and tack buttons throughout the Western and Eastern Hemisphere.  Scovill's origins reach back at least to 1802, when a small button making business began in Waterbury, Connecticut.

7.     Over the last 200 years, Scovill has continued to grow and expand. Its core brand of products include world-recognized branded products such as Gripper®, Duramark™, and Dot®.  The Gripper® product line was introduced in 1937 and created a closure method that continues to be widely used in childrenswear.  With the increased popularity of denim in the 1950's, Scovill introduced Duramark™ snap fasteners, tack buttons, rivets and burrs for everyday fashion use.  This product line quickly became the choice of many of the world's top jeans manufacturers and brands. In 1991, Scovill acquired the Dot® brand which is the fastener of choice for the transportation market and includes a variety of engineered industrial fasteners.

**Scovill's Business Operations**

8.     Scovill's business is generally organized into three divisions: (1) Apparel, (2) Specialty Products and (3) Scovill Brands and Contract Finishing.   Apparel manufacturing for various fashion labels represents the majority of sold products but, through its diverse range of products, Scovill also serves the packaging, military and medical industries.

9.     Apparel - The Apparel division manufactures a number of products, most manufactured in the United States and others through a network of manufacturing partners.  This division is responsible for the manufacture of the Gripper®, Dot® and Duramark™ product lines.  Products from the Duramark™ brand are used primarily for denim jeans, jackets and casual twill pants.  Duramark™ also includes Whispersnap™, Maxi-Snap™, and Mighty-Snap™ snap fasteners used in light to heavy-duty fashion wear such as windbreakers and ski jackets.

- 3 -

10.     The Apparel division is a driven by "nominations" from fashion labels in the United States and throughout Europe.  A nomination is the right to manufacture a specific design for that customer.  Each season, Scovill receives new designs from various fashion labels and quickly creates a sample in order to secure a nomination while the trend is still in vogue.  This nomination lasts as long as the garment is being manufactured.

11.     The majority of secured nominations are manufactured in Scovill's Clarkesville, Georgia facility, and the remaining production is completed through licensee and subcontracting agreements with low cost manufacturers, typically in Asia.

12.     Scovill's customers attach Scovill's products to their garments by use of attaching machines owned by Scovill.  Scovill's customers lease over 2,000 attaching machines from Scovill.  Scovill and its subsidiaries maintain seven (7) service support staff in the Western Hemisphere and the same number in the Eastern Hemisphere to maintain and repair these attaching machines.

13.     <u>Specialty Products</u> – In contrast to the broad range of products manufactured in the Apparel division, the Specialty Products division focuses on industrial products made for the medical and military industries.  The DOT® brand includes products sold to the marine, automotive, military, healthcare, sporting goods, and lighting markets, such as heavy-duty snap fasteners, directional fasteners, eyelets, grommets, washers and specialty metal stampings.  This product line also extends to highly specialized goods used in technical sectors such as medical EKG monitoring pads and National Aeronautics and Space Administration (NASA) space suits.

- 4 -

14. The Specialty Products division manufactures nearly all of its products in the United States and engages in more direct sales than the Apparel division.

15. <u>Scovill Brands and Contract Finishing</u> - The Scovill Brands and Contract Finishing division produces made-to-order, non-core items, such as customized surface finishes. Scovill offers its customers metal plating using an assortment of metal alloys consisting of brass, copper, steel, stainless steel and aluminum. The Clarkesville facility has a fully equipped laboratory capable of customizing the surface finish to a customer's exact specifications during the plating process. Additionally, this division sources products including sew-on buttons, studs, nail heads, and zippers from strategic vendors.

**The Clarkesville Facility**

16. As stated above, many of Scovill's products are manufactured in the United States at its 300,000 square foot factory in Clarkesville, Georgia. Clarkesville is also its corporate headquarters location. The majority of Scovill's approximately 222 employees work at the Clarkesville facility, either in the manufacturing or corporate facility. Scovill employs 17 sales, product and technical support employees that work outside of Clarkesville and five independent contractors based in South America.

**Events Leading to Chapter 11 Filing**

17. Scovill is currently suffering a liquidity crisis attributable to losses suffered after the closing of a China facility in 2009. In 2004, a wholly owned indirect subsidiary of Scovill opened a factory in Shenzhen, China. The factory was initially fitted to manufacture the Duramark$^{TM}$ brand. From the onset, a number of adverse

- 5 -

regulatory and operational hurdles plagued the overseas facility. The price of copper rose dramatically but because of restrictions in Scovill's copper contract it was not able to sell its copper scrap at market rate. When Scovill attempted to find an alternative copper buyer its export license was revoked by Chinese customs officials as punishment.

18.    Because of the growth of childrenswear in Asia, the factory had been retooled shortly after opening to also manufacture the Gripper® product line. The export fine delayed production of Gripper® products for six weeks. The loss of its export license eventually cost Scovill $7 million as it was forced to pay the costs of manufacturing Gripper® products in Clarkesville and then shipping the finished products to China to satisfy customer orders.

19.    Compounding this problem, the primary raw material vendor to this facility, Poongsan Corporation ("**Poongsan**"), brought suit against this indirect subsidiary to recover its account receivable. Poongsan was able to enforce a lien against the China factory and the Chinese government subsequently seized control of the factory in 2009. By the time of this seizure Scovill had invested approximately $30 million to open and outfit the factory and fund losses.

**Scovill's Restructuring**

20.    In 2008, because of the operational issues in China, Scovill began to refocus on the capabilities of the Clarkesville facility. This focus continued after the closing of the China facility and the increased efficiency and production capacity in Clarkesville has significantly reduced Scovill's selling, general and administrative expenses.    Scovill's overhead costs were cut considerably by diminishing its

manufacturing presence in Asia and establishing a network of licensees and subcontractors to distribute Scovill products in that area.

21.    Ti Tong Products Ltd. ("**Ti Tong**") is party to Scovill's key license agreement under which Gripper® products are manufactured throughout Asia. Under the agreement, Ti Tong has exclusive manufacturing, marketing, distribution and sales rights for Gripper® products in Mainland China, Hong Kong, Vietnam, Indonesia, Cambodia, Thailand, Singapore, Malaysia, Philippines and South Korea. Scovill retained non-exclusive rights in India, Pakistan, Bangladesh and Sri Lanka. In the non-exclusive territory, Scovill has marketing, distribution, and selling rights, but still relies on Ti Tong for production, customer service, and invoicing services. Scovill has the right to subcontract the production of Gripper® products to other manufacturers in the non-exclusive territory should it wish to do so.

22.    By licensing and subcontracting the productions of its goods, Scovill can concentrate on its core functions of earning nominations and generating sales. Thus, despite sharp increases in the cost of a key commodity for Scovill's products, Scovill's earnings before interest, taxes, depreciation and amortization (EBITDA) went from a *negative* $11.13 million in 2008 to a *positive* $2.49 million in 2010.

23.    Because of the high and immediate cash flow required to keep production at pace, which is typical in the industry, Scovill's management decided that a sale of Scovill's assets is necessary to complete its restructuring, as discussed more below.

**The Debtors' Structure**

24.    Attached as Exhibit A is a chart of the Debtors' current corporate structure.  Parent is the holding company for Scovill and has no employees.  Its only asset is the stock of Scovill.  Parent is owned by GSCP Recovery Inc. ("**Recovery Inc**."), GSC Recovery II, L.P. ("**Recovery II**"), and GCS Recovery IIA, L.P. ("**Recovery IIA**") (Recovery Inc., Recovery II and Recovery IIA are sometimes collectively referred to as "**Recovery**").

25.    The other debtors (Rau, PCI, and Scomex) are subsidiaries of Scovill. Scovill is the sole stockholder of PCI and Scomex, and is the sole member of Rau.

- Rau has no current operations or employees.  Its only asset is the stock of Scovill Canada, Inc. – which has no current operations, assets or employees.

- Scomex has no current operations or employees.  Its only asset is the stock of Scovill Fastener, S.A. de C.V. – which has no current operations, assets or employees.

- PCI has no current operations, assets or employees.

26.    Scovill has other wholly-owned, non-debtor, foreign subsidiaries, three of which - Scovill Fastener (HK) Ltd. ("**Scovill HK**"), Scovill Fasteners (UK) Ltd., and Scovill Fasteners India Pvt. Ltd. - are to be sold to the Stalking Horse Bidder (defined below) pursuant to the APA (defined below).[2]  The APA is subject to higher and better bids.

---

[2] The Stalking Horse Bidder can elect to purchase the assets and assume the liabilities of Scovill HK.

**The Debtors' Prepetition Credit Structure**

27.    While Scovill is currently the only operating entity of the Debtors, the other Debtors are parties to several loan documents.  Scovill is party to that certain Credit Agreement (the "**Prepetition Credit Agreement**"), dated as of February 2, 2004, as amended, by and between Scovill, as Borrower,[3] and General Electric Capital Corporation ("**GECC**"), for itself as Lender and as Agent for the Lenders.  Parent, PCI, Rau and Scomex are each Guarantors under the Prepetition Credit Agreement.  Pursuant to this agreement, the Lenders agreed to make Revolving Credit Advances and make Term Loan A, Term Loan B and Term Loan C.

28.    As of the Petition Date, Scovill was indebted to the Lenders in respect of (i) the Revolving Credit Advances in the approximate principal amount of $13,399,685.87 and approximately $258,440.74 in accrued interest and fees; (ii) the Term Loan B in the principal amount of $10,000,000 and approximately $575,342.47 in accrued interest and fees; (iii) the Term Loan C in the principal amount of $2,075,000 and approximately $39,040.70 in accrued interest and fees; (iv) interest accruing thereon and (v) other costs, fees, expenses, and charges now or hereafter payable thereunder.

29.    The Prepetition Credit Agreement is secured by all, or substantially all, of the assets of Parent, Scovill, PCI, Rau and Scomex.

30.    On December 30, 2010, the parties to the Prepetition Credit Agreement entered into a "Forbearance Agreement" under which the Lenders agreed that the Debtors

---

[3] Capitalized terms used in this section and not otherwise defined have the meanings given in the Prepetition Credit Agreement.

are not obligated to pay interest or principal until a transaction for the sale of their assets is completed.

**Senior Subordinated Notes**

31.     Scovill is a party to that certain Third Amended and Restated Loan and Security Agreement (the "**Tranche B Credit Facility**"), dated as of February 2, 2004, as amended, by and among Scovill, Rau, Scomex, PCI, the Banks[4] and Recovery, Inc., as administrative agent.  Pursuant to the Tranche B Credit Facility, the Banks agreed to continue to extend certain financing to Scovill in the form of Bridge Loans.  The Banks are no longer obligated to provide additional Bridge Loans to Scovill.

32.     As of the Petition Date, Scovill was indebted to the Banks in the approximate amount of $158,855,000 pursuant to the Tranche B Credit Facility.

33.     The Tranche B Credit Facility is secured by all, or substantially all, of the assets of Scovill, Rau, Scomex and PCI.

34.     All of the indebtedness and obligations of Scovill, Rau, Scomex and PCI arising under the Tranche B Credit Facility are subordinated to all obligations under the Prepetition Credit Agreement pursuant to that certain Subordination Agreement, dated as of February 2, 2004, as amended, by and among Recovery and Agent for the Lenders.

35.     Scovill is a party to that certain Term Loan Agreement dated December 23, 2005 (the "**Recovery Term Loan**") by and among Scovill, Rau, PCI and Scomex, as borrowers. and Recovery, as the lenders.

---

[4] Capitalized terms used in this section and not otherwise defined have the meanings given in the Tranche B Credit Facility.

36.    As of the Petition Date, Scovill was indebted to Recovery in the approximate amount of $48,929,000 pursuant to the Recovery Term Loan.

37.    All of the indebtedness and obligations of Scovill, Rau, Scomex and PCI arising under the Recovery Term Loan are subordinated to all obligations under the Prepetition Credit Agreement pursuant to that certain Subordination Agreement, dated as of December 23, 2005, as the same may have been amended, by and among Recovery and Agent for the Prepetition Lenders.

**Pre-Petition Sales Efforts**

38.    In September 2010, Scovill retained Carl Marks Advisory Group, LLC ("**CMAG**") to provide financial advisory services to assist Scovill with exploration of a prospective sale or merger of the Debtors' businesses. A confidential information memorandum was prepared that contained information about the Debtors' operations and financial results.  Since December 7, 2010, this memorandum was provided to forty-nine (49) potential purchasers and produced nine (9) indications of interest.  From that group, Scovill selected five (5) prospective purchasers to participate in management meetings during the weeks of February 7 and 14, 2011.   Following these meetings with management, CMAG and Scovill negotiated with  two (2) leading bidders.

39.    After further negotiations with the two (2) leading bidders, Scovill, with the advice of CMAG, determined that the highest and best offer for the businesses was from Global SFI Holdings, LLC (the "**Stalking Horse Bidder**").  On March 18, 2011 Scovill and the Stalking Horse Bidder signed a letter of intent.  On April 15, 2011, the

Debtors signed an Asset Purchase Agreement (the "**APA**") which is subject to higher or better offers.

### III.    SUPPORT OF FIRST DAY PLEADINGS

40.    On April 19, 2011, the Debtors filed with this Court their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

41.    In connection with the Bankruptcy Cases, the Debtors have filed the following motions and applications (collectively, the "**First Day Pleadings**"):[5]

a.    Debtors' Emergency Motion for Order (I) Scheduling a Hearing on First Day Motions on an Emergency Basis and (II) Modifying Applicable Notice Requirements (the "**Emergency Hearing Motion**");

b.    Debtors' Emergency Motion for Notice Procedures (the "**Notice Procedures Motion**");

c.    Debtors' Emergency Motion for Order Directing Joint Administration of Related Chapter 11 Cases (the "**Joint Administration Motion**")

d.    Debtor's Emergency Motion for an Order Authorizing the Continued Use of Existing (A) Cash Management System and Bank Accounts and (B) Business Forms (the "**Cash Management Motion**");

c.    Debtor's Emergency Motion for an Order (A) Authorizing Debtor to (I) Pay Certain Prepetition Employee Wages and Salaries, Reimbursable Expenses and Withholdings; (II) Maintain its Employee-Related Insurance Programs, and Honor any Prepetition Obligations in Respect Thereof; and (III) Continue Workers' Compensation Programs; (B) Authorizing and Directing Banks to Honor all Checks and Electronic Payment Requests Made by Debtor Related to the Foregoing and (C) Modifying the Automatic Stay to Permit Claims Under the Workers Compensation Program (the "**Employee Motion**")

d.    Debtor's Emergency Motion for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Deeming Utility

---

[5] Because Scovill is the only operating entity, the relief requested in certain of the First Day Pleadings is specific to Scovill only.

Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "**Utility Motion**"):

e.  Debtors' Emergency Application for an Order Appointing BMC Group, Inc. as Claims and Noticing Agent (the "**BMC Application**"); and

f.  Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, Grant Security Interests And Accord Priority Status Pursuant to 11 U.S.C. §§ 361, 364 (c) and 364(d) and (II) Giving Notice of Final Hearing Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and (III) Modifying Automatic Stay (the "**DIP Motion**").

42.    As a result of my first-hand experience, review of various materials and information, discussions with the Debtors' executives, and discussions with the Debtors' advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Pleadings, (b) the need for the Debtors to continue to operate effectively, and (c) the likely consequences facing the Debtors if the requested relief is not granted.

43.    I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct.  In connection with the First Day Pleadings, I declare as follows:

**EMERGENCY HEARING MOTION**

44.    Through the Emergency Hearing Motion, the Debtors seek to establish an emergency hearing on the First Day Pleadings and establish notice procedures for these pleadings and the proposed sale of the Debtors' assets.  I believe that such relief is necessary as the requests for relief made therein are necessary to (i) retain employees

during a critical period; (ii) approve terms and procedures for an expedited sale of the Debtors' assets; (iii) obtain funding for the Debtors' bankruptcy cases and (iv) allow the Debtors to continue and implement procedures that will enable them to operate efficiently during the Bankruptcy Cases.  Further, I believe that the proposed notice provisions in the Emergency Hearing Motion will adequately put the Debtors' parties in interest on notice of the various requests for relief.

## NOTICE PROCEDURES MOTION

45.    Through the Notice Procedures Motion, the Debtors seek to establish certain notice, case management and administrative procedures, all subject to further order of the Court, including: (a) limiting the notice procedures in these Bankruptcy Cases; (b) designating the parties upon whom notice must be served and how such service must be made; and (c) allowing electronic service of documents.

46.    I believe that by regulating the service, notice and filing requirements at the outset of the Bankruptcy Cases, the Court will minimize confusion regarding important procedural matters.  Further, I believe these proposed procedures will ease the Court's administration of the Bankruptcy Cases and reduce the economic burdens on the Debtors' estates.

## CASH MANAGEMENT MOTION

47.    Through the Cash Management Motion, Scovill seeks to maintain its prepetition cash management system, bank accounts and business forms to reduce the disruption to its business, in lieu of closing its prepetition bank accounts and ordering new business forms as required by the United States Trustee.

- 14 -

48.     Scovill's business requires the collection, payment, and transfer of funds through numerous bank accounts (the "**Bank Accounts**"), which are detailed on the chart attached to the Cash Management Motion as Exhibit A.  There are currently no known bank accounts held in the name of Parent, Rau, Scomex or PCI.

49.     Scovill has five primary corporate bank accounts, as follows.  Four of the Bank Accounts are maintained at Regions Bank: an accounts payable account (the "**Accounts Payable Account**"), a payroll account (the "**Payroll Account**"), a general operating account (the "**General Operating Account**"), and an employee health benefits account (the "**Benefits Alternative Account**").  A "lockbox" account (the "**General Lockbox Account**") is maintained at Bank of America, N.A. ("**Bank of America**") and all funds transferred into that account are "swept" to GECC, as explained more fully below.

50.     Advances under the revolving credit facility are deposited directly by GECC into the General Operating Account.  The General Operating Account is utilized primarily for outgoing wire transfers, including money transferred to fund foreign operations, to fund the Accounts Payable Account, and to fund the weekly, bi-weekly and monthly payrolls, including employee benefit plan obligations.

51.     Each day Regions Bank transfers funds from the General Operating Account sufficient to pay the amount of checks presented that morning to the Accounts Payable Account and the Benefits Alternative Account.  Both the Accounts Payable Account and Benefits Alternative Account are "zero balance" accounts, meaning that funds are transferred into these accounts only to cover pending debits.

52.    The Operating Account is also used to transfer money to Paycom ("**Paycom**"), an outside company that handles Scovill's payroll.  Funds sufficient to meet payroll are transferred from the General Operating Account to Paycom two days prior to each scheduled payroll date.

53.    The Payroll Account is used to fund payroll in the event funds are needed to pay employees between scheduled payroll periods.  For example, if an employee does not receive a scheduled payment from the Paycom system or a payroll check has been miscalculated, Scovill will pay the employee with a check written on the Payroll Account.  The Payroll Account is funded from money transferred from the General Operating Account and funds are transferred to this account on only when needed.

54.    Transfers are also made from the General Operating Account to fund an operating account (the "**Hong Kong Operating Account**") held with Bank of America (account #2047) and based in Hong Kong, the location of one of Scovill's subsidiaries, that is used for funds relating to Scovill's obligations in Hong Kong.  The Hong Kong Operating Account is also used to fund an operating account (account # 2039) held with Bank of America and based in Hong Kong that is used to fund local currency obligations needed for operations in that area.

55.    All domestic checks and wire transfers from customers and other parties to Scovill are directed to the General Lockbox Account and deposited on the day received or on the next business day. Depending on the float schedule, cleared funds are swept daily from the General Lockbox Account and forwarded to GECC as repayment of the revolving credit facility.

56.     In addition to the General Lockbox Account, Scovill maintains foreign lockbox accounts to which checks and wire transfers from foreign customers and other parties to Scovill are directed.  Scovill maintains a lockbox account (account #2021) with Bank of America that is based in Asia.  All wires and checks coming in from Asia are directed to that account and then later transferred to the General Lockbox Account to be swept to GECC.  Scovill also holds an account with Bank of America (account #0013) based in London that is used as an operating account and lockbox account.  Funds from that account are used for operations in London and excess amounts are transferred to the General Lockbox Account and then swept to GECC.

57.     Scovill also maintains a number of inactive banks accounts previously used for various business purposes.  This includes (i) an account with Bank of America (account #7131) formerly used for healthcare insurance payments, (ii) a cash deposit account (account #5704) with Bank of America that was formerly used to handle funds relating to the revolving credit facility and (iii) an accounts (accounts #7015) held with Bank of America and based in India that is not actively used by Scovill but required to remain open under applicable foreign law.  Scovill anticipates that most of its inactive bank accounts will be closed in connection with consummation of a sale of its assets.

58.     Because the monetary expense and administrative burden that would be imposed if Scovill was required to close all of its old accounts and open new accounts, requiring Scovill to do so immediately following the Petition Date and on an emergency basis would not be in the best interests of its estate.  Virtually all of Scovill's funds are held in the General Operating Account and Scovill will have to seek approval prior to

making any expenditure not included in the DIP Budget.  Closing Scovill's Bank Accounts and opening debtor in possession accounts would only distract Scovill's key employees at a time when the marketing and sale of Scovill's business requires their full attention.

59.     For these same reasons, Scovill also requests a waiver of the requirement that it replace its current checks and business forms with checks and business forms that will refer to Scovill as "Debtor in Possession."  Most vendors doing business with Scovill undoubtedly will be aware, as a result of the unique nature of Scovill's business and the close-knit nature of the industry, of Scovill's status as a Chapter 11 debtor in possession. Even if Scovill ordered new checks and forms at this time, the delay in receiving these documents would cause further disruption to Scovill's business operation.

60.     I believe that maintenance of the Bank Accounts and business forms is essential to a smooth and orderly transition into Chapter 11 and to a successful sale.  In contrast, requiring Scovill to open numerous new accounts and create new business forms would inevitably lead to confusion and delays.  By avoiding the operational and administrative paralysis that closing the accounts and opening new ones would necessarily entail, all parties-in-interest, including Scovill's employees and customers, will be best served, and Scovill's estate will benefit considerably.

**DIP MOTION**

61.     The Debtors and their professionals have considered several methods of obtaining DIP financing on the best terms possible and have concluded, based upon their discussions with potential lenders and their familiarity with the financing market in

general and in this industry, among other things, that they would be unable to obtain unsecured credit allowable solely as an administrative expense under Section 364(b) of the Bankruptcy Code or solely on the basis of a super-priority or a junior lien under Section 364(c)(1) that would be sufficient to continue its operations at current levels.  I believe that any potential DIP lender will require first priority liens on some or all of the Debtors' assets.

62.     The Debtors intend to finance the expedited sale of their estates through a $22,772167.31 postpetition financing facility (the "**DIP Credit Facility**") offered by the Lenders (the "**DIP Lenders**").   The reasons supporting the Debtors' need to incur postpetition financing are compelling.  The Debtors' prepetition credit structure provides that there is little to no unencumbered cash for the Debtors to fund a postpetition sale, especially considering the extra expenses incurred during a Chapter 11 case.  In addition, the Debtors simply cannot generate cash fast enough to cover expenses as they arise. Consequently, postpetition financing will be necessary to fund the Debtors' cash needs during the pendency of the Chapter 11 case.

63.     The terms of the DIP Credit Facility are more specifically set forth in the DIP Credit Agreement.  The key provisions of the DIP Credit Facility are as follows:[6]

**A.  The Facility**

A senior secured, priming and super-priority revolving credit facility (the "**DIP Credit Facility**") of up to $20,772,167.31 between Scovill, as Borrower, and Parent, Scomex, PCI and Rau, as Guarantors (together with Scovill, the "**Credit Parties**") and

---

[6]  To the extent that the terms set forth herein differ from the terms in the proposed DIP Interim Order and the DIP Credit Agreement, the Interim Order and the DIP Credit Agreement shall govern.

General Electric Capital Corporation (the "**DIP Agent**"), for itself as DIP Lender and as Agent to the DIP Lenders.

**B.  Use of Proceeds**

(a) To pay (or cash collateralize) in full (i) the outstanding balance of the Prepetition Revolving Loan; (ii) the outstanding balance of the Prepetition Term Loan C; and (iii) any amounts owing under the Prepetition Loan Documents relating to the Prepetition Revolving Loan and/or the Prepetition Term Loan C that are contingent and unliquidated and subsequently become liquidated.  DIP Credit Agreement § 1.4(a).

(b) (i) to make adequate protection payments as required by the Interim Order and the Final Order; (ii) for working capital and to pay administrative expenses, including but not limited to claims allowed pursuant to Section 503(b)(9) of the Bankruptcy Code but solely to the extent set forth in the Budget,  for goods and services in the ordinary course of business (other than fees and expenses of professional persons), including payments, not exceeding $300,000 in the aggregate, to critical vendors and employees pursuant to First Day Orders and to the extent set forth in the Budget; (iii) pay amounts owing to the DIP Agent and DIP Lenders under the Agreement; and (iv) prior to an Event of Default, pay fees and expenses of professionals retained by the Borrower or Statutory Committee, to the extent set forth in the Budget and subject to such carve outs and other agreements as may be agreed to by the DIP Agent, to the extent such professional fees and expenses are approved by final order of the Bankruptcy Court.  DIP Credit Agreement § 1.4(b).

**C.  Interest Rates**

At Borrower's option, Revolving Credit Advances will bear interest at (i) the Index Rate plus the Applicable Revolver Interest Margin, or (ii) the LIBOR Rate plus the Applicable Revolver LIBOR Margin.  DIP Credit Agreement § 1.5(a).

Index Rate is a floating rate equal to the highest of (i) the rate publicly quoted from time to time by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks", and (ii) the federal funds rate plus 50 basis points per annum.  Applicable Revolver Interest Margin means 5.25% per annum.  DIP Credit Agreement; Definitions.

LIBOR Rate means for each LIBOR Period, a rate of interest per annum equal to the offered rate per annum for deposits of Dollars for the relevant interest period that appears on Reuters Screen LIBOR01 Page, as of 11:00 a.m. (London, England time) on the day which is two (2) Business Days prior to the first day of such interest period adjusted for reserve requirements.  Applicable Revolver LIBOR Margin is 8.00% per annum.  DIP Credit Agreement; Definitions.

Following an Event of Default the interest rates applicable to the Revolving Loan shall be increased by two percentage points (2%) per annum unless DIP Agent or Requisite DIP Lenders elect to impose a smaller increase.  DIP Credit Agreement § 1.5(d).

### D.  Maturity

Upon the Commitment Termination Date, which is the earliest of (a) one hundred and twenty (120) days after the Petition Date, (b) thirty-five (35) days after entry of the Interim Order if the Final Order is not entered prior to the expiration of such 35-day period (or such longer period as may be agreed upon by the DIP Agent in its sole discretion), (c) the closing of a sale of all or substantially all of the Borrower's assets, (d) the effective date of a plan of reorganization or liquidation in any of the Chapter 11 Cases, and (e) the occurrence of any Termination Event.  DIP Credit Agreement § 1.1(a) and Definitions.

Termination Event – Borrower's (a) failure to deliver 13-week cash flow budget, (b) failure to conduct weekly update progress call on strategic alternatives, (c) failure to file a motion which provides for the sale of all or substantially all of its assets within two (2) days of the Petition Date, which motion shall be acceptable to Agent in its sole and absolute discretion, (d) failure to obtain an order approving bidding procedures relating to the sale of all or substantially all of the assets of the Borrowers within twenty-five (25) days of the Petition Date, which order shall be acceptable to Agent in its sole and absolute discretion, (e) failure to obtain an order confirming such sale by June 12, 2011, which order shall be acceptable to Agent in its sole and absolute discretion, or (f) failure to consummate such sale by July 1, 2011.

### E.  Events of Default

In addition to customary events of default (non-payment, failure to perform certain covenants, breach of representations or warranties, and the like) and the events described in clauses (c) – (h) of the immediately preceding paragraph, the following are Events of Default specific to these Chapter 11 cases as set forth in Section 8.1 of the DIP Credit Agreement:

- Any action taken by a Credit Party: to obtain additional financing not otherwise permitted by the DIP Credit Agreement; to grant any Lien other than Permitted Encumbrances; except as provided in the Interim or Final Order, to use cash collateral of DIP Agent without prior written consent; or any other action or actions adverse to DIP Agent and DIP Lenders;

- The filing of any plan of reorganization or disclosure statement, or any amendment to such plan or disclosure statement, to which the DIP Agent and the Requisite DIP Lenders do not consent;

- The challenge by any Credit Party to the validity, extent, perfection, characterization or priority of any liens granted under or in connection with the Prepetition Credit Agreement;

- The entry of an order in any of the Chapter 11 Cases confirming a plan that does not contain a provision for termination and repayment in full in cash of all of the Obligations under the DIP Credit Agreement on or before the effective date of such plan;

- The entry of an order modifying the Loan Documents (herein referred to as the "**DIP Loan Documents**") or the Interim Order or the Final Order without the written consent of all DIP Lenders or the filing of a motion for reconsideration with respect to the Interim Order or the Final Order;

- The Final Order is not entered immediately following expiration of the Interim Order;

- The payment of, or application for authority to pay, any Prepetition claim without the DIP Agent's and Requisite DIP Lenders' prior written consent unless otherwise permitted under the DIP Credit Agreement;

- The allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against the DIP Agent, any DIP Lender or any of the Collateral (herein referred to as the "**DIP Collateral**") or against the Prepetition Agent, any Prepetition Lender or any Prepetition Collateral;

- The appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers; or the sale without the DIP Agent and DIP Lenders' consent, of all or substantially all of Borrower's assets that does not provide for payment in full in cash of the Obligations and termination of DIP Lenders' commitment to make Loans;

- The dismissal or the conversion of any Chapter 11 Case or the filing by any Credit Party of a motion or other pleading seeking the dismissal of any Chapter 11 Case;

- The entry of an order by the Court granting relief from or modifying the automatic stay to allow any creditor to execute upon or enforce a Lien on any DIP Collateral, in either case in excess of $100,000, or with respect to any Lien of or the granting of any Lien on any DIP Collateral to any state or local environmental or regulatory agency or authority, in each case with a value in excess of $100,000;

- The commencement of an action against the DIP Agent or any DIP Lender and, as to any action brought by any Person other than a Credit Party, the continuation thereof without dismissal for thirty (30) days after service, that asserts or seeks by or on behalf of a Borrower, the Environmental Protection Agency, any state environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, (a) a claim in excess of $500,000, (b) any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the DIP Agent or any DIP Lender under the DIP Loan Documents to any other claim, (c) would otherwise have a material adverse effect, or (d) have a material adverse effect on the rights and remedies of the DIP Agent or any DIP Lender under any DIP Loan Document or the collectability of all or any portion of the DIP Obligations;

- The filing of a claim or counterclaim related to Borrower, Guarantors or DIP Collateral against the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders by any Credit Party;

- The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under the DIP Credit Agreement or the other DIP Loan Documents;

- The failure of Borrower to perform any of its obligations under the Interim Order or Final Order;

- The marshalling of any DIP Collateral;

- The consolidating or combining of Credit Parties with any other Person except pursuant to a confirmed plan of reorganization or liquidation with the prior written consent of the Requisite DIP Lenders;

- The termination or modification of exclusivity as to the proposal of any reorganization or liquidation plan; or

- The entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to DIP Agent, on behalf of itself and DIP Lenders;

- Borrower fails to:
  - within two (2) days of the Petition Date, file a motion, acceptable to Agent in its sole and absolute discretion, providing for the sale of substantially all of the Credit Parties' assets;

- within twenty-five (25) days of the Petition Date, obtain an order, acceptable to Agent in its sole and absolute discretion, approving bidding procedures relating to the sale of substantially all of the Credit Parties' assets;

- by June 12, 2011, obtain an order, acceptable to Agent in its sole and absolute discretion, confirming such sale; or

- by July 1, 2011, consummate such sale.

### F.  Liens Granted

In and on any and all of the assets of the Debtors or their estates.

### G.  Borrowing Limits

The Revolving Loan Maximum Amount (initially $22,500,000, but subject to adjustment).  The aggregate principal amount of Revolving Loans outstanding at any time shall not exceed for any week, the principal amount of the Revolving Loans projected to be outstanding during such week as set forth in the Budget for such week.  The Revolving Loan Borrowing Availability may be reduced by Reserves imposed by the DIP Agent in its reasonable credit judgment.  DIP Credit Agreement, § 1.1(a) and Definitions.

### H.  Borrowing Conditions

In addition to customary conditions precedent, the following conditions precedent are specific to these Chapter 11 cases:

- Entry of the Interim Order no later than five (5) days after the Petition Date and such Interim Order shall not have been reversed, modified, amended or stayed.

- Credit Parties shall have established the Cash Management System described in Annex C to the DIP Credit Agreement and Credit Parties shall have obtained appropriate court orders approving such system.

- The first day orders described on Disclosure Schedule 2.1 in form and substance satisfactory to the DIP Agent shall have been entered in the Chapter 11 Cases (the Interim Order shall be acceptable to the DIP Agent and DIP Lenders in their sole discretion).

- DIP Agent shall have received, in form and substance satisfactory to the DIP Agent, the Budget.

- No pleading or application seeking to amend or modify the provisions of the DIP Credit Agreement and the credit facility provided thereunder on the terms set forth therein shall have been filed in the Bankruptcy Court by the Borrower that has not been withdrawn, dismissed or denied within fifteen (15) days after filing of such pleading or application.

- Entry of the Final Order no later than thirty-five (35) days after the Petition Date (and before the expiration of the Interim Order) and such Final Order shall not have been reversed, modified, amended or stayed.

DIP Credit Agreement § 2.

## I.  Priority Status Provided

An allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**") for all DIP Obligations: (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 cases, at any time existing or arising, of any kind or nature whatsoever; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claim shall be subject to the Carve Out.

An allowed superpriority claim (the "**Prepetition Lender Superpriority Claim**") for the Debtors' use of Cash Collateral, the use, sale or lease of any other Prepetition Collateral, market value decline of the collateral and the priming of the Prepetition Liens.  The Prepetition Lender Superpriority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever; *provided*, *however*, that the Prepetition Lender Superpriority Claim shall be junior to the DIP Superpriority Claim and to the Carve Out.

## J.  Adequate Protection Provided

Liens in and on any and all of the assets of the Debtors or their estates to the extent of any diminution in the value of Prepetition Lenders' interests in Prepetition Collateral (including Cash Collateral).  Interim Order § 11.

## K.  Determination of Validity, Enforcement, Priority or Amount of Claims

Debtors stipulate that the (a) Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and perfected; (b) as of the Petition Date, the Prepetition Liens had priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Credit Documents (to

the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "**Permitted Prior Liens**"); (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Obligations exist, and no portion of the Prepetition Liens or the Prepetition Obligations is subject to any challenge or defense, including, without limitation, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no offsets, defenses, claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the Prepetition Agent or the Prepetition Lenders arising out of, based upon or related to the Prepetition Credit Documents; (f) as of the Petition Date, the value of the Prepetition Collateral securing the Revolver/Term C Obligations exceeded the amount of those obligations, and accordingly the Revolver/Term C Obligations are allowed secured claims within the meaning of Section 506 of the Bankruptcy Code; and (g) the Debtors have released any right they may have to challenge any of the Prepetition Obligations and the security for these obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Prepetition Agent or Prepetition Lenders.  Interim Order; Findings of Fact Paragraph C(v).

Nothing in this Interim Order or the DIP Loan Documents shall prejudice the rights of a Statutory Committee, a successor trustee and any other party in interest with requisite standing other than the Debtors, to seek to object to or to challenge the findings, Debtors' Stipulations, or any other stipulations herein, including, but not limited to those in relation to: (a) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of the Prepetition Agent with respect to the Prepetition Collateral; or (b) the validity, characterization, allowability, priority, fully-secured status, or amount of the Prepetition Obligations.  A party, including the Statutory Committee, if appointed, must commence an adversary proceeding or contested matter, as required by the applicable Bankruptcy Rules, to challenge, including, without limitation, any claim against the Prepetition Agent or the Prepetition Lenders in the nature of a setoff, counterclaim or defense to the Prepetition Obligations, or must file a motion seeking standing within the earlier of (i) with respect to the Statutory Committee, sixty (60) calendar days from the selection of counsel to the Statutory Committee, and (ii) with respect to other parties in interest with requisite standing other than the Debtors or the Statutory Committee, seventy-five (75) calendar days following the date of entry of the Interim Order (the "**Challenge Period**").  The applicable Challenge Period may only be extended with the written consent of the Prepetition Agent and the Prepetition Lenders, as applicable, or by order of the Court.  Interim Order; Paragraph 29.

**L.  Waiver of Automatic Stay**

The automatic stay is vacated and modified to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order. Interim Order; Paragraph 16.

**M.  Waiver of Right to Request Authority to Obtain Credit**

Unless permitted by the DIP Credit Agreement, requesting authority to obtain credit is an Event of Default.  DIP Credit Agreement § 8.1(m).

**N.  Deadlines Imposed**

See Maturity and Events of Default, above.

**O.  Waivers Relating to Perfection or Enforcement of Liens**

See Determination of Validity, Enforcement, Priority or Amount of Claims, above.

**P.  Release of Claims**

Effective upon the entry of the Final Order, the Debtors release DIP Agent and DIP Lenders from any claims.  DIP Credit Agreement § 1.21.

**Q.  Indemnification**

The Debtors indemnify DIP Agent and DIP Lenders from any claims asserted against them arising out of or relating to the transactions contemplated by the Credit Agreement and any Environmental Liabilities.  Credit Agreement § 1.13.

**R.  Release of Rights under Section 506 of the Bankruptcy Code**

No costs of administration shall be charged against the DIP Lenders or DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code without their prior written consent.  Interim Order; Paragraph 31.

**S.  Liens on Certain Causes of Action**

The liens granted in favor of the DIP Lenders on any claim or cause of action under Chapter 5 of the Bankruptcy Code shall be effective upon entry of the Final Order. Interim Order; Paragraph 5.

64.     The Debtors believe that the DIP Credit Facility will provide it with

sufficient liquidity to sell their assets and maximize  value for all creditors.  In contrast,

without the DIP Credit Facility, the Debtors will have little available cash and will, effectively, be unable to effectuate a quick conclusion to the Bankruptcy Cases, be unable to maximize the value of the Debtors' assets, and the commencement of the Bankruptcy Cases will have adverse effects on the Debtors' businesses.

65.    I recommend the approval of the DIP Credit Facility because the Debtors are in a precarious financial position.  The Debtors are unable to find other financing and converting the Bankruptcy Cases to Chapter 7 would result in a loss of significant value.

**EMPLOYEE MOTION**

66.    Through the Employee Motion Scovill is seeking the Court's permission to take certain actions with respect to unpaid prepetition employee obligations, payroll tax obligations and insurance obligations.  Scovill also seeks to continue certain employment procedures and programs that will ensure Scovill's workforce will remain available to preserve Scovill's value as a going concern.

67.    Nonpayment of employee compensation and benefits and the inability to create some level of normality in the postpetition workplace could severely undermine morale. Thus, if Scovill is not able to advise employees during the crucial first days of its case whether they will receive full pay or if prepetition employee programs will be maintained, employees' concerns about their treatment going forward may lead to rapid attribution.

68.     In fact, if the Employee Motion is not granted, the disruption to usual operations caused by the loss of employees would have other significant costs, including (i) out-of-pocket and intangible costs to recruit and train new employees; (ii)

the loss of the proposed asset purchase from the Stalking Horse Bidder and potential higher and greater offers from other bidders and (iii) further strain on Scovill's relationships with its customers and vendors.

**Employee Obligations**

*Wages and Salaries*

69.     Scovill employees, except for foreign employees, are generally paid according to one of three payroll schedules: (1) weekly payroll, which includes 145 employees and averages $90,000, (2) bi-weekly payroll, which includes 28 employees and averages $125,000 or (3) monthly payroll, which includes 44 employees and averages $325,000.  Some salaries and wages are paid by direct deposit, and some are paid by check.

70.     At the Clarkesville facility, five of Scovill's employees are temporary workers that are sourced from Staffing Services, an agency that provides temporary staffing services.  The number of temporary employees used by Scovill varies from time to time.  Temporary workers are paid by the hour and receive their payroll weekly, at the same time payroll funds are transferred to a third party vendor, Paycom ("**Paycom**"), through an invoice paid to Staffing Services.

71.     For all domestic and permanent employees, Scovill utilizes the services of Paycom, to provide payroll oversight and management services.  Specifically, Paycom receives a wire transfer for the necessary payroll amounts from Scovill's operating account two days before Scovill's payroll obligations are due, and either pays an employee by direct deposit (for those employees that have set up direct deposit

arrangements) or pays the employee by issuing a check drawn on Paycom's bank accounts.

72.    Scovill owes its employees salaries and wages for work performed prepetition, but the amount owed to any particular employee will vary based on compensation levels and the applicable pay period (weekly, bi-weekly or monthly). Employees are generally paid by Paycom according to the following schedule.

| Pay Period | Scheduled Payroll Date |
| --- | --- |
| Weekly | Each Thursday; temporary employees are paid two days prior |
| Bi-Weekly | Every other Thursday |
| Monthly | The 26th or last business day of each month; foreign employees are paid two days prior |

73.    Foreign employees or independent contractors are paid monthly and receive a direct wire transfer from Scovill's operating account at the same time Scovill transfers funds to Paycom for domestic employees paid monthly.  All employees were last paid on or before April 18, 2011.  Scovill estimates that it owes employees approximately $71,000 in accrued unpaid wages.

74.    *Payments to Eighteen Retirees* - Scovill's monthly payroll includes payments made to eighteen (18) retired employees.  The monthly payments to each retiree range between $8-1500 and total approximately $2,900 monthly.  These amounts are relatively nominal for Scovill, but are important for the recipients, many of whom are 80-90 years old.  Additionally, the stalking horse bidder is willing to continue making these monthly payments provided each retiree signs a release of claims in form and

substance reasonably acceptable to the Debtors and the stalking horse bidder. Accordingly, Scovill seeks authority to continue making these monthly payments, including any amounts accrued prepetition but not paid.

### *Withholdings*

75.     Included in the accrued but unpaid prepetition payroll amounts described above are funds withheld by Scovill for the benefit of third parties, including amounts relating to employee taxes, insurance premium contributions, supplemental insurance policy premiums, 401(k) contributions, child support and other garnishments, and other withholdings as required by federal, state, and local laws.[7]   Paycom directly deducts and remits withholdings from Scovill employee paychecks to third parties, primarily withholdings that are common to many companies such as federal tax, state tax and social security withholdings.  For withholdings specific to Scovill's employees, such as health and life insurance employee contributions, Scovill directly deducts these amounts from payroll funds and transfers them directly to the applicable third parties.   Scovill or Paycom transfers withheld funds to the appropriate recipient within two days of the funds being withheld, or as soon thereafter as is practicable.

76.     Garnishments - As required by various garnishment orders served on it, Scovill garnishes specific amounts from certain employees' wages earned during each payroll cycle and transfers them to the creditor of the employee.  Ordinarily, Paycom, on behalf of Scovill, transfers such garnished wages within two days of a payroll date.

---

[7] No funds are withheld by Scovill with respect to the wire transfers made to foreign employees.

77.    401(k) Plan - Scovill sponsors a tax-qualified retirement savings plan pursuant to Section 401(k) of the Internal Revenue Code (the "**401(k) Plan**").   The 401(k) Plan is managed by Fidelity Management Trust Company.  Scovill matches $0.50 for each dollar invested for the first 3% of an employee's contributions to the plan. Scovill's average monthly match contribution is approximately $6,740.  Scovill's average 401(k) contribution for the weekly payroll is approximately $1,976, $1,425 for the bi-weekly payroll and $11,114 for the monthly payroll.

78.    Scovill believes that some funds withheld, including garnishments and 401(k) contributions, from prepetition employee wages and salaries paid before the Petition Date may not have been transferred to the appropriate agency or recipient as of the Petition Date.  Funds will also need to be withheld from wages and salaries that were accrued but unpaid as of the Petition Date, if the Court grants Scovill authority to pay those amounts.

79.    Accordingly, Scovill seeks authority to pay (directly or through Paycom) all wages and salaries that accrued prepetition but had not been paid prepetition.  Scovill also seeks authority, directly or through Paycom, to release withholdings, including garnishments, that were not processed as of the Petition Date to the appropriate recipient and to deduct and release withholdings for any accrued prepetition wages and salaries authorized for payment pursuant to this Motion.

*Reimbursements*

80.    Healthcare Reimbursements - Scovill maintains a benefit alternative account (the "**HRA**") for payment of certain healthcare costs that would be subject to the

- 32 -

employee deductible covered by the health plan.  The employee submits claims to an administrator and eligible expenses are paid to the provider directly from the HRA. Unused amounts in the HRA are not rolled over to the next calendar year. Reimbursement requests are processed daily and paid out each Tuesday.

81.    Expense Reimbursements - Scovill reimburses certain employees for various expenses for goods incurred or services procured by them in connection with Scovill's business, such as business travel expenses or out-of-pocket costs for supplies. These costs and expenses are ordinarily reimbursed during the month after they are incurred and have been submitted for reimbursement.  In addition, there may be expenses incurred by employees prepetition that were not submitted before the Petition Date. Scovill requests authority to continue its healthcare and expense reimbursement policies and to honor prepetition reimbursement requests that were not processed as of the Petition Date.

### *Employee Leave*

82.    Scovill has several programs under which employees can take time off with pay (the "**Leave Policies**"), described below.    Scovill seeks authority, but not direction, to honor and continue the Leave Policies, including authority to permit employees to use paid leave earned prior to the Petition Date and to pay severed employees for earned leave that is customarily paid upon termination.

83.    Vacation - In accordance with Scovill's general administrative procedures, employees accrue vacation time based on the following levels of seniority.  Vacation is

earned according to a "benefit year" which begins as soon as the employee starts to earn vacation time.

| Length of Service | Amount of Paid Vacation Time |
|---|---|
| Three (3) months – one (1) year | One (1) week |
| One (1) – ten (10) years | Two (2) weeks |
| Ten (10) – Fifteen (15) years | Three (3) weeks |
| Fifteen (15) years or more | Four (4) weeks |

84.    Employees generally forfeit any unused vacation time at the end of their benefit year.  Scovill customarily pays severed employees upon termination for any accrued but unused vacation time.  Vacation time off is paid at an employee's base rate and does not include overtime or any special forms of compensation.

85.    Personal Leave - After three (3) months of employment all full-time employees are entitled to 64 hours of personal leave paid at the employee's base rate. Personal leave is calculated based on the calendar year.  Employees do not accumulate personal leave and are not compensated for unused personal leave upon termination.

86.    Accordingly, Scovill seeks authority, but not direction, to honor any prepetition obligations to employees under the Leave Policies and to honor and continue these policies.

**Insurance Obligations**

87.    Scovill provides medical, dental, disability and sickness benefits to its full-time employees (together, the "**Medical Benefits**").    Approximately 180 Scovill

- 34 -

employees receive Medical Benefits.[8]   Full-time employees also have the option of purchasing supplemental insurance, including life, accident, and disability insurance (the "**Supplemental Insurance**").

88.     The Medical Benefits are partially funded by deductions from the employees' wages and the Supplemental Insurance is fully funded by deductions from the employees' wages.   Scovill utilizes Coventry Health and Life Insurance for its employee medical and dental coverage, Superior Vision Services for its employee vision coverage, Mutual of Omaha for disability coverage, and American Heritage, Unum/Provident and United Health Care for the Supplemental Insurance coverage.

89.     Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (as amended, "**COBRA**"), Scovill is obligated to offer terminated employees that are eligible for COBRA participation the opportunity to continue insurance coverage under Scovill's existing insurance plans.   Although participating former employees pay the full premium amounts associated with such coverage, these premiums are adjusted annually at the beginning of the plan year, which for Scovill, including some claims that accrued prepetition but that have not yet been paid, may exceed the premiums paid by the participants.   Through the COBRA coverage, there is currently one (1) former employee receiving Medical Benefits through Scovill, and six (6) former employees are currently eligible to elect COBRA coverage.

90.     Scovill estimates that there are approximately $176,921 in premiums associated with the Medical Benefits and Supplemental Insurance that accrued prior to

---

[8] All full-time employees are eligible for Medical Benefits but some employees have opted for coverage under their spouse's healthcare program.

the Petition Date but that remain unpaid.  Scovill seeks authority, but not direction, to continue the Medical Benefits and Supplemental Insurance (the "**Insurance Programs**"), including the payment of premiums that accrued prior to the Petition Date.

**Workers' Compensation Programs**

91.    Applicable state law requires that Scovill maintain workers' compensation policies and programs to provide their employees with workers' compensation benefits for claims arising from or related to their employment with Scovill.  Scovill maintains its current workers' compensation coverage through a fully insured, third-party insurance program (the "**Workers' Compensation Insurance**") provided by The Hartford Insurance Company ("**Hartford**").

92.    The Workers' Compensation Insurance covers all of Scovill's employees. Under the Workers' Compensation Insurance Scovill pays an annual premium of $118,440 (the "**Estimated Premium**"), which is paid in monthly installments and is subject to a "true-up" (discussed below), regardless of the number of claims filed.

93.    At the conclusion of each policy year, Hartford performs an audit of the premium based on (i) an average of the initial base employee count provided at the commencement of the policy period and the actual number of employees for each subsequent quarter and (ii) the actual annual payroll for the policy period.  If the number of Scovill's quarterly employees exceeds those used to calculate the Estimated Premium, Scovill is required to pay an additional premium to Hartford.

94.    Scovill estimates that there are approximately $49,350 in premiums associated with the Workers' Compensation Insurance policy that accrued but were not

paid prior to the Petition Date.  Scovill is seeking the Court's authorization to pay, in its discretion, the prepetition amounts due and the Estimated Premium, in monthly installments, or any true-up, as they come due.

95.     I believe that if the relief requested in the Employee Motion is not granted, the disruption to usual operations that would be caused by the likely attrition of employees would have other significant costs – including the out-of-pocket and intangible costs to recruit and train new employees – and would strain Scovill's relationships with customers and vendors, with whom the employees are often the primary point of contact.  Without its existing workforce Scovill would face substantial risk of being unable to meet its obligations to the detriment of Scovill's ability to maximize its value through a sale.

## UTILITY MOTION

96.     Through the Utility Motion, Scovill requests that the Court prohibit Scovill's utility providers from disconnecting service to Scovill and allow Scovill to deposit funds into an escrow account as adequate assurance of Scovill's future payment for utility services.

97.     Scovill's business is centered around its manufacturing facility, which depends on the constant and reliable provision of utility services including natural gas, electricity, sewer, sanitation and other services (the "**Utility Services**") in order to continue operations.  Should companies providing utility services ("**Utility Providers**") refuse or discontinue service, even for a brief period of time, Scovill's business operations would be severely disrupted.

98.     Prior to the Petition Date, Scovill paid approximately $123,186 per month to the Utility Providers on account of Utility Services.  Scovill intends to pay postpetition obligations owed to the Utility Providers in a timely manner.  Moreover, Scovill expects that borrowings under its proposed postpetition credit facility will be sufficient to pay such postpetition obligations.

99.     To provide adequate assurance of payment for future Utility Services, Scovill proposes to deposit a sum equal to fifty percent (50%) of Scovill's estimated monthly cost of Utility Services into an interest-bearing, newly created segregated account on or before thirty (30) days after the Petition Date.  If any Utility Provider believes additional adequate assurance is required, they may request such additional assurance pursuant to the procedures set forth in the Utility Motion.

100.    I believe that the Utility Deposit, in conjunction with Scovill's ability to pay for future utility services in the ordinary course of business (collectively, the "**Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers.  If a Utility Provider objects to the proposed Adequate Assurance, the Utility Motion provides adequate procedures for such Utility Providers to have their objection addressed.

## BMC APPLICATION

101.    Through the BMC Application the Debtors seek authority to retain BMC Group, Inc. ("**BMC**") as their noticing and claims agent based on the terms and conditions set forth in that certain services agreement dated April 1, 2011 (the "**Agreement**").

102.    I have reviewed and approved the Agreement filed with the BMC Application.  Given the nature of the Debtors' businesses and the number of creditors and parties in interest involved, the Debtors expect thousands of claims.  As a result of the Debtors' limited staffing and the cost benefit of having claims administration and notice matters handled by someone other than counsel, I and the Debtors' management believe it would be in the best interest of the estates to utilize the services of an experienced claims processor such as BMC.

103.    I and the Debtors' management consulted with the Debtors' legal and financial advisors and determined that based on the size, scope, and geography of the Bankruptcy Cases, BMC was the appropriate choice.  Additionally, after solicitation of bids from other claims and noticing agencies, the Debtors' advisors were also able to secure competitive pricing from BMC for these services.

104.    BMC was founded and is operated by experienced claims and noticing professionals and its employees have been involved in numerous large Chapter 11 cases, before this Court and throughout the country.  I and the Debtors' management believe, in our business judgment, that BMC has the necessary experience and expertise to render the necessary services in a professional and efficient manner in accordance with the Bankruptcy Rules and Local Bankruptcy Rules.  The Debtors believe that the proposed compensation to BMC is fair and reasonable.

## IV.      CONCLUSION

105.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

Dated: April 19, 2011
      Clarkesville, Georgia

By:    Stewart Little

Title:  President and Chief Executive
       Officer, Scovill Fasteners Inc.;

       President and Chief Executive
       Officer, Scovill, Inc.;

       President and Chief Executive
       Officer, Scomex, Inc.;

       President and Chief Executive
       Officer, PCI Group, Inc.;

       President and Chief Executive
       Officer, Rau Fastener Company,
       L.L.C..

# EXHIBIT A

## CORPORATE STRUCTURE CHART



Scovill Organizational Chart